IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| In re: | * | |
| ROMAN CATHOLIC ARCHBISHOP OF BALTIMORE, | * | |
| | * | |
| Debtor. | * | Case No. 23-16969-MMH (Chapter 11) |
| * * * * * * | * | |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, | * | |
| | * | |
| Plaintiff, | * | Adversary Proceeding No. 25-00084-MMH |
| v. | * | |
| ROMAN CATHOLIC ARCHBISHOP OF BALTIMORE, | * | |
| Defendant. | * | |

* * * * * * * * * * * * *

**NONPARTY WITNESS MARYLAND CATHOLIC CONFERENCE, LLC'S MOTION TO QUASH PLAINTIFF'S DEPOSITION NOTICE AND SUBPOENA**

Pursuant to Fed. R. Civ. P. 45(d)(3) and Bankr. Rule 9016(d)(3), nonparty witness Maryland Catholic Conference, LLC ("Conference") moves this Court for an order quashing Plaintiff The Official Committee of Unsecured Creditors' Notice of Subpoena Deuces Tecum and related Subpoena dated August 8, 2025 and served on the Conference on August 11, 2025 (collectively, "Deposition Notice").

## I. PRELIMINARY STATEMENT

In its April 1, 2025 Complaint for Declaratory Judgment ("Complaint") (ECF 1), Plaintiff The Official Committee of Unsecured Creditors ("Plaintiff") seeks a declaratory judgment that the defense of

charitable immunity is unavailable to the Archdiocese of Baltimore ("Debtor") in response to claims asserted against the Debtor under the Maryland Child Victims Act of 2023 codified at Md. Code Ann., Cts. & Jud. Proc. § 5-117 ("CVA"). The Deposition Notice seeks testimony or documents concerning the Conference's advocacy relating to the CVA, its communications with the Debtor (a separate religious body, whose Archbishop is a member of the Conference's Board of Governors), its finances, and its relationship with the Debtor and certain other Roman Catholic organizations. If enforced, the Deposition Notice would impose an undue burden on a nonparty to this litigation, for an irrelevant purpose, and in violation of multiple rights protected by the Federal and Maryland Constitution. For these reasons, this Court should quash the Deposition Notice in its entirety.

The Conference, a nonparty to this Adversary Proceeding, is the public policy voice for the Catholic Church in Maryland, including the Archdiocese of Baltimore (*i.e.,* the Debtor), the Archdiocese of Washington and the Diocese of Wilmington.

The Conference has, consistent with its First Amendment rights, offered testimony on the CVA. That testimony is part of the public record, available to the Plaintiff, and is appended to this motion for inclusion in the court record. The Conference's testimony was the product of internal deliberation among the staff of the Conference and with its constituents concerning the proposed legislation. And given the Catholic mission of the Conference, that deliberation was imbued with considerations of theology, morality, and religious faith.

The Deposition Notice does not, of course, merely seek the Conference's public statements. Instead, Plaintiff seeks to pry into the Conference's deliberative process, its communications with constituents, and even its contracting and financing. But that information has no connection to any theory in Plaintiff's Complaint. Plaintiff has identified *no authority* (and the Conference is aware of none) for the notion that the nonparty Conference could somehow "waive" the protections of the ancient common-law doctrine of

charitable as to the party Debtor. And Plaintiff has identified *no authority* establishing that the private deliberations of a nonparty are relevant to the interpretation of a publicly enacted law — again, because courts look only to the enacted text and legislative record when interpreting statutes. Thus, even if the Conference's public statements mentioned charitable immunity (they do not, because the subject was not addressed by the CVA), the Deposition Notice would seek irrelevant information.

In addition, although the topics themselves are irrelevant to the question whether Debtor may benefit from charitable immunity, complying with the Deposition Notice would require the expenditure of substantial time and resources, including in producing documents and preparing for a deposition. It must also be said that, to the extent the Deposition Notice actually does seek discoverable information concerning the Conference's relationship with, or communications with, the Debtor, Plaintiff can seek that information from the Debtor itself, without burdening a nonparty. As a threshold matter, therefore, the Deposition Notice seeks wholly irrelevant information, imposes an undue burden, and is improper under Fed. R. Civ. Proc. 45(d).

Moreover, and perhaps more importantly, even if the subpoenaed information were somehow relevant to Plaintiff's legal position (it is not), the Court should still quash the Deposition Notice because it violates multiple rights and protections afforded to the Conference under the U.S. Constitution, the Maryland Constitution, and the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb ("RFRA"). As explained below, because the information sought is not "crucial" to Plaintiff's theory of its case — indeed, it is not even relevant — Plaintiff has no hope of overcoming these important constitutional and statutory hurdles.[1]

[1] In response to the Deposition Notice, in addition to filing the instant motion, the Conference served timely objections pursuant to Fed. R. Civ. P. 45(d)(3) and Bankr. Rule 9016(d)(3). *See Exhibit 1*.

## II. BACKGROUND

### A. The Conference

Maryland includes more than one million Catholics who live, worship, educate, and serve their communities in the Archdiocese of Baltimore (*i.e.*, the Debtor), Archdiocese of Washington, and the Diocese of Wilmington. *See Exhibit 2*, Declaration of Jenny Kraska at ¶ 2. Maryland has more than 270 parishes, missions, and worship sites served by hundreds of priests, deacons, and religious officials. *Id.* The state is home to Catholic colleges and universities, seminaries, and schools that serve more than 47,000 students. *Id.*

The Conference, a nonparty to this Adversary Proceeding, is a Maryland limited liability company that serves as the public policy voice for the Catholic Church in Maryland. *Id.* at ¶ 3. The Conference has a Board of Governors comprised of Maryland's bishops who oversee the Conference and an administrative board composed primarily of lay leaders from across Maryland. *Id.* at ¶ 3. The Conference's staff of lay professionals performs important religious functions for the Church, including facilitating communication among the bishops, assisting in fulfilling the mission of the Church as it relates to matters of public policy, and coordinating pastoral initiatives. *Id.* at ¶ 3. The Conference makes possible cooperation and communication among the dioceses and ministries throughout Maryland. *Id.* at ¶ 4.

