## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| In re:<br><br>ROMAN CATHOLIC ARCHBISHOP OF BALTIMORE,<br><br>        Debtor.[1] | Chapter 11<br><br>Case No. 23-16969-MMH |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS,<br><br>        Plaintiff,<br><br>    v.<br><br>ROMAN CATHOLIC ARCHBISHOP OF BALTIMORE,<br><br>        Defendant. | Adv. Pro. No. 25-00084-MMH |

### ROMAN CATHOLIC ARCHBISHOP OF BALTIMORE'S OPPOSITION TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITOR'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT

The Roman Catholic Archbishop of Baltimore (the "**Debtor**"), by and through its undersigned counsel, files this Opposition to The Official Committee of Unsecured Creditor's Motion for Summary Judgment (Dkt. No. 43) (the "**Motion**") and a corresponding Cross-Motion for Summary Judgment, both of which concern the applicability of the long-recognized doctrine of charitable immunity to claims raised against the Debtor.[2] In support thereof, Debtor respectfully states as follows:

---

[1] The last four digits of the Debtor's federal tax identification number are 1535. The Debtor's principal place of business is located at 320 Cathedral Street, Baltimore, Maryland 21201.

[2] As allowed by Local Bankruptcy Rule 9013-2, the Debtor relies solely on this Motion/Cross-Motion and the supporting materials attached hereto.

### Introduction

In this adversary proceeding, The Official Committee of Unsecured Creditors (the "**UCC**") seeks declaratory relief that the doctrine of charitable immunity, which has been recognized in the State of Maryland for over 140 years, does not apply to claims asserted by survivors of child sexual abuse (the "**Survivors**")[3] against Debtor.  The UCC claims that charitable immunity is unavailable in a bankruptcy proceeding, that charitable immunity was abrogated by the Maryland Child Victims Act of 2023 ("CVA"), and that Debtor cannot establish the required elements of a charitable institution.  *See generally* Motion at pp. 13–33.  But the UCC's claims must fail as a matter of law.

The Survivor claims are barred under Maryland's well-established doctrine of charitable immunity.  Under that doctrine, tort claims against charitable institutions are barred "[i]n the absence of [liability] insurance."  *Abramson v. Reiss*, 334 Md. 193, 197 (1994); *see also James v. Prince George's Cnty.*, 288 Md. 315, 336–37 (1980); *State ex rel. Cavanaugh v. Arundel Park Corp.*, 218 Md. 484, 487–88 (1959).  This doctrine has deep roots, tracing back to 1885.  *See Perry v. House of Refuge*, 63 Md. 20, 28 (1885) ("House of Refuge").  Charitable immunity "is premised on the trust fund theory, that is, because funds of the organizations are impressed with a trust for charitable purposes, those funds should not be diverted to pay tort damages awards."  *Montrose Christian Sch. Corp. v. Walsh*, 363 Md. 565, 582 (2001) (citing *Loeffler v. Trs. of Sheppard & Enoch Pratt Hosp.*, 130 Md. 265 (1917)); *see also Howard v. Bishop Byrne Council Home, Inc.*, 249 Md. 233, 235 (1968); *House of Refuge*, 63 Md. at 26, 28.

While the Motion raises a number of arguments in support of the UCC's proposition that charitable immunity is unavailable in a bankruptcy proceeding, was abrogated by the CVA, or

---

[3] The Motion defines "Survivors" as victims of sexual abuse who have filed claims in this Bankruptcy, which for purposes of this Opposition and Cross-Motion Debtor adopts.

does not apply because of acts the UCC claims are outside Debtor's charitable mission, it is troubling that the Motion failed to discuss, much less acknowledge, a very recent decision out of the Circuit Court for Montgomery County, Maryland, which held that the doctrine of charitable immunity can be asserted as a defense to claims raised by Survivors against the Roman Catholic Archdiocese of Washington[4] which took place in Maryland. *See Schappelle v. Roman Catholic Archdiocese of Washington, a Corp. Sole, et al.* (Case Circuit Court for Montgomery County, Maryland) (Case No. C-15-cv-23-003696) (July 21, 2025) (attached as Exhibit A). The *Schappelle* decision, discussed in greater detail below, concluded that charitable immunity is still a valid defense against Survivor claims notwithstanding passage of the CVA. That same rationale should apply here.

Not only is the doctrine of charitable immunity still available to Debtor as a matter of law in this bankruptcy proceeding, but Debtor meets all the required elements needed to establish the elements of the defense of charitable immunity. One, the Debtor's principal purpose is charitable in nature. Two, the Debtor's funds are held in trust and are used solely to support Debtor's overall mission. Three, while there may be some insurance policies which apply to certain Survivor's claims, many claims are not covered by insurance, whether due to lack of coverage for the specific act, or exhaustion of policy limits. Consistent with Maryland law, Debtor does not seek to employ this defense against Survivor claims that may be covered by insurance. Md. Code Ann., Ins. § 19-103 (Lexis Nexis 2025). However, Debtor does intend to rely upon this affirmative defense to the extent there is no insurance to cover a specific claim. Having established the required elements, Debtor is entitled to invoke the defense of charitable immunity in response to Survivor's CVA claims.

---

[4] The Roman Catholic Archdiocese of Washington, which includes five counties in the State of Maryland, was part of the Roman Catholic Archdiocese of Baltimore until 1948.

That being said, Debtor's Motion is replete with inflammatory rhetoric and a materially false premise as to Debtor's intent through this bankruptcy proceeding. Debtor does not dispute that an untold number of children were victims of sexual abuse by individuals associated with or employed by a member of the Catholic family in Maryland. Debtor filed this bankruptcy fully intending to continue the process of providing support, outreach, and even compensation to those impacted by these unspeakable acts. But Debtor filed bankruptcy expressly to avoid the expense and burden of the anticipated litigation which would commence with the effective date of the CVA of October 1, 2023, as well as the risk that that in the "race to the courthouse" some Survivors would get judgments which would leave others without a source of recovery. Simply put, one of the principal goals of this Bankruptcy is to ensure fair and equitable compensation to all survivors. Debtor has made quite clear that notwithstanding the protection of charitable immunity, Debtor intends to devote significant assets for payment to Survivors as part of a plan of reorganization.[5]

### COUNTER-STATEMENT OF DISPUTED FACTS IN THE UCC'S MOTION

As a general matter, Debtor agrees that the question of whether charitable immunity applies in this bankruptcy is a matter of law to be resolved by the Court. However, the UCC's Motion

---

[5] In multiple appearances before this Court counsel for the UCC has made the claim that Debtor has made the "outrageous" statement that Survivors are not part of the Catholic Family. *See, e.g.,* Transcript of hearing on MCC's Motion to Quash held September 15, 2025 at pp.___ The UCC claims Debtor made such a statement in Response to the Committee's Request for Admission No. 4. See Motion at p. 31. In fact, the UCC is referring to Request for Admission No. 1, which stated:

> Admit that at least one Survivor is a resident of the State of Maryland and professes the Catholic Faith.
> Debtor's response: Denied, but at least one Survivor is a resident of the State of Maryland.