### B. The Conference's Deliberations and Statements Regarding the CVA

The Conference deliberates over theological, moral, and public policy issues facing Maryland, including with Catholic leaders in the State (such as the Archbishop of Baltimore). *Id.* at ¶ 5. Deciding how the Conference would respond to the CVA involved significant internal deliberation. *Id.* at ¶ 6. The deliberations included careful theological and moral analysis of how the Church should engage in legislative debates. *Id.* The deliberations culminated in the Conference's position opposing the retroactive

provisions of the legislation while supporting prospective reform. *Id.* The Conference has been vocal in supporting prospective legislation to address the issue of child sexual abuse, recognizing the importance of ensuring future victims have access to justice while maintaining constitutional safeguards. *Id.*

Consistent with its ecclesiastical and theological mission, during the legislative process surrounding the CVA, the Conference submitted testimony urging lawmakers to craft reforms that balance compassion for victims with equity and legal stability. *Id.* at ¶ 7. The Conference publicly voiced its opinions relating to expected legislation dealing with the statute of limitations. *Id.* at ¶ 8. For example, on December 19, 2022, the Conference issued a statement expressing its views concerning various aspects of legislation likely to be considered in Maryland. *Id.* at ¶ 8 and *Ex. A* thereto (12/19/22 Statement). Likewise, the Conference publicly voiced its opinions relating to the proposed CVA and proposed amendments thereto. *Id.* at ¶ 8. On February 23, 2023, the Conference issued a statement expressing an unfavorable opinion of Senate Bill 686. *Id.* at ¶ 8 and *Ex. B* thereto (2/23/23 Statement). Specifically, the Conference argued against eliminating the civil statute of limitations. *Id.* at ¶ 8. On March 26, 2025, the Conference issued a statement voicing its opinion of HB 1378 — advocating that deadlines for the filing of claims should equally apply to claims against both governmental and non-governmental entities, like religious organizations. *Id.* at ¶ 8 and *Ex. C* thereto (3/26/25 Statement). Likewise, the Conference made press statements concerning its views on the CVA. *Id.* at ¶ 8 and *Ex. D* thereto (Press Statements). *See also id.* at *Ex. E* thereto (collection of additional examples of statements issued by the Conference relating to the CVA). None of the those statements addressed the common-law doctrine of charitable immunity.

Indeed, charitable immunity was never addressed anywhere in the text of the CVA or in its legislative history — either in 2023 or 2025. Not only did no legislator or witness indicate that the CVA might abrogate the common-law doctrine of charitable immunity, no legislator or witness mentioned the

doctrine at all. That fact was recently confirmed by the Circuit Court for Montgomery County in *Schappelle v. Roman Catholic Archdiocese of Washington* (Case No. C-15-CV-23-003696) on July 21, 2025 in its Memorandum Decision and Order granting summary judgment for the Archdiocese of Washington on charitable immunity. *See Exhibit 3*, Memorandum Decision and Order. As that court put it, "[t]he CVA does not address charitable immunity in any way." *Id.* at 6. Indeed, "the Court finds that there is no support in the language or legislative history that [legislature] intended to abrogate the doctrine of charitable immunity." *Id.* at 3. The suggestion that the legislative discussion surrounding the CVA contemplated that charitable immunity would not apply "lacks support anywhere in the legislative record." *Id.*

Being compelled to produce information concerning any deliberations and communications concerning the Conference's religious, political, and moral views about the CVA would seriously chill such future deliberations and communications and Conference members' desire and willingness to speak freely and express deeply held moral and religious views concerning such matters. *Id.* at ¶ 9. If such things are subject to compelled disclosure (or the threat thereof) in the future, Conference members may naturally feel reluctant to express and share their theological and moral views on matters of importance to the Catholic Church. *Id.* Maintaining the privacy of the Conference's deliberations and communications is crucial to the openness, frankness, and effectiveness of decision-making about important theological and moral issues. *Id.*

### C. The Adversary Proceeding

According to Plaintiff's Complaint, "during the Meeting of Creditors, the Debtor's representative testified under oath that providing compensation to Survivors [of sexual abuse] falls within the Debtor's mission." ECF 1 at ¶ 17. The Complaint alleges that, pre- and post-petition, the Debtor has asserted the doctrine of charitable immunity as a complete defense to claims of sexual-abuse survivors. *Id.* at ¶¶ 22 and 23.

In each of the four Counts of its Complaint, Plaintiff posits four theories for why it believes charitable immunity is not available to the Debtor. For ease of reference, the Conference refers to these theories as the "Bankruptcy Waiver Theory" (Count I); the "Abrogation Theory" (Count II); the "Charitable Mission Theory" (Count III); and "Charitable Trust Theory" (Count IV):

- *Bankruptcy Waiver Theory (Count I*): Plaintiff asserts that the Debtor waived the defense of charitable immunity when it filed for bankruptcy. *Id.* at ¶¶ 29-43.

- *Abrogation Theory (Count II)*: Plaintiff asserts that the CVA abrogated the doctrine of charitable immunity. *Id.* at ¶¶ 44-54.

- *Charitable Mission Theory Count III)*: Plaintiff asserts that "charitable immunity is unavailable as a matter of Maryland state law with respect to any claim against any defendant whose charitable mission includes compensating victims of such claims." *Id.* at ¶ 56. According to that theory, the Debtor lost its charitable immunity because its charitable mission extends to and includes providing support "for Survivors who suffered sex abuse as a result of the actions of Debtor and its representatives." *Id.* at ¶ 57.

- *Charitable Trust Theory (Count IV)*: Plaintiff asserts that charitable immunity is unavailable "to any defendant that fails to establish its entitlement to the protections of a charitable trust, either as an organization or as to particular property not held subject to a charitable trust." *Id.* at 66. Plaintiff alleges that "[t]he Debtor is not a charitable trust" and "cannot establish its entitlement to the protections of a charitable trust." *Id.* at ¶¶ 67-68.

**D. The Deposition Notice[2]**

On August 11, 2025, undersigned counsel accepted service of the Deposition Notice. *See Exhibit 2*. When serving the subpoena, Plaintiff did not tender the witness fee. Nor was the September 4, 2025 deposition date cleared with undersigned counsel beforehand. September 4, 2025 was also the deadline for fact discovery in this Adversary Proceeding.[3] *See* ECF 22 and 23. Pursuant to the Deposition Notice, Plaintiff seeks to depose the Conference's organizational designee on the following six topics:

1. Your business relationship with the Archbishop of Baltimore.

[2] Attached as *Exhibit 4* is undersigned counsel's Certificate pursuant to Rule 7026-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Maryland.

[3] Undersigned counsel understands that Plaintiff and Debtor have agreed to extend fact discovery to October 3, 2025.

2. Any connection You have to the Archbishop of Baltimore, or any other Roman Catholic entity within the geographic territory of the Archdiocese of Baltimore.