Whether a poorly phrased question, or simply a game of "gotcha," the Debtor denied the remainder of this request because it cannot affirm what a third party – a Survivor – "professes." That belongs to the individual to proclaim whether she or he professes the Catholic Faith. Debtor could easily confirm whether a Survivor attended a school or parish, was listed in a parish directory, but cannot answer the question about an individual's personal belief. And it is not relevant to this proceeding. Debtor regretfully acknowledges that many Survivors have turned away from the Catholic Church as a direct result of sexual abuse. But Debtor has in the past, and will continue in this bankruptcy, to provide support and compensation to those individuals (as well as those who remain members of the Church) as part of its overall mission.

posits a series of "facts" that are not material to resolution of the legal issue, much less undisputed. Specifically, Debtor objects to paragraphs 2–6 of the UCC's Statement of Material Facts Not in Dispute as simply a synopsis of a report prepared by the Maryland Attorney General. Paragraphs 6–14 of the UCC's Statement of Material Facts Not in Dispute is an incomplete history of the legislative process which led to passage of the 2023 Child Victims Act ("CVA") and the 2025 Amendment. Collectively, these paragraphs are not facts and cannot be considered as undisputed facts that could be relied upon by the Court for resolution of the Motion.

### DEBTOR'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

1.      The Debtor, a corporation sole, is a charitable institution organized under Maryland law and Canon Law. (Compl., ¶ 2; Ans., ¶ 2.)

2.      The Debtor was established in 1789 under Canon Law, and currently operates as an Archdiocese comprised of the City of Baltimore and the counties of Alleghany, Anne Arundel, Baltimore, Carroll, Frederick, Garrett, Harford, Howard and Washington, all located in the State of Maryland. The predominant function of the Debtor is to provide for the religious, liturgical and sacramental needs of Catholics, and minister to the spiritual and social needs of the community as a whole. Declaration of Bishop Adam J. Parker at ¶ 10 (hereinafter, "Bishop Parker Dec. at ¶") (attached hereto as Exhibit B).

3.      In 1832, the Maryland General Assembly passed the first of many statutory enactments governing the operations of Debtor under Maryland law. For example, pursuant to 1832 Md. Laws 308, the General Assembly of Maryland enacted:

> That it shall and may be lawful to, and for the trustees of any Roman Catholic Church, in whom the title to any lot or lots of ground, whereon any Roman Catholic Church is now erected, or which is used as a grave-yard attached to any such church, to convey the same by deed to be executed, acknowledged and recorded in the usual manner, to the Most Reverend James Whitfield, the present Arch Bishop of Baltimore, according to the discipline and government of

the Roman Catholic Church, forever; and it shall and may be lawful to, and for any person or persons or body corporate, to convey unto the Roman Catholic Arch Bishop of Baltimore, for the time being, and his successors as aforesaid, forever, by deed as aforesaid, any lot, piece or parcel of ground as aforesaid, for the purpose of having a Church erected thereon, for worship according to the discipline and government of the Roman Catholic Church, or for a grave-yard as aforesaid, which said lots of ground and premises, when so conveyed, are to be held by the said Roman Catholic Arch Bishop of Baltimore, and his successors as aforesaid, for the uses of the members of the Roman Catholic Church, worshipping at the respective places where such Churches may be, according to the government and discipline of the Roman Catholic Church; *Provided always*, that the property and estate, so to be conveyed and held, shall not, for any one congregation, exceed two acres; *and provided*, that such property be improved, enjoyed and used, only for a Church lot, parsonage and burial ground, or such conveyance, for such lot scall be void; *and provided* that nothing herein contained shall be so construed as to authorize the said Arch Bishop of Baltimore or his successors, to exact from the members of any congregation, who may make conveyances under this act, any contributions as a consideration for the use of said church property so conveyed, without their consent.

Bishop Parker Dec. at ¶ 6.

4.      Pursuant to 1874 Md. Laws 398, which was an act further to amend and enlarge the

powers conferred upon the Roman Catholic Archbishop of Baltimore, and his successors:

Section 1. *Be it enacted by the General Assembly of Maryland,* That so much of the Act of December Session, eighteen hundred and thirty-two Chapter three hundred and eight, as provides "that the property and estate to be conveyed and held under the provisions thereof, shall not for any one congregation exceed two acres, and that such property be improved, enjoyed and used only for a church lot, parsonage and burial ground, or such conveyance for such lot shall be void," be, and the same is hereby repealed.

Sec. 2. *And be it enacted*, That the Roman Catholic Archbishop of Baltimore for the time being, and his successors forever, shall be capable to take, receive and hold by sale, gift, lease or devise, any lots or parcels of land not exceeding in the whole five acres, for the uses of any one congregation, according to the discipline and government of the Roman Catholic Church, to be improved, enjoyed or used for a church, parsonage, burial ground, school house, or any or all of said purposes.

Bishop Parker Dec. at ¶ 7.

5.      Pursuant to 1894 Md. Laws 50, which was an act to regulate acquisitions by the Roman Catholic Archbishop of Baltimore, for the time being and his successors forever, and to define and limit the purposes for which such property shall be held:

> SECTION 1. Be it enacted by the General Assembly of Maryland, That whenever any grant, devise, gift, sale, legacy or bequest, or any transfer or conveyance of property, real, personal or mixed, to take effect after the passage of this act, shall be made to the present or any future Roman Catholic Archbishop of Baltimore, the same shall be held and construed, without regard to the accuracy of the language used for that purpose, to vest the ownership and title to the said property in the Roman Catholic Archbishop of Baltimore, for the time being and his successors forever, a corporation sole under the laws of this State, unless it shall be made to appear from the instrument of writing effecting such grant, devise, gift, sale, legacy, bequest, transfer or conveyance, that the same is intended by the party or parties thereto, to inure to the benefit of the said present or future archbishop, individually.
>
> SEC. 2. And be it further enacted, That whenever any such property shall be so granted, devised or bequeathed to the said corporation sole, for the use and benefit of any particular church, congregation or society, whether the said designated beneficiary be incorporated or not, or upon any other lawful conditions or any other trusts permitted by law, it shall be taken, held, used and enjoyed by the said corporation sole, upon such conditions and trusts only, and in no manner and for no purpose whatsoever inconsistent therewith; ***and whenever the same shall be so as lastly aforesaid granted, devised or bequeathed without any such conditions, or any such trusts, or absolutely, then the same shall be taken, held, used and enjoyed by the said corporation sole only to advance the general welfare of inhabitants of this State professing the above-named form of the Christian religion, or to promote the legitimate ends of its creation as such corporation sole as aforesaid, and in no other manner and for no other purpose whatsoever***.
>
> SEC. 3. And be it further enacted, That nothing herein contained shall be construed to dispense with or as amounting to the sanction of this General Assembly, to any acquisition of property whereunto such sanction is required to be given by article 38 of the Bill of Rights of this State.