3. The monetary amount You have received in payments from the Archbishop of Baltimore since 2020 to engage in any Services, and the nature of those Services.

4. The contractual basis for any monetary amounts You have received in payments from the Archbishop of Baltimore since 2020 to engage in any Services, and the nature of those Services

5. Your efforts to Lobby the Maryland legislature related to the Maryland CVA, including without limitation the 2025 Amendments.

6. Your discussions with the Archbishop of Baltimore, or any representative, officer, bishop, priest, vicar, or similar Agent of the Archbishop of Baltimore, regarding the Maryland CVA and any subsequent amendments thereto, including without limitation the 2025 Amendments.

Moreover, the Deposition Notice demands that the Conference produce the following documents:

1. All Documents related to Your efforts to Lobby the Maryland legislature related to the Maryland CVA and any subsequent amendments thereto including without limitation, the 2025 Amendments.

2. All correspondence with the Archbishop of Baltimore, or any representative, officer, bishop, priest, vicar, or similar Agent of the Archbishop of Baltimore, regarding Maryland CVA and any subsequent amendments thereto, including without limitation the 2025 Amendments.

## III. <u>CONTROLLING LEGAL PRINCIPLES</u>

Rule 45 provides that a court "must quash or modify" a subpoena that, among other things, "subjects a person to undue burden" or "requires disclosure of privileged or other protected matter." Whether a subpoena imposes an undue burden is a fact-specific analysis requiring the court to weigh the benefits and burdens of the subpoena and, in so doing, consider whether the information sought is necessary or available from other sources and whether compliance would impose significant costs or burdens on the nonparty. *See Maxtena, Inc. v. Marks*, 289 F.R.D. 427, 439 (D. Md. 2012) (quoting authority omitted). "On

the burden side, district courts should of course consider the dollars-and-cents costs associated with a large and demanding document production. But there are other cognizable burdens as well. For example, a subpoena may impose a burden by invading privacy or confidentiality interests." *Virginia Dept. of Corrections v. Jordan*, 921 F.3d 180, 189-90 (4th Cir. 2019).

Likewise, a nonparty should not be compelled to produce information where the subpoenaing party's theory for how the subpoenaed information might bolster its case is flawed or where the nonparty is unlikely to have information useful in the case. *Id.* at 190-91; *see also Solamere Capital v. DiManno*, 621 F. Supp. 3d 152, 161 (D. Ma. 2022) (granting nonparty's motion to quash because, *inter alia*, "the requested discovery is not highly or obviously relevant to the civil conspiracy and fraud claims.").

Importantly, "[a] more demanding variant of the proportionality analysis therefore applies when determining whether, under Rule 45, a subpoena issued against a nonparty 'subjects a person to undue burden' and must be quashed or modified. Fed. R. Civ. P. 45(d)(3)(A)(iv)." *Id.* at 189. "[C]ourts must give the recipient's nonparty status 'special weight,' leading to an even more 'demanding and sensitive' inquiry than the one governing discovery generally." *Id.* (quoting *In re Public Offering PLE Antitrust Litig.*, 427 F.3d 49, 53 (1st Cir. 2005)).

Moreover, as explained more fully below, these considerations become even more acute and sensitive — and the courts are therefore much more protective — when a subpoena would compel under threat of sanctions a religious organization to produce documents and testimony relating to its internal communications and deliberations about positions to adopt or advocacy in response to proposed legislation on matters of theological or moral importance to the organization.

## IV. ARGUMENTS

### A. This Court should quash the Deposition Notice because it does not seek relevant information and would impose an undue burden on the Conference.

As explained above, each of the four counts of Plaintiff's Complaint advances a separate theory for why Plaintiff believes charitable immunity is unavailable to the Debtor: the Bankruptcy Waiver Theory (Count I); the Abrogation Theory (Count II); the Charitable Mission Theory (Count III); and Charitable Trust Theory (Count IV).

But nowhere in the Complaint does Plaintiff articulate a "Lobbying Waiver" theory pursuant to which the Debtor allegedly lost its right to assert charitable immunity because the Conference lobbied against parts of the CVA. In this regard, the Complaint does not contend that the Debtor lost its charitable immunity as a consequence of the Conference exercising its rights to lobby against and voice its opposition to the CVA or aspects of it. Indeed, the subject of lobbying is not mentioned in the Complaint. Nor is the Conference mentioned anywhere in the Complaint. Based on the four corners of the Complaint, anything the Conference said or did in connection with the proposed legislation that ultimately became the CVA has nothing to do with any of the four theories that Plaintiff advances. Stated differently, the Conference's public statements about the CVA and any deliberations or non-public communications on the subject of the CVA do not make it more probable than not or less probable than not that the Debtor lost its ability to invoke charitable immunity. *See* Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").

Even if the Complaint did articulate a "Lobbying Waiver" theory (it did not), the subpoenaed information would still be irrelevant. Plaintiff has not identified — and the Conference is unaware of — any authority that stands for the proposition that anything the Conference said about the CVA could impair the rights of the Debtor to assert its common-law defense of charitable immunity. It is nonsensical to suggest that a lobbying organization's efforts to support or oppose a piece of legislation in which the organization's constituents may have an interest can cause a constituent to lose rights or protections afforded to the

constituent under established law. Indeed, the First Amendment (discussed more fully below) would be turned on its head if one were to lose substantive rights as a consequence of that person (or, as here, another party) exercising the right to petition the legislature to enact or not to enact a piece of legislation.

Importantly, to dispose of the instant motion, this Court need not adjudicate the merits of each theory set forth in Plaintiff's Complaint. Nevertheless, given the judgment in *Schappelle v. Roman Catholic Archdiocese of Washington* (Case No. C-15-CV-23-003696) (discussed above; *Exhibit 3*), the viability of Plaintiff's second, third, and fourth theories is highly doubtful, if not altogether legally incorrect. In its holding, the Circuit Court for Montgomery County determined that the CVA did not abrogate charitable immunity. Further, the court determined, as a matter of law and undisputed fact, that the predominant character of the Archdiocese is charitable and that the Archdiocese's assets are held in trust. Consequently, the circuit court rejected (expressly or implicitly) three of the four theories that Plaintiff has advanced in this Adversary Proceeding, *i.e.*, the Abrogation, Charitable Mission, and Charitable Trust Theories, each of which was briefed in that action. There is no good reason to believe the outcome for the Debtor here would be any different. The dubious nature of Plaintiff's legal theories of recovery in this Adversary Proceeding further demonstrates that the Deposition Notice seeks information of no relevance whatsoever. Parenthetically, for obvious reasons, *Schappelle* did not address the Bankruptcy Waiver Theory. But whether the filing of the bankruptcy case resulted in the Debtor waiving its charitable immunity defense, most obviously, has nothing to do with the Conference and any of its lobbying efforts.