SEC. 4. And be it further enacted, That all acts or parts of acts inconsistent with the provisions of this act be and the same are hereby repealed, to the extent of such inconsistency.

SEC. 5. And be it further enacted. That the General Assembly may at any time repeal or amend this act, or any part or provision thereof.

SEC. 6. And be it further enacted, That this act shall take effect from the date of its passage.

Bishop Parker Dec. Ex. 1 at ¶ 7 (emphases added).

6.     Pursuant to 1927 Md. Laws 397, which was an act to further amend and enlarge the powers conferred upon the Roman Catholic Archbishop of Baltimore, and his successors, by the Acts of 1832, Chapter 308, and other Acts supplemental to or amendatory of said statute:

SECTION 1. Be it enacted by the General Assembly of Maryland, That the powers conferred upon the Roman Catholic Archbishop of Baltimore, and his successors, as a corporation sole, by Chapter 308 of the Acts of the General Assembly of 1832, Chapter 268 of the Acts of 1868, Chapter 398 of the Acts of 1874 and Chapter 50 of the Acts of 1894, or any other Acts supplemental to or amendatory of said first mentioned statute, be and the same are hereby amended and enlarged, so as to authorize said corporation sole to acquire by sale, gift, lease, devise, bequest, or otherwise, property, real or personal, free from any limitation as to amount imposed by any of said former acts or otherwise, and to sell, lease, convey or otherwise dispose of the same from time to time.

SEC. 2. And be it further enacted, That this Act shall take effect June 1, 1927.

7.     More recently, in 1976 the Maryland General Assembly enacted Part II of Subtitle 3 of Title 5 of the Maryland Corporations and Associations Code relating to Religious Corporations of the Roman Catholic Church. Md. Code Ann., Corps. & Ass'ns § 5-314 (Lexis Nexis 2025). That statutory scheme is applicable to Debtor's current operations.

8.     Canon Law also controls Debtor's operations and the use of the funds held in Trust. Debtor's assets are only to be used in furtherance of its charitable mission, and under the oversight of the Archbishop. In turn, the Archbishop must abide by the requirements of Canon Law, and as

modified by the Complimentary Norms, which impose restrictions on how funds can be spent, especially as it pertains to charitable grants which would otherwise interfere with traditional church operations. Bishop Parker Dec. at ¶ 5.

9.      The Debtor is a tax-exempt, nonprofit entity as recognized by § 501(c)(3) of the Internal Revenue Code, which grants tax-exempt status to organizations engaged principally in charitable, religious and educational activities. Debtor's status was confirmed by the Internal Revenue Service pursuant to its inclusion in a group tax exemption issued to the United States Conference of Catholic Bishops under GEN 0828. Declaration of John Matera at ¶ 6 (hereinafter, "Matera Dec. at ¶") (attached hereto as Exhibit C). Under *Md. Code, Courts & Judicial Proceedings*, § 5-406, a charitable organization is defined as an "organization, institution, association, society or corporation" which is exempt from taxation under § 501(c)(3) of the Internal Revenue Code.

10.     Debtor's assets are held in trust and devoted solely to support the charitable mission of the Archdiocese. Matera Dec at ¶ 6.   As a charitable trust, no income generated by Debtor's operations can be used to pay shareholders or individuals.  *Id.*  Further, Canon Law. 1292 places strict controls on how the monies held in trust can be spent:

> §1. Without prejudice to the prescript of can. 638, §3, when the value of the goods whose alienation is proposed falls within the minimum and maximum amounts to be defined by the conference of bishops for its own region, the competent authority is determined by the statutes of juridic persons if they are not subject to the diocesan bishop; otherwise, the competent authority is the diocesan bishop with the consent of the finance council, the college of consultors, and those concerned. The diocesan bishop himself also needs their consent to alienate the goods of the diocese.

Matera Dec. at ¶ 9.

11.    While there might be insurance policies which provide coverage for claims made by Survivors under the CVA, there are a number of claims which would fall under policies which have been exhausted, are in excess of policy limits, or never had insurance coverage. Matera Dec. at ¶ 9.

**LEGAL ARGUMENT**

### I.    Summary Judgment Standard.

Rule 56 of the Federal Rules of Civil Procedure, applied to this matter by Bankruptcy Rule 7056, governs motions for summary judgment. Moving parties may be entitled to judgment as a matter of law under Civil Rule 56 in the absence of any genuine issue of material fact. Fed. R. Civ. P. 56. *See In re Durant*, 586 B.R. 577, 582 (Bankr. M.D. 1995) (citing *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008)). "When a party has submitted sufficient evidence to support its request for summary judgment, the burden shifts to the nonmoving party to show that there are genuine issues of material fact." *Emmett*, 532 F.3d at 297. Courts generally will grant summary judgment "unless a reasonable jury could return a verdict for the nonmoving party on the evidence presented." *Stanley Martin Cos. v. Universal Forest Prods. Shoffner LLC*, 396 F.Supp. 2d 606, 614 (D. Md. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)).

Courts view evidence on summary judgment in "the light most favorable to the nonmoving party and 'draw all justifiable inferences' in its favor, 'including questions of credibility and of the weight to be accorded to particular evidence.'" *Durant*, 586 B.R. at 583 (quoting *Masson v. New Yorker Magazine*, 501 U.S. 496, 520 (1991)). Parties may support assertions made in a motion for summary judgment by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other

10

materials." Fed. R. Civ. P. 56(c). Courts retain "some flexibility in the kinds of evidence that it can consider in resolving a motion for summary judgment." *Durant*, 586 B.R. at 583 (citing *Humphreys & Partners Architects v. Lessard Design, Inc.*, 790 F.3d 532, 538–539 (4th Cir. 2015)).

## II.   Maryland's Doctrine of Charitable Immunity.

Charitable immunity has been recognized in Maryland for over 140 years. *House of Refuge*, 63 Md. at 28. Under that doctrine, "[i]n the absence of [liability] insurance, a negligence [tort] action cannot be maintained against a charitable institution." *Abramson*, 334 Md. at 197; *see also James v. Prince George's Cnty.*, 288 Md. 315, 336–37 (1980). This includes alleged "'corporate' negligence of the charitable institution in hiring an employee." *Howard v. Bishop Byrne Council Home, Inc.*, 249 Md. 233, 243 (1968).

The doctrine of charitable immunity is based on the recognition that "[f]unds are contributed [to charitable institutions] by individuals impelled by philanthropic motives." *House of Refuge,* 63 Md. at 26. Allowing claimants to recover from these funds for wrongs committed in tort would subvert "the intention of the donor," and "the real object of charity would be defeated." *Id.* at 27. Thus, by granting charitable institutions immunity from tort liability, Maryland protects against unintended diversions of funds designated for charitable use. See *Howard v. Bishop Byrne Council Home, Inc.*, 249 Md. at 235; *Montrose*, 363 Md. at 582. Charitable immunity thus encourages the continued financial support of charitable institutions and promotes these institutions' beneficial activities and services to local Maryland communities.