What's more, the Deposition Notice's deposition topics and document requests do not even seek information relating to charitable immunity — the one and only subject of the Complaint. The doctrine is not mentioned at all. Consequently, the Conference's "business relationship with" (topic 1),"connection to"

(topic 2), or "payments" received from (topics 3 and 4) the Debtor have zero bearing on the question of whether the Debtor may invoke charitable immunity. The same is true of the Conference's lobbying efforts regarding the CVA (topic 5) and its discussions with the Debtor about the CVA (topic 6), as well as documents pertaining to those topics (document requests 1 and 2).

Because the information sought lacks any conceivable relevance to the relief requested and theories presented in the Complaint, this Court should quash the Deposition Notice pursuant to Rule 45(d). The information has no probative value and cannot possibly lead to the discovery of potentially relevant information. In such circumstances, forcing a nonparty to spend considerable resources and time having to produce documents, prepare for a 30(b)(6) deposition, and appear for a deposition on the matters delineated in the Deposition Notice is unduly burdensome. *See Exhibit 2* at ¶ 10. Indeed, it would be a complete waste of time and resources. Accordingly, the Court should grant this motion.

This Court can and should grant this motion without having to address the Conference's constitutional arguments and arguments pursuant to the RFRA presented in Part B, below. Indeed, this Court should apply the doctrine of constitutional avoidance and resolve this motion under Rule 45. *See Whole Woman's Health v. Smith*, 896 F.3d 362, 370 (5th Cir. 2018), *as revised* (July 17, 2018) (quoting *Ashwander v. Tennessee Valley Auth.,* 297 U.S. 288, 346-47 (1936) (Brandeis, J., concurring)); *Hersh v. U.S. ex rel. Mukasey*, 553 F.3d 743, 753-54 (5th Cir. 2008) (applying doctrine of constitutional avoidance to direct the quashing of a subpoena directed toward the Texas Conference of Catholic Bishops under Rule 45, rather than reach constitutional questions)). But if this Court has any doubt that the Deposition Notice should be quashed (there should be none), the arguments presented in Part B, below, should more than satisfy this Court that the Deposition Notice is improper.

**B. This Court should quash the Deposition Notice because it seeks constitutionally protected information.**

This Court should quash the Deposition Notice for the independent reason that it infringes on protections guaranteed to the Conference by the First Amendment of the United States Constitution, as well as by Articles 13, 36, and 40 of the Maryland Declaration of Rights.[4] Plaintiff seeks to depose a designee of the Conference about the Conference's efforts to lobby the Maryland legislature regarding the Maryland CVA and any subsequent amendments and the Conference's

---

[4] The Maryland Constitution contains analogues to the First Amendment in several articles of the Maryland Declaration of Rights. Article 13 protects the right to petition, providing "[t]hat every man hath a right to petition the Legislature for the redress of grievances in a peaceable and orderly manner." Article 36, addressing freedom of religion, provides:

> That as it is the duty of every man to worship God in such manner as he thinks most acceptable to Him, all persons are equally entitled to protection in their religious liberty; wherefore, no person ought by any law to be molested in his person or estate, on account of his religious persuasion, or profession, or for his religious practice, unless, under the color of religion, he shall disturb the good order, peace or safety of the State, or shall infringe the laws of morality, or injure others in their natural, civil or religious rights; nor ought any person to be compelled to frequent, or maintain, or contribute, unless on contract, to maintain, any place of worship, or any ministry; nor shall any person, otherwise competent, be deemed incompetent as a witness, or juror, on account of his religious belief, provided, he believes in the existence of God, and that under His dispensation such person will be held morally accountable for his acts, and be rewarded or punished therefor either in this world or in the world to come.
>
> Nothing shall prohibit or require the making reference to belief in, reliance upon, or invoking the aid of God or a Supreme Being in any governmental or public document, proceeding, activity, ceremony, school, institution, or place.
>
> Nothing in this article shall constitute an establishment of religion.

And Article 40, addressing freedom of speech, provides:

> "That the liberty of the press ought to be inviolably preserved; that every citizen of the State ought to be allowed to speak, write and publish his sentiments on all subjects, being responsible for the abuse of that privilege."

Maryland courts have interested Article 40 in *pari materia* with the First Amendment. *WBAL–TV Div., Hearst Corp. v. State*, 300 Md. 233, 243 n. 4 (1984); *Pack Shack, Inc. v. Howard County*, 377 Md. 55, 64–65 n. 3, 832 A.2d 170 (2003).

communications with the Archbishop of Baltimore, or his representatives, concerning this legislation. The Deposition Notice also requests all documents related to those lobbying efforts, as well as all correspondence with the Archbishop of Baltimore and his agents regarding the Maryland CVA and its amendments. These requests target documents containing private, internal religious deliberations on theological and moral issues among members of the Conference and between members of the Conference and the Archbishop. Compelling disclosure of these internal deliberations would burden and violate the Conference's constitutionally protected rights of assembly, religious association, and petition.

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." These First Amendment protections, including the rights of speech, assembly, religious association, and petition, "apply in the context of discovery orders." *Pulte Home Corp. v. Montgomery Cnty. Maryland*, No. GJH-14-3955, 2017 WL 1104670, at *3 (D. Md. Mar. 24, 2017) (citing *Grandbouche v. Clancy*, 825 F.2d 1463, 1466 (10th Cir. 1987)). Courts apply "a two-part framework for evaluating First Amendment privilege claims in the context of discovery," which requires first that "the party asserting the privilege … make a prima facie showing that the privilege applies," and, second, that "the party seeking disclosure … prove that the information sought is of crucial relevance to its case; that the information is actually needed to prove its claims; that the information is not available from an alternative source; and that the request is the least restrictive way to obtain the information." *Id.* at *4 (citing *Grandbouche*, 825 F.2d at 1466-67). The court "must then consider the substantiality of the First Amendment interests of the party asserting the privilege, *see Perry* [*v. Schwarzenegger*], 591 F.3d [1147,] 1161 [(9th

Cir. 2010)], and determine 'whether the privilege must be overborne by the need for the requested information.'" *Pulte Home*, 2017 WL 1104670, at *4 (quoting *Grandbouche*, 825 F.2d at 1466).[5]