As the Maryland Supreme Court recognized in its most recent case addressing charitable immunity, it has consistently "reaffirmed" the doctrine for cases involving tort claims. *Montrose*, 363 Md. at 582; *see also Abramson*, 334 Md. at 206 (noting that the Supreme Court had "steadfastly refused" to abolish the doctrine). The Maryland General Assembly has done the same,

balancing the interests of charitable organizations and tort claimants.  *See Abramson*, 334 Md. at 208–09 ("[T]he Legislature continues to consider the issue of immunity for charities," and it "continue[s] to legislate within the context of charitable immunity.").

In 1947, the General Assembly declined to pass a bill that would have abrogated the defense of charitable immunity.  *See Bishop Byrne Council Home*, 249 Md. at 236.  Instead, it passed Md. Ann. Code art. 48A, § 480, which estops insurers from asserting the charitable immunity defense, but does ***not*** affect the insured charitable organization's ability to assert the immunity when the charitable organization lacks "collectable insurance."  *State ex rel. Cavanaugh v. Arundel Park Corp.*, 218 Md. 484, 487–88 (1959). Section 48A, which has subsequently been recodified with non-substantive clarifying language as *Md. Code. Ann.*, Ins. § 19-103 (Lexis Nexis 2025), "assured that a charitable institution which opted for insurance would receive the full benefit of the coverage it had obtained without disturbing the doctrine under other circumstances," *i.e.*, without abrogating charitable immunity for uninsured tortious acts.  *Abramson*, 334 Md. at 197.

Further, when the General Assembly decided it wanted to limit the reach of charitable immunity based upon specific activities, it did so expressly.  In 1966 the General Assembly enacted a bill that stripped the defense of charitable immunity from "hospital[s] or related institution[s]" operated by charitable institutions, but capping liability exposure at $100,000.00 for those institutions covered by insurance. Md. Code Ann. Art. 43 § 556A (Supp. 1966). *See Sanner v. Trustees of the Shippard and Enoch Pratt Hospital*, 278 F.Supp. 138, 141 (D. Maryland 1968) (while noting that the exemption did not apply to a tort committed prior to enactment, court explained the legislative purpose of the carve out for medical institutions operated by charities).

In 1986, the General Assembly expanded the common-law doctrine through legislation, shielding agents of charitable organizations (who would otherwise be unprotected at common law) from certain tort claims.  Md. Code Ann., Cts. & Jud. Proc. ("CJP") § 5-406 (Lexis Nexis 2025). Far from eroding the common-law charitable immunity doctrine, that statute expressly provided that it "does not affect, and may not be construed as affecting, any immunities from civil liability or defenses . . . available at common law."  *Id.* § 5-406(f)(2).  The next year, the legislature subsequently extended that same protection to volunteers of charitable organizations—again, with the same limitation that it would not impair the common law.  *See id.* § 5-407(d)(2).

Thus, as the Maryland Supreme Court held in *Abramson*, for over a century the legislature has left common-law charitable immunity largely undisturbed.  *Abramson*, 334 Md. at 208.  This remains true today—while the CVA revived previously time-barred tort claims and imposed caps on recovery, the General Assembly took no action to abrogate charitable immunity.  Since the CVA did not disturb the defense of charitable immunity, Survivors cannot pursue those claims in this bankruptcy proceeding against Debtors' assets which are held in trust.

## 1.  THE CVA DID NOT ABROGATE THE DOCTRINE OF CHARITABLE IMMUNITY

### a.  The CVA is silent on the issue of charitable immunity.

It is important to identify exactly what changes the CVA made to existing Maryland law when it was passed in 2023.  There were two significant changes at issue as it relates to Survivor claims.  One, the CVA removed all time bars to child sexual abuse claims.  *See Roman Catholic Archbishop of Washington v. Doe*, 489 Md. 514 (2025). Two, it imposed statutory caps on the total non-economic damages a claimant could recover against defendants for claims that would otherwise have been time barred. Md. Code Ann., Cts. & Jud. Proc. § 5-117(c) (Lexis Nexis 2025). But notably – and notwithstanding the extensive excerpts of the legislative history of the CVA

13

relied upon by the UCC in its Motion (see Motion at pp. 16–24) – the doctrine of charitable immunity was not raised at all during the passage of the CVA.

Faced with this lack of express elimination or modification of charitable immunity by passage of the CVA, the UCC then argues for abrogation. Abrogation occurs when a state legislature repeals or annuls existing law through the passage of a new law so long as "it does not in the process run afoul of the federal and state constitutions." *Jones v. State*, 303 Md. 323, 343–44 (1985). Abrogation of a law can occur expressly or by implication. *Nickens v. Mt. Vernon Realty Grp., LLC*, 429 Md. 53, 74 (2012). Abrogation of the common law may also occur; however, such abrogation "requires a strong pronouncement from the Legislature as evidence of an intention to do so." *WSC/2005 LLC v. Trio Ventures Assocs.*, 460 Md. 244, 258 (Md. 2018).

Where the Maryland legislature has made no express statement as to its desire to abrogate the common law, abrogation by implication may only occur when the legislature's new statutory scheme is "so clearly contrary to the common law right that the two cannot occupy the same space." *Nickens*, 429 Md. at 74. *See also Suter v. Stuckey*, 402 Md. 211, 232 (2007) ("In construing a statute, it is a long-standing rule of statutory interpretation that the common law will not be repealed by implication.").

Here, the passage of the CVA did not "repeal[] and replace[] the entirety" of the law concerning sexual abuse claims on a "comprehensive basis," and the CVA can cleanly "coexist" with the doctrine of charitable immunity. The CVA does not create new liability per se, but merely expands the window when actions may be brought. The CVA did no more than revise the applicable statute of limitations and statutory caps related to sexual abuse claims brought in the State of Maryland. Most significantly, not only is the CVA silent as to the doctrine of charitable immunity, it expressly addressed the scope of sovereign immunity as it placed caps on recoverable

damages from county education boards, local governments, and the State of Maryland.  *See Schappelle,* slip op. at 4*,* Md. Code Ann, Cts. & Jud. Proc. § 5-117 (Lexis Nexis 2025)*.*  The statute's explicit reference to sovereign immunity, coupled with its omission of charitable immunity, is strong evidence that the CVA repealed *only* sovereign immunity. When interpreting statutes, Maryland courts apply the canon "*expressio unius est exclusio alteris*"—"the expression of one thing is the exclusion of another." *Griffin v. Lindsey*, 444 Md. 278, 288 (2015). By *including* a partial repeal of sovereign immunity, the Legislature *excluded* any repeal of charitable immunity from the statute.