In circumstances remarkably similar to those presented in the instant motion to quash, *Whole Woman's Health v. Smith*, 896 F.3d 362, 373 (5th Cir. 2018) (rev. July 17, 2018), addressed whether a subpoena compelling disclosure of internal documents from the Texas Conference of Catholic Bishops ("TCCB") — a nonparty religious organization akin to the Conference — could cause "free exercise and establishment clause problems" because the disclosure would interfere with the organization's "decision-making processes on a matter of intense doctrinal concern" and "induce similar ongoing intrusions against religious bodies' self-government." In *Whole Women's Health*, plaintiffs served a third-party subpoena on the TCCB, seeking documents regarding the TCCB's lobbying efforts in connection with a Texas law imposing certain requirements for disposal of fetal remains following abortion. *Id.* at 366. The TCCB moved to quash the subpoena and for a protective order, arguing, *inter alia*, that the subpoena violated the free exercise, freedom of speech, freedom of assembly, and freedom of petition guarantees of the First Amendment. *Id.*

Although the court avoided having to resolve the constitutional issues because it ultimately ruled that the district court's discovery order presented an undue burden under Fed. R. Civ. P. 45(d) (for reasons similar to those presented in Part IV.A., above), the court's discussion of the constitutional issues is highly instructive. The Fifth Circuit observed that, in light of the significant First Amendment concerns implicated in the discovery order, the disclosure of internal communications would "not only interfere[] with TCCB's decision-making processes on a matter

---

[5] Although "[s]ome courts have addressed the First Amendment interests only at the first part of the inquiry, and not as part of the balancing test," the United States District Court for the District of Maryland has considered the substantiality of the First Amendment interest balanced against each specific discovery request because "[o]therwise, the balancing conducted by the Court will be non-specific and will not account for an interest in protecting some types of information more than others." *Pulte Home*, 2017 WL 1104670, at *4 n.7.

of intense doctrinal concern but also expose[] those processes to an opponent and … induce similar ongoing intrusions against religious bodies' self-government." *Id.* at 373. The Fifth Circuit further emphasized that "courts' involvement in attempting to parse the internal communications and discern which are 'facts' and which are 'religious' seems tantamount to judicially creating an ecclesiastical test in violation of the Establishment Clause." *Id.*

Importantly, while emphasizing the rule of constitutional avoidance, and determining that the subpoena should be quashed under Rule 45(d), the court, evaluated the "'need' for and 'relevance' of this discovery" and the associated burden imposed on TCCB specifically taking into consideration the "burden on TCCB's constitutional right to advocate in the public square," as well as other "burdens TCCB has shown were created by this intrusive discovery request: relations with other parties in the faith impaired, internal modes of discussion upended, and participation by some Catholic cemeteries deterred." *Id.* at 375-76.

The same concerns of improperly burdening a religious institution's constitutional rights are directly implicated by Plaintiff's subpoena here. As explained below, the Conference has shown that the First Amendment privilege applies because the required production of the sought information would violate the Conference's First Amendment rights of assembly, petition, and religious association. In addition, Plaintiff cannot satisfy the second prong of the two-part framework, as the information sought is neither crucial to its claims nor necessary to prove them, and the request is not the least restrictive way to obtain any relevant information. The Conference's motion to quash should be granted.

### 1. Compelling Production of the Conference's Private Religious Deliberations Would Violate its Associational and Petition Rights

#### a. Compelling Production of the Conference's Private Religious Deliberations Would Chill the Conference's Rights of Association

The First Amendment protects both an individual's right to express ideas and the right to freely associate with others to advance shared beliefs and ideas. *Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson ("NAACP")*, 357 U.S. 449, 460 (1958). The freedom of association guards not only against direct government actions that restrict association, but also against actions that may have the effect of undermining the freedom to associate. *Id.* at 460-61.

In *NAACP*, the Supreme Court held that compelled disclosure of NAACP's membership lists would violate the freedom of association because it would have a chilling effect by "affect[ing] adversely the ability of [the NAACP] and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate." *Id.* at 462-63. Disclosure of these membership lists, which would publicly "reve[al] of the identity of [the NAACP's] rank-and-file members" could "induc[e] members to withdraw ... and dissuade others from joining." *Id.* at 462-63. Courts have recognized a First Amendment chilling effect in other contexts as well, such as when compelled disclosure would hinder recruitment of future personnel, *AFL-CIO v. Federal Election Comm'n*, 333 F.3d 168, 176 (D.C. Cir. 2003), or discourage individuals from expressing personal moral views if they knew their non-public communications could be subject to public disclosure. *See Perry*, 591 F.3d at 1163. The freedom of association protects against compelled disclosures that an association shows would in any way "make it more difficult for members of [the] association to foster their beliefs." *In re Motor Fuel Temperature Sales Pracs. Litig.*, 641 F.3d 470, 489 (10th Cir. 2011).

The Ninth Circuit's decision in *Perry* is particularly instructive. There, two same-sex couples sued California state officials, challenging the constitutionality of the state's marriage law, which had been enacted by ballot initiative. 591 F.3d at 1152. During discovery, the plaintiffs

sought internal communications from the proponents of the ballot initiative regarding campaign strategy and advertising. *Id.* at 1152. The trial court rejected a First Amendment challenge to the discovery request, but the Ninth Circuit held that the requested disclosures would violate the First Amendment privilege recognized in *NAACP*. *Id.* at 1159-65. The Court explained that "[i]mplicit in the right to associate with others to advance one's shared political beliefs is the right to exchange ideas and formulate strategy and messages, and to do so in private." *Id.* at 1162. As here, the proponents had made a "prima facie showing of arguable first amendment infringement" by submitting declarations stating that they would be less willing to engage in "communications that expressed … personal political and moral views" and would "drastically alter" future communications if they knew those private deliberations would later be subject to disclosure. *Id.* at 1163. The burden, therefore, "shift[ed] to the plaintiffs to demonstrate a sufficient need for the discovery to counterbalance th[e First Amendment] infringement." *Id.* at 1164.

Similarly, requiring disclosure here would chill the Conference's rights to "exchange ideas[,] formulate strategy and messages, and do so in private." *Id.* at 1163. The information sought includes documents and testimony relating to the Conference's internal communications and deliberations regarding advocacy positions to take in response to proposed legislation on matters of theological or moral importance to the Conference. Forcing disclosure of such internal deliberations would undermine the effectiveness of the Conference's decision-making process when determining how to express their faith-based positions on sensitive matters of public policy. *See Exhibit 2* at ¶ 9. Furthermore, although "[t]he right to freedom of association is a right enjoyed by religious and secular groups alike," the First Amendment affords "special solicitude to the rights of religious organizations." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565

U.S. 171, 189 (2012). Therefore, compelling such disclosure would have an impermissible chilling effect on the Conference's exercise of First Amendment associational rights. *See Exhibit 2* at ¶ 9.