The *Schappelle* decision is directly on point. In that proceeding the Plaintiff brought tort claims against the Archdiocese of Washington ("ADW") and a parish located in Montgomery County, Maryland, arising from allegations of sexual abuse by a priest which took place in 1986 or 1987.  The ability to pursue these claims in 2023 was directly due to the passage of the CVA and the elimination of any statute of limitations.  As a preliminary matter, the Court concluded that the ADW established that it was a charitable organization and its assets were held in trust, thus triggering eligibility for the defense of charitable immunity. Slip op. at 6-11.[6]  As to the impact of the CVA on the doctrine of charitable immunity, the *Schappelle* court clearly rejected the claim of abrogation:

> The statutory framework described in *Robinson* stands in contrast to the present case and, indeed, actually illustrates, that the CVA makes no such comprehensive statutory overhaul of the common law.  The CVA does not stand in conflict with the common law.  Moreover, when the legislature did wish to modify application of the doctrine of charitable immunity, they did so. *See* Md. Code Ann., Cts. & Jud. Proc. § 5-632) (no charitable immunity for charitable medical institutions); *see also,* and for volunteers and agents of charitable organizations (*see* Md. Code Ann., Cts. & Jud. Proc. §§ 5-406–07) (limiting liability to agents and volunteers of charitable organizations to any personal insurance).  **The legislature knows how to remove,**

---

[6] While there are many parallels between Debtor and the ADW, Debtor acknowledges that it must establish the qualifying elements of charitable immunity as it relates to Debtor's structure, operations, and charitable mission.

15

> **limit, or expand charitable immunity when they wish to. The CVA did not
> address charitable immunity in any manner.**

Slip op. at 6 (emphasis supplied).

Additionally, charitable immunity does not absolve the Debtor entirely of all liability (which seeming would be inconsistent with the CVA), but merely limits the assets from which the liability can be paid (*i.e.*, insurance), which is exactly as the Maryland legislature intended. As the *Abramson* court noted: "the General Assembly had the opportunity to abrogate the common law doctrine of charitable immunity at that time [of revising the insurance laws]" but instead it "did no more than restrict the use of the doctrine [of charitable immunity] by an insurer, not by the charitable institution. It thus assured that a charitable institution which opted for insurance would receive the full benefit of the coverage it had obtained without disturbing the doctrine under other circumstances." *Abramson*, 334 Md. at 197. While the General Assembly has modified the reach of charitable immunity by crafting the health provider exception noted in *Abramson*, and by extending the coverage to volunteers working on behalf of a charitable institution, it has resisted calls to eliminate the defense as created under Maryland law.

In passing the CVA in 2023, and then amending in 2025, the General Assembly was silent on the doctrine of charitable immunity. Applying the Maryland Supreme Court's decisions in *WSC/2005 LLC v. Trio Ventures Associates* and *Suter v. Stuckey*, the legislature's reluctance to expressly modify or strike the defense of charitable immunity in passing the CVA means that it is still available to Debtor as a defense to claims raised under the CVA.

### b. The CVA did not pre-empt the doctrine of charitable immunity.

The UCC asserts that the CVA pre-empted the charitable immunity doctrine. This is incorrect as a matter of law.

The UCC's Motion does not argue that the CVA occupies the entire field or "deals with [the] entire subject matter" of a charity or nonprofit's liability, such that the principle of *field preemption* would apply. Nor could it so argue; the CVA did not "repeal[ ] and replace[ ] the entirety of the prior law on a comprehensive basis" and it "makes no mention of an intent to preempt the field." *WSC/2005 LLC*, 460 Md. at 258–59.

Instead, the UCC relies on the principle of *conflict preemption*, *i.e.*, that "the new legislation has a clear incompatibility and disharmony with the common law, such that both the common law and the statutes *cannot coexist*." *WSC/2005 LLC*, 460 Md. at 259 (emphasis added). Motion at pp. 16–24. Importantly, "implied preemption of the common law is highly disfavored[.]" *Harris v. State*, 479 Md. 84, 101–02 (2022) (citing *WSC/2005 LLC*, 460 Md. at 258) (internal quotation marks omitted). Because the common law is constitutionally guaranteed to the inhabitants of Maryland, "its erosion is not lightly to be implied." *State v. North*, 356 Md. 308, 312 (1999). "[I]t is not to be presumed that the legislature intended to make any innovation upon the common law, further than the case absolutely required," but "[t]he law rather infers that the act did *not* intend to make any alteration *other* than what is *specified*, and besides *what has been plainly pronounced*." *North*, 356 Md. at 312 (quoting *Hooper v. Mayor & C.C. of Balt.*, 12 Md. 464, 475 (1859)) (emphasis in original).

The UCC does not come close to demonstrating that the CVA and the charitable immunity doctrine **cannot coexist**. First, charitable immunity is not inconsistent with the provisions of the CVA. The CVA repealed the statute of limitations for child sexual abuse claims and imposed a damages cap for such claims. Neither of those changes is necessarily inconsistent with charitable immunity. Indeed, legislation altering the time period within which claims may be filed has no impact on the availability of defenses (other than time-bar defenses), and no case has held as much.

17

And damages caps for personal injury claims have "coexisted" with charitable immunity for decades. *See, e.g.*, Md. Code Ann., Cts. & Jud. Proc. § 11-108(b) (Lexis Nexis 2025) (imposing noneconomic damages cap of $350,000 in personal injury actions arising after July 1, 1986).

Second, charitable immunity is not inconsistent with the purpose of the CVA. The UCC cites a handful of oblique references to religious institutions and the Catholic Church in the legislative record, *but even those cherrypicked quotes* (ostensibly the strongest evidence the UCC could locate) do not state that the purpose of the CVA is to ensure Debtor can be held liable beyond the extent of its insurance coverage. Nor do any of the cited snippets from the legislative record state that the legislature intended to preempt or abrogate the charitable immunity doctrine.[7] Rather, the statements cited by the UCC explain the reason for the legislation was to revive common-law claims that were previously time-barred. *See* Motion at pp. 17–21 n. 33, 39, 43, 44. Charitable immunity would have been an available affirmative defense if those claims had been brought *before* the statutory period ran. There is nothing in the legislative history of the CVA to suggest that it became unavailable when the statutory period was extended. The "undisputed purpose of the 2023 Act" was simply to address the "problem … that numerous child sexual abuse claims, more prevalent than previously understood, were never pursued during the then-applicable limitations period." *Roman Cath. Archbishop of Washington v. Doe*, 489 Md. 514, 571 (2025). These purposes are memorialized in the session law itself, which the UCC conspicuously fails to cite.[8]

Furthermore, while the legislative record contains scattered references to the Catholic Church, it reflects that the intent of the bill was to remove the time bar for claims against ***virtually***

---

[7] Indeed, the phrase "charitable immunity" cannot be found anywhere in the 2023 CVA, the 2025 Amendment, or the legislative record of either.