**b. Compelling Production of the Conference's Private Religious Deliberations Would Also Chill Its Rights to Petition**

In addition to having a chilling effect on the Conference's associational rights, compelling disclosure of the materials identified in the Deposition Notice would have a chilling effect on the Conference's right to petition the government. The sought private communications, with the Conference or with the Archbishop of Baltimore, reflect the Conference's exercise of its right to petition — recognized as "one of 'the most precious of the liberties safeguarded by the Bill of Rights.'" *BE & K Const. Co. v. N.L.R.B.*, 536 U.S. 516, 524 (2002) (quoting *Mine Workers v. Illinois Bar Ass'n*., 389 U.S. 217, 222 (1967); *see also Richards Furniture Corp. v. Bd. of Cnty. Comm'rs of Anne Arundel Cnty.*, 233 Md. 249, 259 (1963) ("[T]he freedom of speech, press, assembly and petition were among the most cherished rights of the citizens of [the colonial period].").

The right to petition is also protected under Article 13 of the Maryland Constitution, which provides "[t]hat every man hath a right to petition the Legislature for the redress of grievances in a peaceable and orderly manner." The right to petition enables "citizens to express their ideas, hopes, and concerns to their government and their elected representatives." *Bernstein v. Sims*, 643 F. Supp. 3d 578, 585 (E.D.N.C. 2022). Lobbying activities fall within the scope of the First Amendment's protection of the right to petition the government. *Citizens United v. Federal Election Com'n*, 558 U.S. 310 (2010) (discussing the First Amendment's protection of the right of corporations to petition legislative bodies).

The Deposition Notice seeks information about the Conference's lobbying activities concerning the CVA, specifically targeting the Conference's constitutionally protected petitioning

activities. Forcing the Conference to appear in court and disclose details of its internal deliberations related to petitioning would discourage future advocacy and compromise the "breathing space essential to the[] fruitful exercise" of petition rights. *BE & K*, 536 U.S. at 531 (internal quotation omitted). The Deposition Notice's demand for disclosure of the Conference's lobbying strategies and activities intrudes on its right to petition and will likely deter the Conference from engaging in robust advocacy in the future. *See Exhibit 2* at ¶ 9. Compelling disclosure of the materials sought by Plaintiff would have a chilling effect on the Conference's constitutionally protected right to petition. *Id.*

**c. Plaintiff Cannot Meet its Burden to Overcome the Chilling Effect on Associational and Petition Rights**

Because the Conference has demonstrated that compelled disclosure would chill association and petition rights, the burden shifts to Plaintiff to show that disclosure serves a "compelling" interest and is the "least restrictive means" of obtaining the desired information. *Perry*, 591 F.3d at 1161. Plaintiff cannot prove that the information sought is of crucial relevance to its case, is actually needed to prove its claims, is not available from an alternative source, or that the request is the least restrictive way to obtain the information. *Pulte Home*, 2017 WL 1104670, at *4.

Indeed, the information Plaintiff seeks from the Conference is entirely irrelevant to the legal question of whether the Debtor may invoke the defense of charitable immunity. Not only is the information not "of central or crucial importance to this case," *id.* at *8 (citing *Perry*, 591 F.3d at 1161; *Grandbouche*, 825 F.2d at 1466), it has no bearing on whether charitable immunity applies. Plaintiff is unable to satisfy its burden given the complete irrelevance of the disclosure sought by Plaintiff to the pending declaratory judgment action and the significant chilling effect

the disclosure would have on the Conference's associational and petition rights—rights which are afforded "special solicitude" as to religious organizations. *Hosanna-Tabor*, 565 U.S. at 189.

**2. Compelling Production of the Conference's Private Religious Deliberations Would Violate the Religion Clauses by Intruding into Internal Church Affairs and Creating Impermissible Church-State Entanglement**

The First Amendment's Establishment Clause prohibits excessive government intrusion on religion, and the Free Exercise Clause protects the rights of religious organizations to decide matters of faith, doctrine, and governance "independent[t] from secular control or manipulation." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952). Similarly, Article 36 of the Maryland Declaration of Rights has been interpreted as a state analogue to the federal Free Exercise Clause, with Maryland courts treating both provisions as having the same effect. *Booth v. Maryland Dep't of Pub. Safety & Corr. Servs.*, No. CIV.A.RDB05-1972, 2008 WL 2484937, at *7 (D. Md. June 18, 2008) ("Maryland courts have repeatedly decided cases on the assumption that the free exercise provision of Article 36 is in *pari materia* with the First Amendment.") (citing *Supermarkets Gen. Corp. v. State*, 286 Md. 611, 409 A.2d 250, 258 (Md. 1979); *Stover v. Prince George's County*, 132 Md. App. 373, 752 A.2d 686, 695 (Md. Ct. Spec. App. 2000) (proceeding "on the basis that, in the context of this case, the two constitutional provisions have the same effect")).

"Both Religion Clauses bar the government from interfering with" internal affairs of religious organizations. *Hosanna-Tabor*, 565 U.S. at 181. *See also Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020) ("[T]he Religion Clauses protect the right of churches and other religious institutions to decide matters of faith and doctrine without government intrusion. State interference in that sphere would obviously violate the free exercise of religion, and any attempt by government to dictate or even to influence such matters would constitute one

of the central attributes of an establishment of religion.") (internal quotation and citation omitted); *From the Heart Church Ministries, Inc. v. African Methodist Episcopal Zion Church*, 370 Md. 152, 187, 803 A.3d 548, 569 (Md. 2002) ("The Supreme Court [of the United States], as has [the Supreme Court of Maryland], and those of our Sister States ... have made clear that... civil courts [are] prohibited from deciding religious disputes....") (internal citations omitted); *Dixon v. Edwards*, 172 F. Supp. 2d 702, 713 (D. Md. 2001) ("[W]henever the questions of discipline or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories ... the legal tribunals must accept such decisions as final.").