[8]     *See*     SB     686     (https://mgaleg.maryland.gov/2023RS/bills/sb/sb0686T.pdf)     and     HB     001 (https://mgaleg.maryland.gov/2023RS/bills/hb/hb0001T.pdf).

*every type of institution*.  *See* Glasnovich Dec. at ¶ 15,[9] Ex. M, February 23 Senate Transcript at 116:9–117:3 ("churches of any denomination, synagogues, the Boy Scouts, the Girl Scouts, private businesses, including dental practices, brokerage firms, large corporations, small corporation, law firms, medical practices, private schools, private hospitals, religious schools, private colleges, any other private institutions in the state of Maryland, as well as any public institutions you could think of, from elementary schools to middle schools to high schools to community colleges, to public hospitals, to governments who might have harbored a sex predator in the government and it is preying on people employed by the government").  This broad repeal of the statute of limitations is not inconsistent with allowing institutions to raise the affirmative defense of charitable immunity, *in cases where it applies*.[10]  Indeed, while Debtor satisfies the elements of the charitable immunity defense (*i.e.*, that the organization's predominant character is charitable, the organization's assets are held in trust, and the organization has no applicable insurance coverage), not every defendant sued under the CVA—or even every religious institution—will qualify. Accordingly, the CVA is entirely compatible with the availability of charitable immunity defense.

The UCC's argument that charitable immunity cannot coexist with the CVA must necessarily presume that the CVA was **specifically intended to target Debtor**.  After all, claims can readily be asserted under the CVA against organizations that do not meet the requirements for charitable immunity; thus, there is no disharmony between the existence of the doctrine generally and the broad repeal of the statute of limitations.  Disharmony only exists if one accepts the premise

---

[9] The Declaration of Andrew Glasnovich is attached to the UCC's Motion.

[10] In this sense, there is no basis to draw a distinction between charitable immunity and any other defense.  The UCC does not (and could not legitimately) argue that the CVA preempted, *e.g.*, the defenses of collateral estoppel, res judicata, or release, notwithstanding that, if established, they too would bar recovery by Survivors.  Nothing in the CVA or its legislative history creates liability *per se* or precludes organizations from asserting available defenses.  *Cf. SM Landover, LLC v. Sanders*, 489 Md. 614, 650, 330 A.3d 1129, 1150 (2025) (finding a Maryland statute, BR § 4.5-605, which declared that certain contracts of unregistered homebuilders were per se unenforceable, preempted the common-law balancing test for unenforceability).

that the purpose of the CVA is to uniquely and specifically impose liability against Debtor—in which case Debtor's assertion of the affirmative defense would be inconsistent with the law's purpose. But the legislative history flatly contradicts this premise: legislators identified numerous categories of organizations that could be the target of suits under the CVA, with Senator William Smith characterizing the notion that the legislation targets the Catholic Church as "misrepresentations … from the press." Glasnovich Dec. at ¶ 15, Ex. M, February 23 Senate Transcript at 116:4–117:12. Because the purpose of the CVA is not to specially impose liability upon Debtor, the UCC fails to establish that Debtor's invocation of the charitable immunity defense is inconsistent with the CVA's purpose—much less that they "cannot coexist." *WSC/2005 LLC*, 460 Md. at 259.

### III.    CHARITABLE IMMUNITY IS AN ALLOWED DEFENSE UNDER SECTION 558 OF THE BANKRUPTCY CODE AND IS NOT PRECLUDED BY THE FILING OF A CHAPTER 11 PETITION

The UCC asserts that every debtor automatically and affirmatively waives upon filing a petition for relief those defenses available to such debtor if those defenses are incompatible with the objectives and purposes of the Bankruptcy Code. (*See* Compl., ¶ 36.) That is simply an incorrect statement of the law. Section 558 of the Bankruptcy Code provides:

> **The estate shall have the benefit of any defense available to the debtor as against any entity other than the estate**, including statutes of limitation, statutes of frauds, usury, and other personal defenses. A waiver of any such defense by the debtor after the commencement of the case does not bind the estate.

11  U.S.C. § 558 (emphasis supplied).

Contrary to the Committee's position, the Bankruptcy Code ***expressly preserves*** affirmative defenses for the benefit of the estate. *See In re Circuit City Stores, Inc.*, No. 08-35653, 2009 Bankr. LEXIS 4011, at *13 (E.D. Va. 2009) ("Courts have found that section 558 preserves to the debtor any prepetition defenses a debtor may have." (citing *In re TSLC I, Inc.*, 332 B.R. 476,

20

478 (Bankr. M.D. Fla. 2005)).  This is true even when the assertion of an affirmative defense would prevent a potential creditor from recovering.  *See, e.g., In re Cole*, 371 B.R. 93, 95 (Bankr. M.D. Pa. 2007) (holding bankruptcy trustee could assert a sovereign immunity defense, barring a claim against the estate); *In re Cutler-Owens Int'l Ltd.*, 55 B.R. 291, 293–94 (Bankr. S.D.N.Y. 1985) (allowing debtor to assert defense under New York's "door-closing" statute that would bar creditor's claim); *In re Princeton Off. Park, L.P.*, 504 B.R. 382, 393–403 (Bankr. D.N.J. 2014) (finding New Jersey forfeiture statute, an affirmative defense, barred a claimant's claim in its entirety); *In re Roman Cath. Diocese of Rockville Ctr., New York*, No. 20-12345 (MG), 2025 WL 2301607, at *5 (Bankr. S.D.N.Y. Aug. 8, 2025) (expunging sex abuse claim that was time-barred under New York statute of limitations).

Here, charitable immunity has been a well-established defense and doctrine in Maryland for approximately one hundred forty (140) years.  *House of Refuge, see also Abramson v. Reiss.* Charitable immunity is also expressly listed by the Maryland Rules of Civil Procedure as an affirmative defense. Md. R. Civ. P. § 2-323(g). *See also Montrose Christian School Corp. v. Walsh*, 363 Md. 565 (2001) (stating charitable immunity is a defense against tort actions); *Ward v. Rebuilding Together Baltimore, Inc.*, No. 1278, 2016 WL 3185134 (Md. Spec. App. Ct. June 8, 2016) (affirming plaintiff's successful use of charitable immunity as affirmative defense). Accordingly, the Debtor did not waive charitable immunity by the filing of the petition for relief in this bankruptcy.

The UCC also argues that the assertion of charitable immunity is inconsistent with the Bankruptcy Code, and it "would render Survivor claims uncollectable in bankruptcy." Motion at p. 13. The UCC's assertion is factually incorrect, as it is abundantly clear that the largest potential source of recovery in this bankruptcy are the insurance policies which covered Debtor and other

members of the Catholic family during the relevant time period. In an effort to defeat the uncontroverted fact that the Debtor's assets are held in trust and covered by the charitable immunity doctrine, the UCC points to a decision by another Maryland bankruptcy court which considered the reach of charitable immunity in the bankruptcy context. *In re: City Homes III, LLC* 564 B.R. 827, 871–72 (Bankr. D. Md. 2017) ("*City Homes*").