The Conference's right to decide matters of faith, doctrine, and governance — including faith- and doctrinally-informed lobbying decisions — is affected not only by direct government action, but also by the court's role in discovery. Churches mindful of the possibility of public disclosure of their decision-marking processes might make important decision regarding faith, doctrine, and govern themselves "with an eye to avoiding litigation or bureaucratic entanglement rather than upon the basis of their own personal and doctrinal assessments of who would best serve the pastoral needs of their members." *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985). This is precisely the type of government influence on religious affairs the Religion Clauses protect against.

The courts' role in the resolution of discovery disputes, such as evaluating responsiveness, relevance, and privilege, implicates First Amendment concerns. *New York v. Cathedral Acad.*, 434 U.S. 125, 133 (1977) ("The prospect of church and state litigating in court about what does or does not have religious meaning touches the very core of the constitutional guarantee against religious establishment"). The government's inspection of a church's internal religious records presents serious entanglement concerns that implicate significant constitutional issues. *See Lemon v.*

*Kurtzman*, 403 U.S. 602, 620 (1971) (explaining that government inspection of religious schools' records is the "kind of state inspection and evaluation of the religious content of a religious organization is fraught with the sort of entanglement that the Constitution forbids."). One of the reasons for avoiding entanglement in religious affairs is to avoid circumstances in which churches' "personnel and records … become subject to subpoena, discovery, cross-examination, the full panoply of legal process designed to probe the mind of the church" regarding internal religious matters. *Rayburn*, 772 F.2d at 1171.

Requiring the Conference, a nonparty to the instant litigation, to produce documents concerning its religious deliberations would inappropriately interfere with religious affairs and would produce a "chilling of the decision making process" for the Conference and other religious institutions. *Colorado Christian Univ. v. Weaver*, 534 F.3d 1245, 1264 (10th Cir. 2008). The significant impact of this entanglement on the Conference is particularly substantial given that the Conference is a nonparty whose privacy interests are "entitled to special weight." *Watts v. S.E.C*, 482 F.3d 501, 509 (D.C. Cir. 2007) (citing *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998)). The motion to quash should be granted.

**C. This Court should quash the Deposition Notice because enforcement of it would substantially burden the Conference's religious exercise and, therefore, enforcing the Deposition Notice is barred by the Religious Freedom Restoration Act.**

The Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.*, protects individuals and religious groups from governmental imposition on religious exercise. The RFRA provides that the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except ... if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §§

2000bb–1(a)-(b). When analyzing a claim under the RFRA, a court must consider whether the government's action imposes a substantial burden on religious exercise, and if so, whether those actions are the least restrictive means of serving a compelling government interest. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 691 (2014). The RFRA applies to court-ordered discovery, like that at issue here. *Whole Women's Health*, 896 F.3d at 371.; *In re Grand Jury Empaneling*, 171 F.3d 826, 835 (3d Cir. 1999) ("Lest there be any confusion, we reiterate: in deciding whether to enforce a grand jury subpoena over a RFRA objection, the district court must satisfy itself that the witness's testimony is necessary to serve a compelling state interest.") The party bringing a RFRA claim has "the burden of establishing that 'a substantial burden has been imposed on the exercise of sincerely-held religious beliefs,' and upon such a showing, the Government" — or court, or litigant using the court, *Whole Women's Health*, 896 F.3d at 37[6] — has the burden to demonstrate that the policy furthers a 'compelling governmental interest' and that it does so by 'the least restrictive means.'" *Philadelphia Yearly Meeting of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*, 767 F. Supp. 3d 293, 328–29 (D. Md. 2025) (quoting *Goodall by Goodall v. Stafford Cnty. Sch. Bd.*, 60 F.3d 168, 171 (4th Cir. 1995); *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 428-29 (2006)).

As the Declaration of Ms. Kraska (*Exhibit 2*) makes clear, the sincerity of the religious beliefs of the Conference, which influence its faith- and doctrinally-informed lobbying decisions, cannot seriously be questioned. The "substantial burden" would arise from compelling the

[6] In *Whole Women's Health*, the Fifth Circuit substituted "the court's or litigant's using the court" for "the government" when assessing whether a compelling government interest had been demonstrated. 896 F.3d at 371. Court enforcement of a subpoena is an act of the government. *See* 42 U.S.C. § 2000bb-2 (defining "government" as a "branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States"); *In re Young*, 82 F.3d 1407, 1416-17 (8th Cir. 1996) (RFRA applies to "implementation of federal bankruptcy law" by "federal courts," which "are a branch of the United States").

Conference "to reveal wholly internal communications concerning its approach to" lobbying decisions relating to the CVA "and participation in the issues surrounding the statute," as well as communications with the Archbishop of Baltimore on that same subject. *Whole Women's Health*, 896 F.3d at 371. And, as the Fifth Circuit emphasized in *Whole Women's Health*, issues concerning sincere religious belief and substantial burden should be handled with "a light touch." *Id.* (quoting *Moussazadeh v. Texas Dep't of Criminal Justice*, 703 F.3d 781, 792 (5th Cir. 2012), as corrected (Feb. 20, 2013)). "'[T]he burden here," as in *Whole Women's Health*, "comes from compelling" the Conference "to produce internal communications as the price for" engaging in constitutionally protected lobbying activities related to a "controversial law, and subjecting [the Conference] to a threat of sanctions, ranging from monetary to striking the witness to contempt, if it fails to comply." *Id.* Forcing the Conference to choose between obeying a court order and protecting its religious deliberations constitutes a substantial burden. *See Thomas v. Review Bd.*, 450 U.S. 707, 717-18 (1981) ("Where the state … put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists.").

Nor can the government (or the court, or the litigant using the court) demonstrate a compelling need for the information it seeks to compel the Conference to disclose. Indeed, the information sought by Plaintiff from the Conference is entirely irrelevant to the legal question of whether the Debtor may invoke the defense of charitable immunity. "[T]o the extent the sought "communications may reveal internal deliberations about the implications of" the Conference's lobbying activities as they relate to "canon law and Catholic doctrine, there is no compelling need whatsoever." *Whole Women's* Health, 896 F.3d at 371. The lack of compelling need is starkly apparent in light of the narrow legal question before the court in this declaratory judgment action. Therefore, Plaintiff is unable to meet its burden.

**D. This Court should quash the Deposition Notice because Plaintiff failed to comply with Rule 45(b).**

Consistent with the customary practice among members of the bar of this District, undersigned counsel agreed to accept service of the Deposition Notice. Undersigned counsel saw no good reason not to extend that professional courtesy and accommodation to Plaintiff's lead counsel. Regrettably, Plaintiff's lead counsel declined to grant similar courtesies in return.[7] *See Exhibit 4*.