The court in *City Homes* was presented with a proposed Chapter 11 plan which would have extended releases to certain non-debtors, and the only consideration offered for these releases would have been a waiver of charitable immunity which belonged to the residential single purpose entities in bankruptcy. 564 B.R. at 871–72. When the debtors appeared before the Court for the hearing on confirmation of the plan, it was a consensual plan which the creditors' committee helped to formulate with the debtor, and there was no objection to confirmation. The Court, without the benefit of any briefing by any party, rejected the argument that the debtors' waiver of charitable immunity could support a release of a non-debtor party who was not, itself, making a substantial contribution to the funding of the plan. 564 B.R. at 871. In the Court's words: "the waiver of charitable immunity is not their consideration to give. They do not get credit for a substantial contribution they do not own." *Id.* In addition, the debtors in *City Homes* agreed in their Chapter 11 plan to liquidate all of their assets, in addition to insurance proceeds, for the benefit of tort claimants, so that the issue of the availability of charitable immunity in a chapter 11 case for a nonprofit debtor was not even before the Court. *City Homes* thus offers no support for the Motion.[11]

---

[11] To the extent that the UCC may view some of the *City Homes* Court's discussion as suggesting that a Chapter 11 debtor is not entitled to invoke charitable immunity, not only was that dictum, entirely unnecessary to the Court's decision, the issue was never briefed by any of the parties, as the plan was consensual, and the opinion is unsupported by a single reference to any case or other legal authority.

While the UCC claims this decision provides authority for the argument that a debtor's reliance on charitable immunity is incompatible with the Bankruptcy Code, they fail to discuss how such a conclusion is in direct opposition to Section 541(c)(2) ("a restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title") as well as Section 558 ("the estate shall have the benefit of any defense available to the debtor as against any other entity other than the estate").  Given the trust created over Debtor's assets pursuant to charitable immunity, these provisions weigh in favor of application in this case. *See From the Heart Church Ministries, Inc.*, 370 Md. at 183–84; *Bishop Byrne Council Home*, 249 Md. at 235; *House of Refuge*, 63 Md. at 26 (to protect interests of donors funds given to charitable institution shall be held in trust). Moreover, while this bankruptcy is not at the plan confirmation stage, the Debtor has made clear of its intention to devote substantial financial assets, in addition to insurance, in support of a plan notwithstanding the blanket protection that charitable immunity would otherwise provide.[12]

## IV.    THE DEBTOR SATISFIES ALL ELEMENTS NECESSARY FOR CHARITABLE IMMUNITY TO APPLY.

As noted above, charitable immunity is intended "to protect charitable organizations from tort liability."  *Montrose*, 363 Md. at 582.  Charitable immunity is an affirmative defense, Md. Rule 2-323(g)(20), and applies to organizations that meet three criteria: (1) "the predominant character of the organization is charitable," *Abramson*, 334 Md. at 205–06, (2) "the assets of the charitable organization are held in trust, either expressly or by implication," *James*, 288 Md. at 337, and (3) "the corporation has no liability insurance covering the complained of act."  *Id.*  As Debtor easily meets each of these criteria, the Court should enter judgment in favor of Debtor.

---

[12] The same is true for the non-Debtor schools, parishes and affiliates, who would also be eligible to claim the defense of charitable immunity.

### 1.    Debtor's Predominant Mission and Function is Charitable.

*First*, the predominant character of the Debtor is charitable in nature.  Maryland has long recognized that what constitutes a "charity" enjoys a broad interpretation under the law, with virtually any entity designed to "better the condition of society or any considerable part thereof" qualifying. *Rosser v. Prem*, 52 Md. App. 357, 369 (1982).  The primary role of Debtor is to provide spiritual leadership, support, leadership development and resources to members of the Roman Catholic faith in the archdiocese, including parishes, schools, and other related entities which carry out the mission of the church.  As described in detail in the Declarations provided by Bishop Parker and John Matera, the Debtor has been organized and operated for religious, educational and charitable purposes for more than 200 years.  Adhering to both Canon Law and Maryland statutes, Debtor has existed as a corporation sole under the direction of the Archbishop. Bishop Parker Dec. at ¶ 4.  Debtor's principal function is to administer the mission of the Roman Catholic Church in the geographic area covered by the archdiocese, including the religious programming and educational system operated through the parishes and schools within the diocese. Bishop Parker Dec at ¶ 9.  This effort extends to Catholics and non-Catholics, as many services are provided to support the basic needs of those who reside in the area defined by the archdiocese.  This includes, but is not limited to, providing food and shelter to the hungry and unhoused, providing emotional and clinical support addressing mental health issues, substance abuse, marital and family counseling, as well as efforts to fill gaps which state and local governments simply cannot adequately address.  Maryland courts have consistently recognized other faith-based institutions as "charitable institutions" entitled to claim charitable immunity. *Abramson*, 334 Md. at 205–06 (charitable immunity defense available to Jewish Community Center).

Debtor has also been recognized as a tax-exempt non-profit organization, and Maryland law recognizes that such tax-exempt status is indicative of a charitable organization. Matera Dec. at ¶ 6. Likewise, the federal government recognizes Debtor as a non-profit charitable entity under § 501(c)(3) of the Internal Revenue Code, the statutory provision by which the federal government grants tax-exempt status to organizations engaged exclusively in charitable, religious, and educational activities. *Id.* The General Assembly has consistently equated § 501(c)(3) certifications with charitable status,[13] and Maryland courts have held that proof of federal and state tax-exempt charitable status weighs strongly in favor of charitable immunity. *See Abramson*, 334 Md. at 196–200, 206 (considering IRS § 501(c)(3) exemption letter and an affidavit from defendant's administrator); *Brownlee v. Poppleton Partners*, *L.P.*, Case No.: 24-C-14-004722 (Balt. City Cir. Ct. June 15, 2015) 2015 Md. Cir. Ct. LEXIS 255 (Hong, J.) (considering evidence from IRS and state agency confirming charitable exempt status).[14]

### 2. The Debtor's Assets are Held In Trust To Further a Charitable Purpose.

*Second*, Debtor satisfies the second factor necessary to qualify for charitable immunity because its funds and real property are held in trust for the furtherance of religious, spiritual and educational purposes. "Under Maryland law, the property of a charitable or religious nonprofit corporation is held in trust." *From the Heart Church Ministries, Inc. v. African Methodist Episcopal Zion Church*, 370 Md. 152, 183–84 (2002); *see also Inasmuch Gospel Mission, Inc. v. Mercantile Trust Co.*, 184 Md. 231, 239, (1945) ("[W]hen a corporation is organized for charitable purposes, its property is held in trust for the public."). Here, the Debtor, as a corporation sole, is

---

[13] Specifically, the General Assembly has defined a "charitable organization" under CJP § 5-406(a)(5), in pertinent part, as "an organization, institution, association, society, *or corporation that is exempt from taxation under § 501(c)(3) of the Internal Revenue Code.*" (emphasis added). Similarly, the Maryland Volunteer Service Act, CJP § 5-407(a)(4), defines "Charitable organization" as "an organization, institution, association, society, *or corporation that is exempt from taxation under § 501(c)(3) of the Internal Revenue Code.*"). (emphasis added).

organized and operated for charitable purposes, and such formation has been repeatedly recognized by statute.  There is no further inquiry required to establish the charitable trust.