Given Plaintiff's lead counsel's unwillingness to deviate from the rules in this regard, the Conference is compelled to point out that Plaintiff failed to comply with Rule 45(b) (applicable pursuant to Bankr. Rule 9016), which provides: "Serving a subpoena requires delivering a copy to the named person and, *if the subpoena requires that person's attendance, tendering the fees for 1 day's attendance and the mileage allowed by law*." (emphasis added).

Because Plaintiff failed to tender the fee at the time of service (in addition to the failure to observe the Discovery Guidelines), the subpoena is invalid, and Plaintiff cannot legitimately insist that an organizational designee of the Conference appear for deposition on the date unilaterally noted by Plaintiff's lead counsel. *See, e.g., Bierman Family Farm, LLC v. United Farm Family Ins.*

---

[7] For example, as set forth in the Conference's counsel's Local Bankruptcy Rule 7026-1(f) certificate (*Exhibit 4*), Plaintiff's lead counsel: noted the September 4, 2025 deposition date without clearing the date with undersigned counsel beforehand; declined to give undersigned counsel a four-day extension to file the instant motion; after the initial Zoom meet-and-confer conference, rebuffed or ignored undersigned counsel's multiple invitations to discuss (in a telephone call or via Zoom, as opposed to interminable email exchanges) and work through undersigned counsel's scheduling concerns, which included Plaintiff's lead counsel's desire to schedule a hearing on this motion on a day when undersigned counsel is scheduled to be out of town and Plaintiff's lead counsel's unwillingness to accommodate undersigned counsel's scheduling concerns relating to the Jewish High Holidays. *See* Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Maryland, Discovery Guideline, *e.g.*, 1.a. ("The parties and counsel have an obligation to cooperate in planning and conducting discovery to tailor the discovery to ensure that it meets these objectives."); 1.d. ("Attorneys are expected to behave professionally and with courtesy towards all involved in the discovery process, including but not limited to . . . non-parties."); and 7.a. ("Attorneys are expected to make a good faith effort to coordinate deposition dates with . . . non-party deponents, before noting a deposition.").

*Co.*, 2017 WL 3311206, *2 (D. Md. Aug. 2, 2017) ("Thus, the Court finds that the subpoena was not properly served in accordance with Rule 45(b)(1) because Defendant failed to tender the required witness and mileage fees upon service."); *Kador v. City of New Roads*, 2010 WL 3418265, *1 (M.D. La. Aug. 26, 2010) ("A failure to tender the appropriate sums at the time the subpoena is served invalidates the subpoena, and a non-party deponent is not required to attend the deposition set forth in that subpoena. Thus, because Ms. Francois was not tendered both the fee for one day's attendance at the deposition scheduled for July 9, 2010, as well as the mileage fee, at the time that the subpoena was served upon her, the subpoena in question is invalid, and she was not required to attend that deposition."); *United States v. Planned Parenthood Federation of America*, 2022 WL 21758612, *2 (N.D. Tex. Dec. 6, 2022) ("Accordingly, a subpoena delivered without the witness fees and mileage is 'not properly served' and should be quashed."); *Smart Pharmacy, Inc. v. Billingsly*, 2022 WL 4547007, *2 (E.D. Mo. Sep. 29, 2022) (failure to tender fees means the subpoena was not properly served). *See also* 9A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2454 (3d ed.) ("Failure to tender the appropriate sums at the time the subpoena is served invalidates the subpoena.").

The bottom line is that the federal courts that have considered this issue "uniformly agree" that the failure to tender the witness fee means that the subpoena is not properly served and is invalid. *See Smart Pharmacy, Inc.* 2022 WL 4547007, *2. Therefore, the Conference need not appear at the deposition[8] and this Court should quash the subpoena.

[8] In the Deposition Notice, Plaintiff unilaterally set the deposition date for September 4, 2025 (the original fact discovery deadline). Even if the subpoena had been valid (it is not), given that Plaintiff and Debtor agreed to extend fact discovery to October 3, 2025, it would be patently unreasonable for Plaintiff's lead counsel to insist on going forward with a deposition on September 4.

## V. CONCLUSION

For the foregoing reasons, this Court should enter an order in the form of the accompanying proposed order quashing the Deposition Notice.

Dated: August 25, 2025

*/s/ David J. Shuster*

David J. Shuster (Fed. Bar No. 23120)
Elizabeth M.W. Pittman (Fed. Bar No. 31276)
KRAMON & GRAHAM, P.A.
750 East Pratt Street, Suite 1100
Baltimore, Maryland 21202
dshuster@kg-law.com
epittman@kg-law.com
(410) 752-6030 Telephone
(410) 539-1269 Facsimile

*Attorneys for Nonparty Witness*
*Maryland Catholic Conference, LLC*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 25th day of August, 2025, a copy of the foregoing was filed electronically via CM/ECF, which effected service on counsel for all parties, sent via electronic mail and mailed, first class postage prepaid to:

Edwin H. Caldie, Esquire
Andrew Glasnovich, Esquire
Robert T. Kugler, Esquire
Stinson LLP
50 South Sixth Street, #2600
Minneapolis, Minnesota 55402
ed.caldie@stinson.com
drew.glasnovich@stinson.com
robert.kugler@stinson.com

Nicole Khalouian, Esquire
Stinson LLP
100 Wall Street, Suite 201
New York, New York 10005
nicole.khalouian@stinson.com

Richard L. Costella, Esquire
Alan M. Grochal, Esquire
Tydings & Rosenberg LLP
One E. Pratt Street, Suite 901
Baltimore, Maryland 21202
rcostella@tydings.com
agrochal@tydingslaw.com

Attorneys for Plaintiff/Counter-Defendant
Official Committee of Unsecured Creditors

**and to:**

Philip Tucker Evans, Esquire
Holland and Knight
800 17th Street, Suite 1100
Washington, DC 20006
philip.evans@hklaw.com

Catherine Keller Hopkin, Esquire
YVS Law, LLC
185 Admiral Cochrane Drive, Suite 130
Annapolis, Maryland 21401
chopkin@yvslaw.com

Christopher Scott Kunde, Jr., Esquire
Blake Daniel Roth, Esquire
Holland & Knight LLP
511 Union Street, Suite 2700
Nashville, Tennensee 37219
scott.kunde@hkbaw.com
blake.roth@hklaw.com

Attorneys for Defendant/Counter-Claimant
Roman Catholic Archbishop of Baltimore

*/s/ David J. Shuster*
David J. Shuster (Fed. Bar No. 23120)