Under Canon Law, property of the Archdiocese is entrusted to the Archbishop for the exclusive use and benefit of Debtor.  While Maryland law originally authorized the Archbishop to hold property as a corporation sole for only the purpose of for erecting a church for worship or a graveyard, all subject to the discipline and governance of the Roman Catholic Church, Maryland law has expanded over the years to include the areas and functions attendant to the overall mission of the Archdiocese including, but not limited to, schools and parsonages. None of Debtor's earnings inure to the benefit of individuals or private shareholders but, instead, are used to support Debtor's overall mission, and under controls established by Canon Law. Matera Dec. at ¶ 6; Bishop Parker Dec. at ¶ 5.

While the UCC posits that Debtor must establish five elements identified by the Restatement to justify the conclusion at a charitable trust exists – see Motion at pp. 33–34 – those factors do not apply when the property included in the trust belonged, as here, to the charitable institution.  See *Schappelle*, slip op. at 8–10. While the UCC ignores Maryland law in terms of a charitable trust – which need not be an in writing to create an express trust – it also raises a confusing, and conflated, argument suggesting that because Debtor has used funds to support and, even further, compensate Survivors, those assets fall outside the protection afforded to charitable trusts.  The UCC's argument is premised on a flawed conclusion as to the scope of Debtor's charitable mission.  As described in Bishop Parker's Declaration, the charitable mission of Debtor includes not only traditional religious and educational functions, but also includes works and services designed to aid, comfort and support those who may be suffering. Bishop Parker Dec. at ¶ 10. This would include programs and compensation directed to Survivors, and the Debtor has

26

been very open about this process for nearly twenty years.  See Exhibits I, J and R as attached to the Glasnovich Declaration.  The Committee now asserts that Debtor has disclaimed as part of its mission payment to Survivors, but the response to the very Request for Admission cited by the UCC[15] does not deny that payments to Survivors are part of its mission but, instead, points out that the Debtor's mission requires that Debtor reach out to Survivors "in love and service to Survivors in a number of ways"[16]

More importantly, charitable immunity as applied under Maryland law does not ask whether payment of a particular tort damages claim fits within the charitable mission of the applicable defendant.  Instead, the scope of the charitable mission is defined by organizational documents which control the charitable entity, as well as pronouncements by the leadership. Indeed, at least with respect to religious entities, Maryland law could not require courts to make such an inquiry as to the scope of the charitable mission without violating the First Amendment.

Given the limitations imposed by the First Amendment, no court can direct a religious entity like the Debtor to deploy its charitable funds among myriad competing mission-based priorities according to the court's preference—to do so would be to direct a religious entity on precisely how it was to exercise its religion in direct contravention of the First Amendment. Under the church autonomy doctrine, religious associations have "independence in matters of faith and doctrine and in closely linked matters of internal government." *Our Lady of Guadalupe School v. Morrissey-Berru*, 591 U.S. 732, 747 (2020). *See also Watson v. Jones*, 80 U.S. 679, 710–11 (1871) (stating "that the jurisdiction of civil courts being confined to 'civil actions,' they may not take cognizance of purely spiritual or ecclesiastical questions"). As the Supreme Court has noted:

---

[15] Request for Admission 4, as attached to Exhibit L to the Glasnovich Declaration.
[16] *Id.*

> There are occasions when civil courts must draw lines between the responsibilities of church and state for the disposition **_or use_** of property. Even in those cases when the property right follows as an incident from decisions of the church custom or law on ecclesiastical issues, the church rule controls. This under our Constitution necessarily follows in order that there may be free exercise of religion.

*Kedroff v. St. Nicholas Cathedra of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 120–121 (1952) (emphasis added).

Under this long-settled doctrine, no court could direct a religious entity to deploy its religious assets according to a court's preference. Similarly, under this long-settled doctrine, no court could make a determination that a particular tort damages claim fits within a defendant's religious charitable mission and then direct such defendant's deployment of any amount of funds to such claim over other competing aspects of fulfilling the defendant's charitable religious mission.

Accordingly, while the Debtor maintains that the care, support, and even compensation provided to Survivors is consistent with its overall mission to provide aid and comfort to those who may be suffering, First Amendment limitations and longstanding precedent dictate that courts may not compel the Debtor to undertake specific actions in furtherance of its religious purposes. Therefore, whether any particular action falls or does not fall within the charitable mission of the Debtor is not relevant (and has never been considered in the context of charitable immunity in Maryland), and charitable immunity still applies to tort claims against the Debtor and damages arising from same.

28

## Conclusion

For the reasons articulated above, it is clear that the doctrine of charitable immunity remains the law in Maryland, and is available to the Debtor in this bankruptcy proceeding. As a result, judgment should enter in favor of Debtor on all counts raised in the UCC's Complaint, as well as the single count raised in Debtor's counterclaim.

September 18, 2025                    RESPECTFULLY SUBMITTED

                                      _____/s/ Philip T. Evans_____
                                      Philip T. Evans (Fed. Bar No. 11796)
                                      HOLLAND & KNIGHT LLP
                                      800 17th Street, NW, Suite 1100
                                      Washington, DC 20006
                                      Telephone: 202.457.7043
                                      Email: philip.evans@hklaw.com


                                      -and-

                                      Blake D. Roth (admitted pro hac vice)
                                      C. Scott Kunde (admitted pro hac vice)
                                      HOLLAND & KNIGHT LLP
                                      511 Union Street, Suite 2700
                                      Nashville, TN 37219
                                      Telephone: 615.244.6380
                                      Facsimile: 615.244.6804
                                      Email: blake.roth@hklaw.com
                                      scott.kunde@hklaw.com

                                      -and-

                                      Catherine Keller Hopkin (Fed. Bar No. 28257)
                                      YVS LAW, LLC
                                      185 Admiral Cochrane Drive, Suite 130
                                      Annapolis, MD 21401
                                      Telephone: 443.569.0788
                                      Facsimile: 410.571.2798
                                      Email: chopkin@yvslaw.com


                                      Attorneys for the Debtor and Debtor In
                                      Possession

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 18th day of September, 2025, a true and accurate copy of the foregoing was filed with the Clerk of the Court by electronic case filing, and the electronic case filing system provides a "Notice of Electronic Filing" to all counsel of record.

/s/ Philip T. Evans
Philip T. Evans