**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(<u>Baltimore Division</u>)**

| | |
|---|---|
| In re: | Case No. 23-16969-MMH |
| Roman Catholic Archbishop of Baltimore, | (Chapter 11) |
| Debtor. | |

| | |
|---|---|
| The Official Committee of Unsecured Creditors, | |
| Plaintiff, | Adv. Proc. No. 25-00084-MMH |
| v. | |
| Roman Catholic Archbishop of Baltimore, | |
| Defendant. | |

**PLAINTIFF'S PRETRIAL STATEMENT**

6485811.1

# <u>TABLE OF CONTENTS</u>

INTRODUCTION.................................................................................................................1

STATEMENT OF FACTS AND LEGAL ARGUMENT .............................................2

I.   SUMMARY OF FACTS ...........................................................................................2

II.  THE DEBTOR BEARS THE BURDEN OF PROOF ON ITS AFFIRMATIVE DEFENSE AND COUNTERCLAIM. ..........................................................................6

III. THE DEBTOR'S WORDS AND CONDUCT, INCLUDING FILING FOR BANKRUPTCY, WAIVED CHARITABLE IMMUNITY. .......................................7

    a.   The Bankruptcy Code requires the Debtor to pay Survivors fairly and equitably. .................8

    b.   The Debtor is bound by its promises to pay Survivors fairly and equitably. .........................12

       1.   By Promising Marylanders It Would Treat Survivors Fairly and Equitably, the Debtor Waived Its 558 Defenses Prior to Bankruptcy. ...................................................................13

       2.   The Debtor Is Estopped from Asserting 558 Defenses That Contradict Its Promises in This Chapter 11 Case. ..........................................................................................................14

IV.  THE 2023 CHILD VICTIMS ACT ABROGATED CHARITABLE IMMUNITY. ............19

    a.   The Purpose and Provisions of the 2023 CVA Are in Irreconcilable Conflict with Charitable Immunity. ..........................................................................................................................23

    b.   The Court Must Engage in a Comprehensive Statutory Interpretation Analysis of the CVA to Evaluate the Issue of Conflict Preemption. ..................................................................26

V.   THE DEBTOR'S MISSION INCLUDES PAYING SURVIVORS AND SO CHARITABLE IMMUNITY DOES NOT APPLY IN THIS CASE. ..........................................32

VI.  THE DEBTOR CANNOT PROVE IT HOLDS ITS ASSETS IN TRUST..........................33

    a.   The Debtor Does Not Have Articles of Incorporation Impressing Its Assets with a Charitable Trust ................................................................................................................................35

    b.   The Debtor Cannot Show Its Property Is Held in Trust Through Specific Trust Intent Because It Holds Legal and Equitable Title And It Was Given the Property for Its General Purposes. .....36

    c.   The Debtor Cannot Trace Assets Held in Commingled Accounts.........................................38

VII. THE DEBTOR IS NOT ENTITLED TO DECLARATORY RELIEF. ...............................40

STATUS OF PLEADINGS .................................................................................................43

STIPULATIONS..................................................................................................................43

PLAINTIFF'S TRIAL STATEMENT - ii

SUMMARY OF RELIEF SOUGHT ............................................................................43

EXHIBITS AND OTHER EVIDENCE........................................................................43

EXPERTS....................................................................................................................51

PRETRIAL RULINGS AND EVIDENTIARY ISSUES ..............................................51

CONCLUSION ...........................................................................................................52

# <u>TABLE OF AUTHORITIES</u>

## CASES

*ABRAMSON V. REISS,*
  334 MD. 193 (1994) ..................................................................................................6

*ANTOINE V. STATE,*
  245 MD. APP. 521 (2020) ............................................................................19, 23, 31

*ARMSTRONG V. TEX. COM. BANK,*
  1998 U.S. APP. LEXIS 40647 (5TH CIR. MAR. 11, 1998) .......................................12

*BALTZELL V. CHURCH HOME,*
  110 MD. 244, 73 A. 151 (1909) ............................................................................33, 37

*BD. OF EDUC. OF BALT.  CNTY. V. ZIMMER-RUBERT,*
  409 MD. 200 (2009) ..................................................................................................31

*BD. OF EDUC. OF CHARLES CNTY. V. ALCRYMAT CORP. OF AM.,*
  258 MD. 508 (1970) ..................................................................................................29

*BOLLING V. BAY COUNTRY CONSUMER FIN., INC.,*
  251 MD. APP. 575 (MD. CT. SPEC. APP. 2021)......................................................26

*BRANDT, INC. V. Y.W.C.A. OF BALT. CITY,*
  169 MD. 607, 182 A. 452 (1936)........................................................................33, 36

*BROWNING MFG. V. MIMS (IN RE COASTAL PLAINS, INC.),*
  179 F. 3D 197 (5TH CIR. 1999).............................................................................18

*CALAFIORE V. WERNER ENTERS., INC.,*
  418 F. SUPP. 2D 795 (D. MD. 2006)................................................................12, 14

*CALLAWAY V. MEMO MONEY ORDER CO.,*
  381 B.R. 650 (E.D.N.C. 2008)..............................................................................38

*CECIL V. AM. FED'N OF STATE, CNTY. & MUN. EMPS.,*
  261 MD. APP. 228 (2024) ........................................................................................28

*CRAWFORD V. COURTNEY,*
  451 F.2D 489 (4TH 1971) ......................................................................................20

*DAY SCH., INC. V. APPLIED UNDERWRITERS CAPTIVE RISK ASSURANCE CO.,*
  867 F.3D 449 (4TH CIR. 2017)..............................................................................15

*DUNBAR V. BIEDLINGMAIER,*
  NO. DKC 20-0738, 2022 WL 814293 (D. MD. MAR. 17, 2022)............................41

*ERIE R. CO. V. TOMPKINS,*
  304 U.S. 64 (1938)................................................................................................20

*EST. OF BURRIS V. STATE,*
  360 MD. 721 (2000) ..............................................................................................31

*FIRE & IMP. CO.,*
  264 MD. 729 (1972) ..............................................................................6, 33, 36, 37

*FIRE INS. PATROL V. BOYD,*
  120 PA. 624 (1888)................................................................................................37

*FRANKLIN SQUARE HOSP. V. LAUBACH,*
  318 MD. 615 (1990) ....................................................................................26

*GENIES V. STATE,*
  426 MD. 148 (2012) ....................................................................................27

*GOLDBERG V. MILLER,*
  371 MD. 591 (2002) ....................................................................................31

*GORDON V. CITY OF BALTIMORE,*
  258 MD. 682 (1970) ....................................................................................33

*GREGG NECK YACHT CLUB, INC. V. CNTY. COMM'RS OF KENT CNTY.,*
  137 MD. APP. 732 (MD. CT. SPEC. APP. 2001) ....................................................13

*H.D. OLIVER FUNERAL APARTMENTS, INC. V. DIGNITY FUNERAL SERVICES, INC.,*
  964 F. SUPP. 1033 (E.D. VA. 1997) ..................................................................20

*HARRIS V. STATE,*
  479 MD. 84 (2022) ......................................................................................19

*HARRISON V. JOHN F. PILLI & SONS, INC.,*
  321 MD. 336 (1990) ..............................................................................27, 28

*HEART CHURCH MINISTRIES, INC. V. AFRICAN M.E. ZION CHURCH,*
  370 MD. 152 (2002) .......................................................................33, 34, 51

*HOLLAND V. BANK OF ITALY,*
  1 P.2D 1031 (CAL. APP. 4TH DIST. 1931) ..........................................................38

*HOWARD V. BISHOP BYRNE COUNCIL HOME, INC.,*
  238 A.2D 863 (1968) ...................................................................................35

*IN RE ADVENT MGMT. CORP.,*
  104 F.3D 293 (9TH CIR. 1997) ......................................................................38

*IN RE B.I. FIN. SERVS. GRP., INC.,*
  854 F.2D 351 (9TH CIR. 1988) ......................................................................38

*IN RE BOWMAN,*
  181 B.R. 836 (BANKR. D. MD. 1995) .................................................................9

*IN RE BRYSON PROPERTIES, XVIII,*
  961 F.2D 496 (4TH CIR. 1992) .........................................................................9

*IN RE CATH. DIOCESE OF WILMINGTON, INC.,*
  432 B.R. 135 (BANKR. D. DEL. 2010) ...............................................................39

*IN RE CHEATHAM,*
  78 B.R. 104 (BANKR. E.D.N.C. 1987) .................................................................9

*IN RE CITY HOMES III LLC,*
  564 B.R. 827 (BANKR. D. MD. 2017) ................................................................11

*IN RE D&F CONST.,*
  865 F.2D 673 (5TH CIR. 1989) .........................................................................9

*IN RE DAMERON,*
  155 F.3D 718 (4TH CIR. 1998) ...................................................................38, 39

*IN RE DANT & DANT,*
  39 F. SUPP. 753 (W.D. KY. 1941) ....................................................................12

*IN RE DBSD N. AM., INC.*,
634 F.3D 79 (2D CIR. 2011) ....................................................................................................9

*IN RE E.M. WILLIAMS & SONS, INC.*,
NO. 08-03055-KRH, 2009 WL 2211727 (BANKR. E.D. VA. JULY 17, 2009) ......................................8

*IN RE EFH GROVE TOWER ASSOCS.*,
105 B.R. 310 (BANKR. E.D.N.C 1989) ........................................................................................9

*IN RE FOAM SYS. CO.*,
92 B.R. 406 (B.A.P 9TH CIR. 1988) ...........................................................................................8

*IN RE GLOBAL FERTILITY & GENETICS*,
663 B.R. 584 (BANKR. S.D.N.Y 2024) ........................................................................................9

*IN RE LEWIS W. SHURTLEFF, INC.*,
778 F.2D 1416 (9TH CIR. 1985) ...............................................................................................8

*IN RE NORTH AMERICAN COIN & CURRENCY, LTD.*,
767 F.2D 1573 (9TH CIR. 1985) ...............................................................................................8

*IN RE OMEGAS GRP., INC.*,
16 F.3D 1443 (6TH CIR. 1994) ................................................................................................8

*IN RE PREMIERE HOSP. GRP., INC.*,
NO. 13-02145-8-RDD, 2013 WL 6633428 (BANKR. E.D.N.C. DEC. 16, 2013) .................................9

*IN RE R & T ROOFING STRUCTURES & COM. FRAMING, INC.*,
887 F.2D 981 (9TH CIR. 1989) ...............................................................................................39

*IN RE SHORT*,
625 B.R. 678 (BANKR. E.D. MICH. 2021) ..................................................................................8

*IN RE SKAGIT P. CORP.*,
316 B.R. 330 (B.A.P. 9TH CIR. 2004) ......................................................................................39

*IN RE SUPERIOR CREWBOATS, INC.*,
374 F.3D 330 (5TH CIR. 2004) ........................................................................................14, 18

*IN RE USINTERNETWORKING, INC.*,
310 B.R. 274 (BANKR. D. MD. 2004) ..................................................................14, 16, 17, 18

*IN RE VALLEY FOOD SERVS., LLC*,
389 B.R. 685 (BANKR. W.D. MO. 2008) ..................................................................................38

*INASMUCH GOSPEL MISSION V. MERCANTILE TR. CO. OF,*
*BALT.*, 184 MD. 231 (1945) ..........................................................................................32, 33

*JAMES V. PRINCE GEORGE'S CTY,*
288 MD. 315 (1980) ......................................................................................6, 33, 35, 36

*JAY COLL. OF HEALTH SCIS. V. CHINWUBA,*
NO. 1776, 2025 WL 762163 (MD. APP. CT. MAR. 11, 2025) .....................................................6

*JONES V. STATE,*
311 MD. 398 (MD. 1988) .....................................................................................................27

*KACZOROWSKI,*
309 MD. ............................................................................................................................26

*KELLEY V. KELLEY,*
178 MD. 389 (1940) ...........................................................................................................33

*KING V. HERBERT J. THOMAS MEM'L HOSP.*,
   159 F.3D 192 (4TH CIR. 1998) ..............................................................................................14

*KRYSTAL CADILLAC-OLDSMOBILE GMC TRUCK, INC. V. GEN. MOTORS CORP.*,
   337 F.3D 314 (3RD CIR. 2003) ..............................................................................................14

*LAKE CARRIER'S ASSOC. V. MACMULLAN*,
   406 U.S. 498, 92 S.CT. 1749, 32 L.ED.2D 257 (1972) ..........................................................20

*LANGSTON V. RIFFE*,
   359 MD. 396 (2000) ..............................................................................................................26

*LEHMAN BROS. V. SCHEIN*,
   416 U.S. 386 (1974) ..............................................................................................................20

*LOCKETT V. BLUE OCEAN BRISTOL, LLC*,
   446 MD. 397 (2016) ..............................................................................................................26

*LOEFFLER V. TRS. OF SHEPPARD & ENOCH PRATT HOSP.*,
   130 MD. 265 (1917) ................................................................................................................6

*LONG GREEN VALLEY ASS'N V. BELLEVALE FARMS, INC.*,
   432 MD. 292 (2013) ..........................................................................................................6, 34

*LOWERY V. STOVALL*,
   92 F.3D 219 (4TH CIR. 1996) ..............................................................................................14

*LUTZ V. STATE,* 167 MD. 12, 15 (1934) ....................................................................................27, 28

*MARTIN V. STATE FARM MUT. AUTO. INS. CO.*,
   375 F.2D 720 (4TH CIR. 1967) ..............................................................................................20

*MARTINEAU V. WIER*,
   934 F.3D 385 (4TH CIR. 2019) ..............................................................................................14

*MASTERS V. MASTERS*,
   200 MD. 318 (1952) ..............................................................................................................33

*MATTER OF BATCHELOR*,
   260 MD. APP. 456 (2024) ......................................................................................................28

*MATTER OF WEY*,
   827 F.2D 140 (7TH CIR. 1987) ..............................................................................................12

*MEREDITH V. CITY OF WINTER HAVEN*,
   320 U.S. 228 (1943) ..........................................................................................................20, 21

*MINNIELAND PRIV. DAY SCH., INC. V. APPLIED UNDERWRITERS CAPTIVE RISK ASSURANCE CO.*,
   867 F.3D 449, 458 (4TH CIR. 2017) ......................................................................................16

*MITCHELL V. HENDERSON*,
   128 F. SUPP. 2D 298 (D. MD. 2001) ................................................................................40, 42

*MONTROSE CHRISTIAN SCH. CORP. V. WALSH*,
   363 MD. 565 (2001) ....................................................................................................6, 31, 32

*NAT'L UNION FIRE INS. OF PITT. V. MFRS. & TRADERS TR. CO.*,
   137 F. APP'X 529 (4TH CIR. 2005) ......................................................................................18

*NEW HAMPSHIRE V. MAINE*,
   532 U.S. 742 (2001) ..............................................................................................................14

*NICKENS V. MT. VERNON REALTY GRP., LLC,*
  429 MD. 53 (2012) ..............................................................................................26, 27

*PERRY V. H. OF REFUGE,*
  63 MD. 20 (1885) ........................................................................................................32

*POTOMAC ABATEMENT, INC. V. SANCHES,*
  424 MD. 701 (2012) ....................................................................................................30

*RE PARROTT BROAD. LTD. P'SHIP,*
  2013 BANKR. LEXIS 2594 (BANKR. D. IDAHO JUNE 26, 2013) ..................................12

*ROBINSON V. STATE,*
  353 MD. 683 (1999) ........................................................................................19, 27, 31

*ROMAN CATH. ARCHBISHOP OF WASH. V. DOE,*
  489 MD. 514 (2025) ..............................................................................24, 25, 29, 30

*ROSENSHEIN V. KLEBAN,*
  918 F.SUPP. 98 (S.D.N.Y. 1996) ................................................................................14

*ROSSER V. PREM,*
  52 MD. APP. 367 (1982) ............................................................................................34

*SCHUYLER V. LITTLEFIELD,*
  232 U.S. 707 (1914) ....................................................................................................38

*SELIG V. STATE HIGHWAY ADMIN.,*
  383 MD. 655 (2004) ..............................................................................................26, 27

*SONY CORP. OF AM. V. BANK ONE, W. VA., HUNTINGTON NA,*
  85 F.3D 131 (4TH CIR. 1996) ....................................................................................40

*STATE V. FABRITZ,*
  276 MD. 416 (1975) ....................................................................................................27

*STATE V. NORTH,*
  356 MD. 308 (MD. 1999) ............................................................................................19

*TEDERS V. ROTHERMEL,*
  205 MINN. 470 (1939) ................................................................................................29

*UNITED STATES V. STATE OF WASHINGTON,*
  759 F.2D 1353 (9TH CIR. 1985) ................................................................................40

*WARD V. REBUILDING TOGETHER BALT., INC.,*
  NO. 1278, 2016 WL 3185134 (MD. APP. CT. JUNE 8, 2016) ........................................6

*WATT V. ALASKA,*
  451 U.S. 259 (1981) ....................................................................................................26

*WILLIAMS V. RESCUE FIRE CO.,*
  254 F. SUPP. 556 (D. MD.1966) ................................................................................37

*WISCONSIN V. CONSTANTINEAU,*
  400 U.S. 433 (1971) ....................................................................................................20

*WOHL V. KEENE,*
  476 F.2D 171 (4TH CIR. 1973) ..................................................................................20

*WSC/2005 LLC V. TRIO VENTURES ASSOCS.,*
  460 MD. 244 (2018) ....................................................................................................29

# STATUTES

11 U.S.C. § 1129(B) .................................................................................................9

11 U.S.C. § 1129(B)(1) ............................................................................................9

11 U.S.C. § 1129(B)(1)(B) .......................................................................................9

11 U.S.C. § 1129(B)(2) ............................................................................................9

11 U.S.C. §§ 1107 AND 1108 ..................................................................................2

11 U.S.C. § 558 ......................................................................................................12

CORPS. & ASS'NS § 5-314 ....................................................................................35

CORPS. & ASS'NS § 5-316 ...............................................................................35, 36

CORPS. & ASS'NS § 5-304 ....................................................................................35

CORPS. & ASS'NS § 5-302(C) ...............................................................................35

MD. CODE ANN., CTS. & JUD. PROC. (C&JP) § 5-117(C) .................................24

 MD. CODE, CORPS. & ASS'NS §5–301 TO § 5–31 .............................................35

MD. CODE, STATE GOV'T § 12-104 ......................................................................31

MD. CONST. DECL. OF RTS. ART. 5 .....................................................................29

11 U.S.C. §§ 105(A) AND 362 ...............................................................................49

# RULES

FED. R. CIV. P. 37(D) .............................................................................................52

# OTHER AUTHORITIES

4 NORTON BANKR. L. & PRAC. 3D § 113:23 (2025) ...........................................9

15 AM. JUR. 2D CHARITIES § 146, AT 155 (1964) .............................................37

H.R. REP. 95-595 .....................................................................................................9

*CHARLES M. HOWARD, CHARITABLE TRUSTS IN MARYLAND,*
 1 MD. L. REV. 105, 121 (1937) ...........................................................................33

RESTATEMENT (SECOND) OF TRUSTS § 348 .....................................................34

RESTATEMENT (SECOND) OF TRUSTS § 373(A), AT 256 (1959) ......................37

RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 58 ..........39

SUTHERLAND STATUTORY CONSTRUCTION § 61:1 (8TH ED.) ...................................29

SUTHERLAND STATUTORY CONSTRUCTION § 61:2 (8TH ED.) ............................27, 28

## **INTRODUCTION**

For decades, thousands of Survivors have carried the weight of unspeakable harm perpetrated on them as children—harm inflicted while in the care of the Roman Catholic Archbishop of Baltimore. They carried that weight in a silent struggle, for many out of fear of rejection by their families, friends, and religious community, and for all because Maryland law did not afford Survivors the opportunity to seek legal recourse for acts that happened decades ago.

When the Maryland General Assembly reopened the courthouse doors through the 2023 Child Victims Act, Survivors hoped the silence would give way to transparency and justice. The Debtor capitalized on that hope when it publicly promised transparency, accountability, and **fair and equitable compensation** in the wake of the passage of the 2023 CVA, and it reaffirmed that it would hold to that promise when it filed for bankruptcy. Yet after two years of enjoying the protections and advantages of bankruptcy, for itself and hundreds of its non-debtor affiliates, the Debtor has revealed its true position: it owes Survivors nothing at all and any payments made will be discretionary and reflect only the Debtor's subjective view of what Survivors deserve to receive.[1]

The Debtor's assertion of charitable immunity is an attempt to use bankruptcy not as a tool to effectuate fairness and equity, but as a shield to forestall costly and embarrassing litigation while it simultaneously defines its own, subjective view of its responsibility and imposes it—using this Court as its agent—on nearly a thousand Survivors of child sexual abuse assault.

At trial, the Debtor will ask this Court to affirm and enforce its perspective and thus recreate a dark and devastating past. The Debtor will ask this Court, under the auspices of federal bankruptcy law, to require Survivor creditors to accept the unilaterally-defined charity of the institution that presided over their collective devastation and denied them acknowledgement for decades.

---

[1] The Archdiocese has filed a plan of reorganization indicating that Survivors should be paid approximately $33 million in the aggregate. *See* Bky. No. 23-16969 at Dkt. 1412.

Such a result would be far from fair and equitable. It would be unconscionable and fundamentally incompatible with the Bankruptcy Code, the Debtor's fiduciary duties, and the basic promise that brought this case into this Court: that Survivors would finally be treated fairly and equitably. The evidence at trial will show that the Debtor waived charitable immunity long ago—by the Debtor's public assurances to Marylanders, its promises to this Court, and its decades-long practice of compensating Survivors as part of its own stated mission. The evidence will also show what is obvious to everyone in Maryland, that General Assembly abrogated charitable immunity when it passed the 2023 CVA.  But even if the Debtor can overcome these stark realities at trial, it cannot meet its heavy burden to prove that its assets are held in any charitable trust.

For these reasons, judgment should be entered for the Committee, and the Debtor's attempt to rewrite history and escape genuine, objective accountability should be rejected.

## STATEMENT OF FACTS AND LEGAL ARGUMENT

### I.    SUMMARY OF FACTS.

1.    The Debtor is a corporation sole organized under the laws of the State of Maryland.

2.    The Debtor does not have articles of incorporation.

3.    On September 29, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

4.    The Debtor's bankruptcy case, 23-16969 (the "Bankruptcy Case"), is pending in the bankruptcy court for the District of Maryland.

5.    The Debtor is continuing in possession of its property and management of its business as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

6.    The 2023 Maryland Child Victims Act (the "2023 CVA"), introduced by the Maryland General Assembly as House Bill 1 and Senate Bill 686, became effective on October 1, 2023.

7.      The Debtor filed this chapter 11 case because it faced what the Debtor has continually characterized as potentially catastrophic liabilities from hundreds of Survivors' claims following the passage of the 2023 CVA.

8.      More than 1,000 proofs of claim have been filed in this chapter 11 case alleging that the Debtor is liable for claims arising from child sexual assault and/or other sexual abuse encompassed by the 2023 CVA.

9.      The Debtor took an active role in opposing the 2023 CVA and seeking modifications in 2025 that would reduce liability caps for non-governmental defendants, like the Debtor.

10.     Providing support and compensation to Survivors who were harmed while in the care of the Debtor is consistent with and furthers the Debtor's charitable mission.

11.     Since the 1980s, the Debtor has invested more than $13.2 million into care and monetary compensation for at least 301 Survivors.

12.     The Debtor paid settlements to Survivors whose claims were time-barred and legally unenforceable under the pre-2023 CVA statute of limitations.

13.     The Debtor never took the position, prior to this bankruptcy litigation, that compensating Survivors was inconsistent with or outside of its alleged charitable mission.

14.     Most donations to the Archdiocese over its history were unrestricted gifts intended for the Debtor's general use.

15.     The Debtor does not maintain separate bank accounts for purportedly trust-restricted assets.

16.     The Debtor identified on its statement of financial affairs only the following as property to which it holds legal title but does not own:

| Owner Name | Description of Property | Value |
|---|---|---|
| **The League of the Little Flower of the Archdiocese of Baltimore** | Investment fund (stock/bonds) | $ 3,310,909 |
| **Mother Mary Lange Support Corporation 320 Cathedral St. Baltimore, MD 21201** | Cash collected on pledges for construction of Mother Mary Lange Catholic School | $    125,841 |
| **United States Conference of Catholic Bishops** | Cash from parishes for USCCB requested national collections | $    412,959 |
| **Little Flowers Early Childhood and Development Center** | Cash Deposit held on lease | $      4,000 |
| **Baltimore International Academy, Inc.** | Cash Deposit held on lease | $     35,500 |
| **Elm Street Communities, Inc.** | Cash Deposit on possible sale | $     50,000 |
| **Watershed Public Charter School, Inc.** | Cash Deposit held on lease | $     18,011 |
| **Various Parishes** | Central Online Giving Function | $     34,733 |
| **Society for the Propagation of the Faith** | Cash from parishes for Mission Sunday Collections | $     60,151 |
| **Archdiocese of Baltimore, Mother Mary Land Catholic School, CCF Inc.** | Cash from Campaign with multiple purposes for 3 organizations | $    100,000 |
| **Agency Organizations - Scouting and Youth Group Region 4** | Mission Sunday Collections | $     25,029 |
| **N/A** | Gifts received for disaster relief purposes | $    211,493 |
| **Associated Catholic Charities** | Cash rent from Parking Garage Franklin St. | $     26,220 |
| **Archdiocese of Baltimore Lay Pension Plan Trust** | Cash from participating organizations for lay retirement purposes | $ 2,276,490 |
| **Archdiocese of Baltimore Priest Pension Plan Trust** | Cash from participating organizations for Priest Pension purposes | $    118,597 |
| **Archdiocese of Baltimore Priest Post-Retirement Plan Trust** | Cash from participating organizations for Priest post-retirement purposes | $     14,436 |
| **T. Rowe Price** | Cash from participating organizations for Employer 403(b) contributions | $ 1,127,371 |

| Owner Name | Description of Property | Value |
|---|---|---|
| **The General Insurance Trust of the Archdiocese of Baltimore** | Investments held for property and casualty insurance & Workers Comp | $41,788,440 |
| **The Health Insurance Trust of the Archdiocese of Baltimore** | Investments held to support the Health Insurance program | $17,910,812 |
| **The Sexual Misconduct Trust of the Archdiocese of Baltimore** | Investments held for voluntary support of sexual assault victims | $ 2,057,473 |
| **Archdiocese of Baltimore Priest's Pension Trust Fund** | Investments from participating organizations for Priest Pension purposes | $36,879,820 |
| **Archdiocese of Baltimore Lay Employees' Retirement Trust Fund** | Investments from participating organizations for Lay Employees' Retirement purposes | $177,832,956 |
| **Archdiocese of Baltimore Priests' Post-Retirement Medical Benefits Trust Fund** | Investments from participating organizations for Priests' post-retirement purposes | $12,967,262 |

17.    The Debtor identified $204,962,748.36 in additional assets on its Schedule A/B.

\*\*\*

## II.     THE DEBTOR BEARS THE BURDEN OF PROOF ON ITS AFFIRMATIVE DEFENSE AND COUNTERCLAIM.

The Debtor bears the burden to establish the affirmative defense of charitable immunity.[2] Charitable immunity is "intended to protect charitable organizations from tort liability. Under Maryland law, charitable immunity is premised on the trust fund theory, that is, because funds of the organization are impressed with a trust for charitable purposes, those funds should not be diverted to pay tort damage awards."[3] But not every charitable organization is entitled to assert the affirmative defense.[4] Instead, "only when the assets of the charitable organization are held in trust, either expressly or by implication, and when the corporation has no liability insurance covering the complained of act, does the charitable immunity doctrine apply."[5]

The Debtor's burden in this case is substantial, and it cannot produce sufficient evidence at trial to meet its high burden on any element of the charitable immunity defense. In addition to the burdens of proof and persuasion on all other elements of the defense, the Debtor must produce clear and convincing evidence that it holds its assets in a charitable trust(s).[6] The Committee's evidence, in contrast, will rebut the Debtor's assertions of charitable immunity by demonstrating (i) the Debtor waived the defense through its actions and promises, (ii) charitable immunity was abrogated by the

---

[2] *Ward v. Rebuilding Together Balt., Inc.*, No. 1278, 2016 WL 3185134, at * 2 (Md. App. Ct. June 8, 2016); *accord Jay Coll. of Health Scis. v. Chinwuba*, No. 1776, 2025 WL 762163, at *7 (Md. App. Ct. Mar. 11, 2025); *see also* Memorandum Opinion, Dkt. 111, at 11 n.19 ("Given that the Debtor bears the burden of proof on . . . the affirmative defense of charitable immunity, . . . .").

[3] *Montrose Christian Sch. Corp. v. Walsh*, 363 Md. 565, 582 (2001) (citing *Abramson v. Reiss*, 334 Md. 193, 197, 206–09 (1994); *Loeffler v. Trs. of Sheppard & Enoch Pratt Hosp.*, 130 Md. 265 (1917)).

[4] *James v. Prince George's Cty*, 288 Md. 315, 336 (1980), *superseded by statute on other grounds*.

[5] *Id.* at 337 (citations omitted) (emphasis added); *see Annapolis v. W. Anna. Fire & Imp. Co.*, 264 Md. 729, 737 (1972) (explaining that a volunteer fire company, although possibly a charitable corporation, is not necessarily a charitable trust).

[6] *Long Green Valley Ass'n v. Bellevale Farms, Inc.*, 432 Md. 292, 315 (2013) ("Because a charitable trust is an express trust, the person seeking to establish the trust has the burden to prove, by clear and convincing evidence, that a charitable trust exists.").

2023 CVA, (iii) the Debtor's mission includes paying Survivors' claims, and (iv) the Debtor holds little, if any, of its assets in a charitable trust. For these reasons the Court should enter judgment in favor of the Committee.

## III.   THE DEBTOR'S WORDS AND CONDUCT, INCLUDING FILING FOR BANKRUPTCY, WAIVED CHARITABLE IMMUNITY.

The Debtor's voluntary decision to file for bankruptcy protection and its repeated promises to treat Survivors fairly and equitably, prevent the Debtor from relying on charitable immunity to avoid all liability for Survivor claims.

The evidence at trial will show the Debtor filed bankruptcy to avoid catastrophic liability arising from Survivors' claims, and it promised to treat Survivors fairly and equitably in exchange for the opportunity to reorganize the Debtor's financial affairs. But, rather than playing by the rules applicable to all other chapter 11 debtors, this Debtor decided to couple charitable immunity with the equitable powers of this Court to obtain a complete discharge of all Survivor claims, for itself and its Catholic affiliates, by paying a price that the Debtor will alone determine to be fair and equitable. Moreover, the evidence at trial will show that the Debtor has obtained extraordinary relief during the course of its chapter 11 case by promising to pay Survivors fairly and equitably, but failed to inform Survivors or this Court that what is "fair and equitable" was subject to the Debtor's sole and absolute discretion pursuant to the doctrine of charitable immunity.

Employing charitable immunity to avoid all liability to unsecured creditors (or to unilaterally impose an arbitrary cap on the Debtor's liability to creditors) is neither fair nor equitable and is incompatible with the Debtor's fiduciary duties to creditors in this bankruptcy. Even if the Debtor has the legal power to unilaterally set the terms of a bankruptcy settlement with Survivors, equity prevents the Debtor from changing course from its past conduct and promises to pay Survivors fairly and equitably.

a. **The Bankruptcy Code requires the Debtor to pay Survivors fairly and equitably.**

The Bankruptcy Code does not permit the Debtor to use the automatic stay to avoid the cost and scandal of defending against Survivor lawsuits while using the bankruptcy process to forever eliminate its responsibility to pay Survivors. By electing chapter 11 protection to address "catastrophic" liabilities from CVA claims, the evidence at trial will show the Debtor elected a superior federal statutory framework, assumed fiduciary duties to creditors, and waived its charitable immunity defense. The Debtor cannot now invoke state law immunity to render Survivor claims uncollectible in bankruptcy. To do so would vitiate the Debtor's duty to treat creditors fairly and equitably, undermine Congress's purpose in adopting the Bankruptcy Code,[7] and render this bankruptcy case futile at best and at worst effect a miscarriage of justice.

---

[7] *See In re Omegas Grp., Inc.*, 16 F.3d 1443, 1452 (6th Cir. 1994) ("The equities of bankruptcy are not the equities of the common law. Constructive trusts are anathema to the equities of bankruptcy since they take from the estate, and thus directly from competing creditors, not from the offending debtor. 'Ratable distribution among all creditors' justifies the Code's placement of the trustee in the position of a first-inline judgment creditor and bona fide purchaser for value, empowered to avoid certain competing interests (and even to nullify the debtor's "preferential" prepetition payments to otherwise entitled creditors) so as to maximize the value of the estate.'" (emphasis added)); *In re Foam Sys. Co.*, 92 B.R. 406, 409 (Bankr. App. 9th Cir. 1988), *aff'd*, 893 F.2d 1338 (9th Cir. 1990), *aff'd sub nom. Ins. Co. of the W. v. Simon*, 893 F.2d 1338 (9th Cir. 1990) ("In light of the Bankruptcy Code's strong policy of ratable distribution among all creditors, the bankruptcy court properly declined to exclude the funds in the account from the debtor's estate by imposing a resulting trust. *See In re Lewis W. Shurtleff, Inc.*, 778 F.2d 1416, 1419–1420 (9th Cir. 1985) (although equities as between debtor and one group of creditors favored imposition of a constructive trust, court would not impose constructive trust and deprive estate of property which could be distributed to other creditors as well); *In re North American Coin & Currency, Ltd.*, 767 F.2d 1573, 1575 (9th Cir. 1985) (court reluctant to exercise relatively undefined equitable power, the imposition of a constructive trust, in favor of one group of potential creditors at the expense of other creditors, because ratable distribution among all creditors is one of the strongest policies of bankruptcy law.)[.]"); *see also In re Short*, 625 B.R. 678, 689 (Bankr. E.D. Mich. 2021) (noting Bankruptcy Code's system of equitable distribution); *In re E.M. Williams & Sons, Inc.*, No. 08-03055-KRH, 2009 WL 2211727, at *2 n. 7 (Bankr. E.D. Va. July 17, 2009), *aff'd sub nom.*, No. CIV.A 3:09CV533, 2010 WL 1279094 (E.D. Va. Mar. 30, 2010) (same).

A Chapter 11 debtor-in-possession has similar duties to a chapter 11 trustee and must act in the best interest of the creditors of the estate.[8] In other words, "[t]he job of the debtor-in-possession is to make sure the creditors are paid."[9]  The Debtor assumed a fiduciary obligation to treat Survivors fairly and equitably when it filed this chapter 11 case, and unless Survivors consent to the Debtor's reorganization, the Debtor must show its proposal to pay Survivors is "fair and equitable."[10]

"A plan **must be fair and equitable in a broad sense,** as well as in the particular manner specified in 11 U.S.C. § 1129(b)(2)."[11] In other words, a debtor's compliance with the absolute priority rule is a necessary, but not a sufficient, step in determining whether a plan is fair and equitable.[12] "For a plan to be 'fair and equitable,' the 'plan must literally be fair and equitable.'"[13]

A plan cannot be fair and equitable if creditors are asked to make a substantial sacrifice while the debtor is asked to sacrifice little.[14] To this end, the Debtor agrees the fair and equitable standard,

---

[8] *See In re Bowman,* 181 B.R. 836, 843 (Bankr. D. Md. 1995) (explaining a debtor-in-possession would owe the same duties as a trustee).

[9] *Id.* at 843.

[10] 11 U.S.C. § 1129(b).

[11] *In re Bryson Properties, XVIII*, 961 F.2d 496, 505 (4th Cir. 1992) (emphasis added). As the Fourth Circuit notes, a plan must satisfy the absolute priority rule to be considered fair and equitable under 11 U.S.C. § 1129(b)(1). The absolute priority rule prevents a debtor's equity owners from retaining an interest in the debtor unless unsecured creditors are paid in full. 11 U.S.C. § 1129(b)(1)(B). The Debtor contends that it does not need to satisfy the absolute priority rule by virtue of its status as a non-profit entity. 10/6/25 H'ng Tr. 55–56 ("So with respect to the absolute priority rule, in a non-profit, there are no equity holders. . . . And so if the Debtor is putting insurance plus, then we've satisfied, by Bankruptcy Code standards, the fairness standards."). Regardless of the merits of this position, the Debtor cannot simply pay unsecured creditors nothing and satisfy the elements of 1129. *See* William L. Norton III, *Absolute priority rule*, 4 Norton Bankr. L. & Prac. 3d § 113:23 (2025) ("Because there effectively is no statutory definition of 'fair and equitable' for such cases, it remains to be seen what it requires beyond the liquidation value of the best interests test.").

[12] *In re Global Fertility & Genetics*, 663 B.R. 584, 609–10 (Bankr. S.D.N.Y 2024) (B.J., Bentley) (citing *In re Bryson Properties, XVIII*, 961 F.2d 496, 505 (4th Cir. 1992)); *see In re D&F Const.*, 865 F.2d 673, 675 (5th Cir. 1989) (explaining that Section 1129(b)(2) "should not be interpreted as requiring that every plan not prohibited be approved" but instead, that courts "must consider the entire plan in the context of the rights of the creditors under state law and the particular facts and circumstances when determining whether a plan is 'fair and equitable.'"); *In re DBSD N. Am., Inc.*, 634 F.3d 79, 88 (2d Cir. 2011) ("The Code does not define the full extent of 'fair and equitable,' but it includes a form of the absolute priority rule as a prerequisite."); *Matter of D & F Constr. Inc.*, 865 F.2d 673, 675 (5th Cir. 1989) (finding that the requirements of Section

at a minimum, requires that even a non-profit debtor must provide unsecured creditors the value of all of its non-mission critical assets:

> Q:    Okay.  Bishop Parker, is it the Debtor's intention to pay survivors fairly and equitably as part of the bankruptcy process?
>
> A:    Yes, it is.
>
> Q:    What is the concept of fair and what does the concept of fair and equitable mean to you?
>
> A:    It means that all of the survivors would have -- with legitimate claims would have the opportunity to receive compensation. Not that everybody would necessarily receive the same amount, but all would have the opportunity to receive compensation.
>
> Q:    What would be a fair amount of compensation for survivors?
>
> A:    Are you referring to a dollar figure?

---

1129(b)(2) are not exhaustive but merely describe the minimum standard that a plan must meet to satisfy the fair and equitable requirement). This is consistent with the legislative history of Section 1129(b):

> Although many of the factors interpreting "fair and equitable" are specified in paragraph (2) [of § 1129(b)], others, which were explicated in the description of section 1129(b) in the House report, were omitted from the House amendment to avoid statutory complexity and because they would undoubtedly be found by a court to be fundamental to "fair and equitable" treatment of a dissenting class. For example, a dissenting class should be assured that no senior class receives more than 100 percent of the amount of its claims. While that requirement was explicitly included in the House bill, the deletion is intended to be one of style and not one of substance.

H.R. Rep. 95-595 at 549 (1978).

[13] *In re Premiere Hosp. Grp., Inc.*, No. 13-02145-8-RDD, 2013 WL 6633428, at *2 (Bankr. E.D.N.C. Dec. 16, 2013) (quoting *In re Cheatham,* 78 B.R. 104 (Bankr. E.D.N.C. 1987), *aff'd* 91 B.R. 377 (E.D.N.C. 1988)).

[14] *See In re EFH Grove Tower Assocs.,* 105 B.R. 310, 313–14 (Bankr. E.D.N.C 1989) (noting that the "costs of the debtor's reorganization should be borne by those who stand to gain from the reorganization[]"); Pamela Foohey, *Chapter 11 Reorganization and the Fair and Equitable Standard: How the Absolute Priority Rule Applies to All Nonprofit Entities*, 86 STJL 31, 75–76 (2012) ("If the reorganizing entity proposes a plan that violates the payment priority structure among creditors and interest holders, allocating going concern value away from senior claimants, to equity holders or simply to itself, the plan is not fair and equitable. This is the principle that courts addressing absolute priority claims in the context of nonprofit reorganizations only marginally acknowledged or completely overlooked. And this is the principle that animates the absolute priority rule and warrants its application to all nonprofit reorganizations. Regardless of case law that may be read to provide otherwise, **unless creditors consent, a plan of reorganization, whether addressing a for-profit or nonprofit entity, is not fair and equitable unless creditors are provided for as much as possible until they are paid in full.**" (emphasis added)).

Q:    Yes.

A:    I'm not able to answer that question because it would be different depending on the perspective of the individual.

Q:    Okay.

A:    So by "fair," we want a fair opportunity for all survivors to have the opportunity to participate.  I would distinguish that from the word that some have used as in reasonable, what is a reasonable amount. So when we say "fair" compensation, we mean a fair opportunity for people to participate. It would be fair that they would have the access to the Survivors' Compensation Trust as opposed to a path of litigation where perhaps only a few people would have access to compensation.

Q:    So if everyone -- if all survivors got a dollar from the bankruptcy case, as long as everyone's all participating, that would be a fair and equitable proposal?

MR. EVANS:  Objection. You may answer.

A:    It would be fair if one dollar were the amount of the finan -- resources of the Debtor, yes.

Q:    Okay. So exploring that a little bit more, would you agree that the Debtor's ability to pay is also a factor in what is fair and equitable?

A:    Yes.

Q:    Can you help me understand that a little bit more in terms of what the Debtor considers its ability -- what finite resources does the Debtor have to pay survivors?

A:    To describe it generally, it would be the funds that are not designated for a specific purpose that the archdiocese has in what we often refer to our stable patrimony. Those would be dollars that we have, in many cases, invested over the years that have grown through market gains and are not designated for mission-specific purposes. They would also exclude dollars that even if not designated for mission-specific purposes, that we would in fact need for undertaking our mission.[15]

It is for these reasons that the Debtor cannot invoke the Bankruptcy Court's broad equitable

powers to perpetrate a further injustice on Survivors.[16] Instead, this Court should require that the

---

[15] Tr. Deposition of Bishop Adam Parker and 30(b)(6) examination of the Debtor, 106:8-109:2.

[16] *See In re City Homes III LLC*, 564 B.R. 827, 871–72 (Bankr. D. Md. 2017) ("[A]s the Debtors voluntarily sought relief under Chapter 11, their assets *must* be made subject to the superior Chapter 11 statutory scheme in order to exit by way of a confirmed plan.").

Debtor do what all debtors must and pay its creditors fairly and equitably. The Court should disallow the Debtor's charitable immunity defense, because the defense conflicts with the letter and spirit of the Bankruptcy Code and would render meaningless both the bankruptcy process and the Debtor's own stated purpose in filing this chapter 11 case, which is the fair compensation of Survivors. For these reasons the Court should enter judgment in favor of the Committee.

       **b.**     **The Debtor is bound by its promises to pay Survivors fairly and equitably.**

The Debtor's assertion of charitable immunity is in direct conflict with its promises and actions, both before and after it filed for bankruptcy, and so the Debtor should be estopped from asserting the charitable immunity defense.

While Bankruptcy Code Section 558 preserves a debtor's defenses that existed prior to bankruptcy, a debtor's pre-bankruptcy conduct may waive these defenses before they ever repose in the estate.[17] Likewise, a debtor's inequitable conduct during bankruptcy may affect its ability to raise defenses or assert rights otherwise protected by the Bankruptcy Code.[18]

---

[17] *See Matter of Wey*, 827 F.2d 140, 142 (7th Cir. 1987) ("Collier on Bankruptcy points out, '[t]he trustee, however, is bound by any waiver of a defense made by the debtor *before* the filing of the petition in bankruptcy.'") (emphasis added) (citing Collier on Bankruptcy ¶ 558.01, at 558–5 (15th ed. 1987)); *Armstrong v. Tex. Com. Bank*, 1998 U.S. App. LEXIS 40647 (5th Cir. Mar. 11, 1998) (unpublished) (holding the prepetition renunciations of debtors' notice rights precluded trustee from asserting lack of foreclosure notice as a defense); *In re Wey*, 827 F.2d 140, 142–43 (7th Cir. 1987) (holding the prepetition waiver of objection to garnishment precluded trustee from asserting under strong arm clause); *In re Dant & Dant*, 39 F. Supp. 753, 755 (W.D. Ky. 1941) (deeming the debtor to have waived right to rescind contract for fraud when he did not assert right of recission for long period prior to bankruptcy and finding the trustee was precluded from asserting right to rescind in later claim based on such contract); *In re Parrott Broad. Ltd. P'ship*, 2013 Bankr. LEXIS 2594, at *20–23 (Bankr. D. Idaho June 26, 2013) (deeming the debtor to have waived right to prepetition salary).

[18] *See Calafiore v. Werner Enters., Inc.*, 418 F. Supp. 2d 795, 801 (D. Md. 2006) ("[B]arring a former bankrupt from pursuing a valid claim that he failed to schedule would result in a windfall for the defendant, while preventing the creditors from receiving money to which they would have been entitled had the claim been listed.").

1. *By Promising Marylanders It Would Treat Survivors Fairly and Equitably, the Debtor Waived Its 558 Defenses Prior to Bankruptcy.*

The evidence at trial will show that the Debtor promised Marylanders that it had made progress in protecting children and was filing for bankruptcy to make right on its past wrongs by compensating Survivors. Allowing the Debtor to make such public promises and then assert charitable immunity to avoid all liability for its role in the sexual assault of nearly 1,000 children is unconscionable. It is for these reasons that this Debtor is barred from relying on charitable immunity while in bankruptcy under Maryland's doctrine of equitable estoppel:

> Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded both at law and in equity, from asserting rights which might perhaps have otherwise existed . . . as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse and who on his part acquires some corresponding right, either of property, of contract, or of remedy.

> Three essential and related elements are generally necessary to establish equitable estoppel: 1) voluntary conduct or representation; 2) reliance; and 3) detriment. Clearly . . . equitable estoppel requires that the voluntary conduct or representation constitute the source of the estopping party's detriment…. **[T]he rule now to be followed in Maryland is that equitable estoppel may be applied**, not only when the conduct of the party to be estopped has been wrongful or unconscientious, and relied upon by the other party to his detriment, but also **when the conduct, apart from i[t]s morality, has the effect of rendering it inequitable and unconscionable to allow the rights or claims to be asserted or enforced.**[19]

Trial evidence will show that Survivors, Marylanders, and this Court have been the target of the Debtor's misleading statements, insincere actions, and false promises; and that these deceptions were meant to repair the Debtor's damaged public image and leverage the cheapest possible settlement for itself through bankruptcy. These self-serving actions came at the cost of Survivor creditors who were deprived of meaningful process and subjected to additional, harmful delay without any authentic justification. It is for these reasons that equity requires that the Debtor be estopped from

---

[19] *Gregg Neck Yacht Club, Inc. v. Cnty. Comm'rs of Kent Cnty.*, 137 Md. App. 732, 772–73 (Md. Ct. Spec. App. 2001) (citations omitted) (quotations omitted) (emphasis added).

asserting charitable immunity as a defense in its bankruptcy.

> 2.   The Debtor Is Estopped from Asserting 558 Defenses That Contradict Its Promises in This Chapter 11 Case.

The evidence at trial will also show the Debtor previously asserted in pleadings filed with, and arguments made to, this Court that it would use its assets to pay Survivors' claims. The Debtor should be judicially estopped from now withholding those assets based on the charitable immunity doctrine. Judicial estoppel is an equitable doctrine that exists to protect the integrity of the judicial process.[20] The doctrine prohibits parties from "deliberately changing positions according to the exigencies of the moment."[21]

The Fourth Circuit has repeatedly emphasized that "the doctrine is invoked to prevent a party from 'playing fast and loose with the courts,' from 'blowing hot and cold as the occasion demands,' or from attempting 'to mislead the [courts] to gain unfair advantage.'"[22] The application of the doctrine is left to the discretion of the Court and should be based on the facts and circumstances of each case.[23]

Courts, including the U.S. District Court for the District of Maryland, have accorded "great weight to the interests of the bankruptcy debtor's creditors in deciding whether to apply judicial estoppel."[24] Judicial estoppel is thus particularly salient in the bankruptcy context because it provides

---

[20] *See Martineau v. Wier*, 934 F.3d 385, 393 (4th Cir. 2019) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001)); *King v. Herbert J. Thomas Mem'l Hosp.*, 159 F.3d 192, 196 (4th Cir. 1998); *Lowery v. Stovall*, 92 F.3d 219, 223 (4th Cir. 1996).

[21] *Martineau*, 934 F.3d at 393 (quoting *New Hampshire v. Maine*, 532 U.S. at 749–50); *see also In re Superior Crewboats, Inc.*, 374 F.3d 330, 334 (5th Cir. 2004)).

[22] *King*, 159 F.3d at 196 (quoting *Lowery*, 92 F.3d at 223, 225).

[23] *Id.*

[24] *Calafiore*, 418 F. Supp. 2d at 801 . The bankruptcy system also "depends on full and honest disclosure by debtors of all of their assets[,]" a duty that continues throughout the bankruptcy. *In re USinternetworking, Inc.*, 310 B.R. 274, 282 (Bankr. D. Md. 2004) (internal quotations omitted). "The interests of both the creditors, who plan their actions in the bankruptcy proceeding on the basis of information supplied in the disclosure statements, and the bankruptcy court, which must decide whether to approve the plan of reorganization on the same basis, are impaired when the disclosure provided by the debtor is incomplete." *Id.* (citing *Rosenshein v.*

a method of assuring the disclosure on which the bankruptcy system depends by holding debtors to their word.

To determine whether to apply judicial estoppel, the Fourth Circuit has identified four elements that must be met:

> (1) the party sought to be estopped must be seeking to adopt a position that is inconsistent with a stance taken in prior litigation; (2) the position sought to be estopped must be one of fact rather than law or legal theory; (3) the prior inconsistent position must have been accepted by the court; and (4) the party sought to be estopped must have intentionally misled the court to gain unfair advantage.[25]

The Debtor's conduct in its chapter 11 case and litigation positions in this adversary proceeding plainly implicate all four elements of judicial estoppel, and so the Court should enter judgment in favor of the Committee.

> a)      *The Debtor's Categorical Assertion of Charitable Immunity Is Inconsistent with Its Prior Representations to the Court.*

The first element of judicial estoppel requires that the position a party seeks to adopt (i.e., charitable immunity) be inconsistent with a previous position the party adopted (i.e., fair and equitable payment to Survivors). In bankruptcy cases, courts recognize this factor when a party has failed to disclose an asset or claim.[26] Trial evidence will show the Debtor made unequivocal, unqualified promises to pay Survivors fairly and equitably. Allowing the Debtor to change its tune and assert charitable immunity as a complete defense to its responsibility for payment of all Survivor claims would be unconscionable.

Notwithstanding all of these promises, and despite enjoying two years of an extended stay

---

Kleban, 918 F.Supp. 98, 104 (S.D.N.Y. 1996): *accord Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 321–323 (3rd Cir. 2003)).

[25] *Minnieland Priv. Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co.*, 867 F.3d 449, 458 (4th Cir. 2017).

[26] *See In re USinternetworking, Inc.*, 310 B.R. (applying judicial estoppel to prevent a former debtor from asserting a claim that it failed to include in its plan of reorganization).

protecting hundreds of Debtor affiliates obtained on the basis of such promises, insisting that the Court order parties into confidential mediation, and realizing the other benefits of a coordinated bankruptcy proceeding (such as, among other things, a claim bar date that State law would not have provided), the Debtor seeks to assert charitable immunity and categorically eliminate its legal responsibility to furnish compensation to the Survivors.

It is illogical and nonsensical for the Debtor to argue these positions are compatible. Accordingly, the Debtor's promises, made on the first day of the chapter 11 case and on many occasions since, to pay Survivors is inconsistent with the doctrine of charitable immunity as the Debtor intends to apply it in this case, and so the Debtor's assertion of the charitable immunity defense should be estopped.

> b)    *The Debtor has changed its factual position, not a legal argument.*

The second element of judicial estoppel requires that the inconsistent positions be based in fact, not law. Pursuant to this element, a party offering a new legal argument would not be estopped based on that party's previous assertion of a different legal argument.[27] However, a party who has previously asserted one fact is estopped from subsequently asserting a contrary fact.[28] The failure to disclose the existence of a bankruptcy claim is considered a factual matter.[29]

Trial evidence will establish the Debtor previously contended and represented that (i) it sought bankruptcy relief because of the enormous liability it faced as the direct result of Survivor claims;

---

[27] *See Minnieland Priv. Day Sch., Inc.*, 867 F.3d at 283 (finding that whether a document constitutes an insurance contract is a question of law, and thus, a party cannot be judicially estopped from changing its position on that question).

[28] *See In re USinternetworking, Inc.*, 310 B.R. at 283–84 (finding that a party's failure to disclose the existence of a claim judicially estopped the party from later asserting the claim because the existence of that claim was a question of fact).

[29] *See id.* at 284 ("This contention [that the decision to not disclose was legal] is flawed, because it focuses on the reasons why [the Debtor] took the position that the claim need not be disclosed, **rather than on the existence of the claim, which was the factual subject matter that was not disclosed**." (emphasis added)).

(ii) it would compensate Survivors fairly and equitably; (iii) it was not filing bankruptcy to escape its financial obligations to pay Survivors; and (iv)  a substantial part of  its payment of Survivor claims would come directly from the Debtor (and not its insurers). Now in this litigation, the Debtor asserts it has no legal obligation to pay Survivor claims at all.

Whether the Debtor believes its decision to assert charitable immunity was legal strategy or not, its decision to assert immunity so late in the chapter 11 case is a departure from its prior factual representations and therefore subject to judicial estoppel.

        c)     *The Court Previously Relied on the Debtor's Promise of Fair Payments to Survivors.*

To satisfy the third element, the court must have accepted the party's previous (inconsistent) position. A court may accept a party's position by entering a ruling based on that position, entering a debtor's plan based on the position, or approving an agreement among the parties that relied on the position.[30]

The record in this case evidences that, as early as four days after the Petition Date, the Court relied on the Debtor's assertion that extending the stay would further the Debtor's plan to pay Survivors fairly and equitably. The Debtor never mentioned its intention to assert charitable immunity, but instead made an unambiguous representation that nearly half of all payments to Survivors would come from the Debtor and its affiliates.[31] The evidence at trial will show how the Debtor neglected to mention to the Court that it believed it could never face catastrophic liabilities because it had an affirmative defense of charitable immunity.

---

[30] *See In re USinternetworking, Inc.*, 310 B.R. at 284 (holding that the court accepted the debtor's previous position by entering the plan of reorganization).

[31] 10/3/2023 H'ng Tr. 87 ("[DEBTOR]: It [the Survivor trust] will be funded primarily – it will be funded from the Debtor, from insurance policies, and from parishes and schools. That will be part of their contribution. And historically, the insurance, if you average it, which I know average is about 55 percent of the compensation, ultimately comes from the carrier.").

PLAINTIFF'S TRIAL STATEMENT - 17

Based on the Debtor's explicit assertion that it had liability for Survivor claims and would pay those claims fairly and equitably, the Court, among other things, twice entered orders extending the stay to the Debtor's affiliates and denied the Committee's request to fully lift the automatic stay.[32] It is unmistakable that the Court, in exercising its vast equitable powers during this case, has relied on the Debtor's promise to compensate Survivors fairly and equitably and that these promises are violated by the Debtor's eleventh-hour invocation of complete immunity.

> d)   *The Debtor Intentionally Misled the Court and Must Be Estopped from Asserting Charitable Immunity.*

The fourth element requires that the party seeking to change its position intentionally misled the court to gain an unfair advantage.[33] A party intentionally misleads the court when it makes a deliberate decision to take a position or not to disclose something.[34] To determine whether a party sought to mislead the court intentionally, the court can examine the party's motivation in changing its position.[35] Generally, judicial estoppel is invoked where "'intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice.'" [36]

The Debtor knew before it filed for bankruptcy and throughout the course of the chapter 11 proceeding that it would assert charitable immunity as a defense to paying Survivor claims. Instead of revealing its intention to assert charitable immunity to avoid paying Survivors fair compensation

---

[32] *See* Bky. 23-16969, Dkts. 52, 173, *Interim Orders Extending the Automatic Stay to Certain Related Entities* (extending the automatic stay to entities covered under Debtor's insurance); Bky. 23-16969, Dkt. 1127, *Order Modifying Automatic Stay Solely for Purposes of Filing and Serving Certain Civil Complaints Under Maryland Law on or Before May 31, 2025* (partially granting Committee's motion to lift automatic stay).

[33] *See Nat'l Union Fire Ins. of Pitt. v. Mfrs. & Traders Tr. Co.*, 137 F. App'x 529 (4th Cir. 2005) (holding that the party adopted a "subsequent inconsistent position intentionally for the purpose of gaining unfair advantage, rather than as a result of inadvertence or mistake[]" (internal quotations omitted)).

[34] *See In re USinternetworking, Inc.*, 310 B.R. at 285 (judicially estopping the party from asserting a claim because the party made a deliberate decision not to previously disclose the claim).

[35] *See id.* (analyzing the party's motive for concealing the claim it failed to disclose).

[36] *In re Superior Crewboats, Inc.*, 374 F.3d 330, 334–35 (5th Cir. 2004) (citing *Browning Mfg. v. Mims (In re Coastal Plains, Inc.)*, 179 F. 3d 197, 205 (5th Cir. 1999)).

during this chapter 11 case, the Debtor expressly and repeatedly promised the opposite.

The Debtor's motive for concealing its inconsistent positions is clear: the Debtor, its affiliates, and the implicated insurance companies have exchanged promises of a fair and equitable process in exchange for two years of protection under the automatic stay and to avoid public litigation of horrific claims of sexual abuse. Under the Fourth Circuit's test, the Debtor should be judicially estopped from asserting the defense of charitable immunity to avoid paying Survivors' claims.

## IV.    THE 2023 CHILD VICTIMS ACT ABROGATED CHARITABLE IMMUNITY.

The common law doctrine of charitable immunity cannot bar claims related to child sexual abuse, because the policies and provisions of the 2023 CVA preempt the charitable immunity doctrine. A statute overrides the common law if it "deals with an entire subject-matter" (field preemption) or if "a statute and the common law are in conflict" (conflict preemption).[37] In those circumstances, even if "the language . . . contain[s] no specific words of repeal or abrogation," a statute will be "construed as abrogating the common law as to that subject."[38] "Conflict preemption occurs when the new legislation has a clear incompatibility and disharmony with the common law, such that both the common law and the statutes cannot coexist."[39]

The Court can and should decide whether the 2023 CVA preempts charitable immunity as to this Debtor in this bankruptcy case. Certification of a state law issue "rests in the sound discretion of

---

[37] *Antoine v. State*, 245 Md. App. 521, 558 n. 15 (2020); *see, e.g.*, *State v. North*, 356 Md. 308, 313 (Md. 1999) ("Neither § 287B, as codified, nor the session law that enacted it (1991 Md. Laws, ch. 362) expressly declares an intent to circumscribe the attachment to § 287 of the common law offense of attempt. They are, indeed, entirely silent in that regard. If the common law offense was narrowed, therefore, the narrowing was accomplished by implication, not by expression, and to determine whether the Legislature had such an intent, we turn to the legislative history of the enactment.").

[38] *Id.* (quoting *Robinson v. State*, 353 Md. 683, 693–94 (1999)).

[39] *Harris v. State*, 479 Md. 84, 101 (2022).

the federal court."[40]  This discretion extends to "[u]nsettled questions of state law."[41]

While the Maryland Supreme Court might ultimately disagree with a decision by a federal court on matters of state law,[42] until that time this Court has jurisdiction and the ability to decide the legal questions concerning Maryland law placed before it. The United States Supreme Court has directed that even if there is difficulty in ascertaining local law, and absent extraordinary circumstances, the court should not remit the parties to a state tribunal for the start of another lawsuit.[43] A federal court may, in its discretion, abstain when "the unsettled question of state law is one which only a state tribunal could authoritatively construe."[44] But here, abstention is not proper when the court can reach a "concise alternative decision on the merits" and "has citation to numerous Maryland cases demonstrate[ing] that the applicable state law does not lack certainty."[45]

A question is not reserved solely for state courts just because it poses "difficult state law questions.""[46] And while the question of whether the 2023 CVA abrogated charitable immunity has

---

[40] *Lehman Bros. v. Schein*, 416 U.S. 386, 389–91 (1974).

[41] *H.D. Oliver Funeral Apartments, Inc. v. Dignity Funeral Services, Inc.*, 964 F. Supp. 1033, 1035 (E.D. Va. 1997).

[42] *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 (1938). This is provided that there is no overriding federal rule which pre-empts state law by reason of an overriding federal interest. See *Lehman Bros.* 416 U.S. at 389–91.

[43] *Meredith v. City of Winter Haven*, 320 U.S. 228, 234 (1943) ("[W]e are of opinion that the difficulties of ascertaining what the state courts may hereafter determine the state law to be do not in themselves afford a sufficient ground for a federal court to decline to exercise its jurisdiction to decide a case which is properly brought to it for decision.").

[44] *Wohl v. Keene*, 476 F.2d 171, 174 (4th Cir. 1973) (citing *Wisconsin v. Constantineau*, 400 U.S. 433 (1971); *Crawford v. Courtney*, 451 F.2d 489, 492 (4th 1971); *Lake Carrier's Assoc. v. MacMullan*, 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972)); *see Crawford v. Courtney*, 451 F.2d 489, 492 (4th Cir. 1971); *see Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 511 (1972) ("The Michigan Watercraft Pollution Control Act of 1970 has not been construed in any Michigan court, and, as appellants themselves suggest in attacking it for vagueness, its terms are far from clear in particulars that go to the foundation of their grievance.").

[45] *Wohl v. Keene*, 476 F.2d at 174 (citation omitted).

[46] *Wohl v. Keene,* 476 F.2d at 174 *(citation omitted); Martin v. State Farm Mut. Auto. Ins. Co.*, 375 F.2d 720, 722 (4th Cir. 1967) ("The mere possibility that, solely, in the exercise of its diversity jurisdiction, a federal court may be called upon to decide an issue of state law, not theretofore decided by a state court, in a manner different from some subsequent authoritative state decision is no ground for abstention.").

not been answered by the Maryland Supreme Court, the unsettled question of state law is not so novel that this Court lacks guidance to construe and resolve the question. Rather, it is a routinely occurring question concerning the application of well-established Maryland law governing statutory interpretation to one particular piece of legislation, the 2023 CVA. Moreover, this circumstance is not one of the enumerated exceptions noted by the United States Supreme Court.[47] Instead, abrogation of charitable immunity is a question this Court has complete discretion, but also full authority, to answer using well-established canons of statutory interpretation under Maryland law. The Committee requests that the Court resolve this issue to move the adversary proceeding and the chapter 11 case toward a prompt resolution.

The Committee has already submitted into evidence,[48] and the Court has taken judicial notice of, relevant portions of the legislative record regarding the passage of the 2023 CVA. The record demonstrates that the 2023 CVA eliminated charitable immunity as a defense to child sexual abuse claims by establishing a statutory framework that conflicts with the common law doctrine. The

---

[47] *Meredith v. City of Winter Haven*, 320 U.S. 228 at 235–36 ("It is for this reason that a federal court having jurisdiction of the cause may decline to interfere with **state criminal prosecutions** except when moved by most urgent considerations; or with the **collection of state taxes** or with the fiscal affairs of the state; or with the **state administrative function** of prescribing the local rates of public utilities; or to interfere, by appointing a receiver, **with the liquidation of an insolvent state bank** by a state administrative officer, where there is no contention that the interests of creditors and stockholders will not be adequately protected. Similarly it may refuse to appraise or shape **domestic policy of the state governing its administrative agencies**. And it may of course decline to exercise the equity jurisdiction conferred on it as a federal court when the plaintiff **fails to establish a cause of action**. So too a federal court, adhering to the salutary policy of refraining from the **unnecessary decision of constitutional questions**, may stay proceedings before it, to enable the parties to litigate first in the state courts questions of state law, decision of which is preliminary to, and may render unnecessary, **decision of the constitutional questions presented**. It is the court's duty to do so when a suit is pending in the state courts, where the state questions can be conveniently and authoritatively answered, at least where the parties to the federal court action are not strangers to the state action. In thus declining to exercise their jurisdiction to enforce rights arising under state laws, federal courts are following the same principles which traditionally have moved them, because of like considerations of policy, to refuse to give an extraordinary remedy for the protection of federal rights.") (citations omitted) (emphasis added).

[48] The Committee's prior briefing in support of its Motion for Summary Judgment provides extensive citations to the record regarding statements of the Maryland General Assembly, all of which are incorporated by reference.

legislature's explicit goal of holding organizations like the Debtor **liable and responsible** for the damages caused to Survivors cannot coexist with a defense that would render such entities neither liable nor responsible. There is no plausible reading of the 2023 CVA and its accompanying legislative history that indicates the legislature intended for entities like the Debtor to escape liability entirely or limit their liability only to the extent of their insurance. Instead, the legislature plainly stated and intended the opposite. The Maryland General Assembly abrogated charitable immunity because: (1) it intended entities like the Debtor to be liable and responsible for 2023 CVA claims, as evidenced by the legislative record specifically addressing this Debtor's specific actions that perpetuated the child sexual abuse crisis in Maryland, and the establishment of damage caps that presuppose defendant liability up to $1.5 million per occurrence; and (2) permitting charitable immunity to  cap Survivor claims at $0.00 would render the 2023 CVA's $1.5 million damage caps superfluous and create an unintended windfall for insurance companies—outcomes inconsistent with the legislature's remedial purpose of ensuring Survivors can obtain meaningful compensation from responsible entities.

By acting as a complete bar to recovery against the Debtor, charitable immunity is in direct conflict with the goal of allowing Survivors to seek healing and justice against all entities responsible for child sexual abuse in Maryland. The legislative history and plain language of the statute shows that the clear purpose of the 2023 CVA was to allow the filing of child sexual abuse claims against institutions like churches and schools who are responsible for the epidemic of child sexual abuse in Maryland, even if that exposed the Debtor's non-insurance assets to collection and bankruptcy. The legislative history also shows that the Maryland General Assembly passed the 2023 CVA with the intention of responding to the horrific crisis of child sexual abuse and to provide Survivors a genuine opportunity to access the courts when previously the law had not. Because the Maryland legislature intended to shine a light on decades of child sexual abuse, indifference, and coverup perpetrated by

non-profits in Maryland, most especially the actions and coverup perpetrated by this Debtor, the Court should find that the 2023 CVA abrogated charitable immunity for claims related to child sexual abuse and grant summary judgment in favor of the Committee.

### a. The Purpose and Provisions of the 2023 CVA Are in Irreconcilable Conflict with Charitable Immunity.

Conflict preemption applies in this instance because charitable immunity and the 2023 CVA cannot operate simultaneously. Any common law rule that totally excuses liability against the same exact category of defendants towards whom the 2023 CVA was aimed and replaces the maximum liability award under that law with a cap of $0.00, directly and irreconcilably conflicts with the Maryland General Assembly's intention in passing the 2023 CVA. By acting as a complete bar to liability against charities responsible for sexual abuse, the doctrine of charitable immunity completely undermines both the general purpose and key provisions of the 2023 CVA. The doctrine of charitable immunity and the statute cannot be harmonized and so the common law has been preempted as to CVA-related claims.[49]

The record shows that the General Assembly passed the 2023 CVA to hold defendant institutions, including this Debtor, liable and responsible for their tortious conduct in failing to prevent the sexual assault of children. That legislative intent directly contradicts the charitable immunity doctrine, which otherwise would categorically exempt from liability many of the very entities for which the 2023 CVA sought to restore liability. The General Assembly also did not intend to enhance accountability for the insurers of entities like the Debtor, who would be the only entities with liability under the 2023 CVA for charitable defendant institutions like the Debtor. As a policy matter, this would make no sense at all: the insurers were not responsible for the heinous acts, like those described in the Attorney General report, that precipitated the 2023 CVA. The General Assembly intended

---

[49] *See Antoine v. State*, 245 Md. App. 521, 558 n. 15 (2020).

instead to restore legal and financial accountability for those entities, like the Debtor, with direct and ongoing responsibility for the oversight, care, and protection of children.

Here, while the 2023 CVA does not mention charitable immunity, the legislative history clearly shows that when it crafted the specific provisions of the statute, the General Assembly desired both to (i) provide Survivors with access to justice by holding institutions responsible for sexual abuse accountable and (ii) protect the financial well-being of private institutional defendants. The Maryland Supreme Court found such a strong and irrefutable intent even in the 2017 CVA.[50] Those competing interests resulted in a compromise that is central to the structure and purpose of the 2023 CVA.[51] The elimination of the statute of limitations was intended to allow Survivors to sue institutions (indeed all "defendants")[52] responsible for their abuse, while the liability caps were intended to allow Survivors to achieve some financial recovery from those defendants but also prevent schools, churches, and other institutions from facing larger verdicts that might lead to their insolvency. It is also no secret that the Maryland Attorney General's report indicting the conduct of this Debtor specifically was released immediately preceding the passage of the 2023 CVA and was inextricably intertwined from the legislature's intent in finally passing a 2023 CVA after several years of attempts to do so.

The subsequent 2025 Amendments to the 2023 CVA prove the point: not only did the limits

---

[50] *Roman Cath. Archbishop of Wash. v. Doe*, 489 Md. 514, 562 (2025) ("If it had been the General Assembly's intent to create an irrevocable immunity for the benefit of alleged non-perpetrator defendants who had contributed to instances of child sexual abuse, we would expect there to be some mention of it in the legislative history. However, except for a single memorandum by an unknown author of uncertain circulation, there is not.") (rejecting the Roman Catholic Archbishop of Washington's position that the inclusion of the words "statute of repose" in the text of the statute makes the statute a statute of repose when the legislative intent and function of the statute required the opposite conclusion).

[51] *See also Roman Cath. Archbishop of Wash. v. Doe*, 489 Md. at 563–64 ("Ultimately, the General Assembly struck a compromise, extending the limitations period to 20 years and applying a heightened standard of proof to obtain damages, but only to claims against non-perpetrator defendants filed more than seven years after the alleged victim reached the age of majority.") (discussing the 2017 CVA).

[52] *See* Md. Code Ann., Cts. & Jud. Proc. (C&JP) § 5-117(c) (establishing a damages cap for single defendants, rather than per incidence).

PLAINTIFF'S TRIAL STATEMENT - 24

for private institutional entities decrease as a result of those amendments, but the evidence at trial will show how the Debtor's lobbying arm, the Maryland Catholic Conference, actively engaged in lobbying to reduce those limits as a part of those Amendments. One can infer that these damage caps were meant to impose limited liability on the Debtor to the extent of those caps notwithstanding the charitable immunity doctrine, and the Debtor has no evidence to the contrary.

Three critical aspects of the 2023 CVA would be unrealized in a world where the schools, churches, and other institutions responsible for the care and protection of children continue to enjoy complete charitable immunity from 2023 CVA claims, those include, (i) the intention to hold institutions liable and responsible for child sexual abuse, (ii) the imposition of liability caps, and (iii) the decision to lower those caps at the behest of the Debtor's and MCC's lobbying efforts. Because the Maryland General Assembly's intent in passing and amending the 2023 CVA would be thwarted by allowing churches, schools, and other institutions responsible for child sexual abuse to escape liability except to the extent of their insurance, the 2023 CVA's establishment of liability caps for the benefit of institutional defendants and the common law blanket charitable immunity for those same entities are in irreconcilable conflict.[53]

---

[53] The Debtor offers no evidence the liability caps were intended to benefit insurance companies. *See Roman Cath. Archbishop of Wash. v. Doe*, 489 Md. at 563–64 (noting absence of intent to give repose to institutions responsible for child sexual abuse was persuasive in interpreting the intent of the statute).

PLAINTIFF'S TRIAL STATEMENT - 25

### b.     The Court Must Engage in a Comprehensive Statutory Interpretation Analysis of the CVA to Evaluate the Issue of Conflict Preemption.

It cannot be disputed that the 2023 CVA was intended as a remedial statute,[54] which was passed to give Survivors access to courts after decades of structural and institutional injustices. Remedial statutes are entitled to a liberal construction to discern their meaning and to effectuate the remedial effect intended by the legislature.[55]

Contrary to what the Debtor will argue at trial, the absence of the words "charitable immunity" from the language of the 2023 CVA has no bearing on whether the 2023 CVA preempts charitable immunity. Maryland's courts have, for decades, rejected this narrow and unyielding approach to statutory interpretation:

> "**[A]scertainment of the meaning apparent on the face of a single statute need not end the inquiry. This is because the plain-meaning rule is 'rather an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence if it exists.'**" [I]t is fair to say that legislation usually has some objective, goal, or purpose. It seeks to remedy some evil, to advance some interest, to attain some end.[56]

A statute can abrogate the common law if the survival of the common law would deprive the statute of its "efficacy and render its provisions nugatory."[57] Courts often allow a statute and common

---

[54] *Langston v. Riffe*, 359 Md. 396, 408–09 (2000) ("Generally, remedial statutes are those which provide a remedy, or improve or facilitate remedies already existing for the enforcement of rights and the redress of injuries. They also include statutes intended for the correction of defects, mistakes and omissions in the civil institutions and the administration of the state. The definition of a remedial statute has also been stated as a statute that relates to practice, procedure, or remedies and does not affect substantive or vested rights. Every statute that makes any change in the existing body of law, excluding only those enactments which merely restate or codify prior law, can be said to 'remedy' some flaw in the prior law or some social evil." (citing 3 NORMAN J. SINGER, SUTHERLAND'S STATUTORY CONSTRUCTION, § 60.02, at 152)).

[55] *Bolling v. Bay Country Consumer Fin., Inc.*, 251 Md. App. 575, 589 (Md. Ct. Spec. App. 2021) ("[W]e liberally construe a remedial statute to effectuate its broad remedial purpose . . . .") (citing *Lockett v. Blue Ocean Bristol, LLC*, 446 Md. 397, 424 (2016)).

[56] *Franklin Square Hosp. v. Laubach*, 318 Md. 615, 619–20 (1990) (quoting *Watt v. Alaska*, 451 U.S. 259, 265–266 (1981)) (citing *Kaczorowski*, 309 Md. at 514) (emphasis added).

[57] *Selig v. State Highway Admin.*, 383 Md. 655, 677 (2004); *Nickens v. Mt. Vernon Realty Grp., LLC*, 429 Md. 53, 74–75 (2012), *overturned due to legislative action* ("For a statute or ordinance to abolish a right available through the common law, the statutory language must indicate an express abrogation or an abrogation by

law to coexist if the statute simply provides a more specific remedy to a general common law doctrine:

> The text of Section 8B–2 does not indicate that *all* foreclosure purchasers *must* resort to its statutory repossession process exclusively; rather, the language implies that it is but another manner by which a foreclosure purchaser may repossess property in Baltimore. In short, the express language of Section 8B–2 does not clearly indicate that the common law right to peaceable self-help is "repugnant to the act, or the part thereof invoked, that [its] survival would in effect deprive it of its efficacy and render its provisions nugatory."[58]

and:

> The specific intent renders it separate and distinct from the common law and, thus, supplemental, rather than exclusive. As a result, the specific intent of Section 8–803(b), coupled with a legislative history describing an intent to protect a particular class of victims rather than preempt the common law offense, establishes that Section 8–803 was intended to serve as a discrete offense, supplementing rather than supplanting the common law, so both prevail.[59]

Because any legislative action necessarily implicates existing common law, the Court must examine the Maryland General Assembly's intention to decide the scope of the preemption.[60] "It is a cardinal rule of statutory construction to give effect to the intent of the Legislature."[61] Courts look

---

implication by adoption of a statutory scheme that is so clearly contrary to the common law right that the two cannot occupy the same space." (citing *Selig v. State Highway Admin.,* 383 Md. at 677)).

[58] *Nickens v. Mt. Vernon Realty Grp., LLC*, 429 Md. 53, 74–75 (2012) (quoting *Selig,* 383 Md. at 677).

[59] *Genies v. State*, 426 Md. 148, 159 (2012) (citing *Lutz,* 167 Md. at 17 ("Since there is therefore no conflict between the common law and the statute, both prevail.")).

[60] *Harrison v. John F. Pilli & Sons, Inc.*, 321 Md. 336, 341 (1990) ("First, that Court held that the statute must be strictly construed because it is in contravention of common law. The canon of construction relied on by the Court of Special Appeals may have efficacy in appropriate cases. **It must be recognized, however, that most statutes have the effect of changing existing law, and therefore the canon 'has been most commonly employed where the statute threatens to invade an existing property or contract right, or tends to interfere substantially with a cherished personal liberty.'** Moreover, as Chief Judge Murphy pointed out for this Court in *State v. Fabritz,* 276 Md. 416, 422 (1975), *cert. denied,* 425 U.S. 942 (1976), **even in the case of statutes ordinarily calling for strict construction, it is the intention of the legislature that governs and, like other statutes they 'are to be fairly and reasonably construed, and courts should not, by narrow and strained construction, exclude from their operation, cases plainly within their scope and meaning**.'" (emphasis added) (citing 3 NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION, § 61.06 (4th ed. 1986 rev.))).

[61] *Robinson v. State*, 353 Md. 683, 694 (1999) (citing *Jones v. State,* 311 Md. 398, 405 (Md. 1988)) ("To be sure, the language of the 1996 assault statutes contain no specific words of repeal or abrogation, nor is there any conflict between those statutes and the common law. We have determined, however, that the statutes as adopted represent the entire subject matter of the law of assault and battery in Maryland, and as such, abrogate the common law on the subject." (emphasis added)); *see also Operation of the strict-construction rule*, 3

primarily to the intention of the legislature to determine whether the policy of the statute and the effect of the common law are in conflict.[62] It is often stated that statutes are not presumed to repeal the common law "further than is expressly declared, and . . . a statute, made in the affirmative without any negative expressed or implied, does not take away the common law."[63] Nonetheless, Maryland courts are directed to consider legislative intent rather than adhere to a narrow textual reading of a statute.[64] Maryland's courts,[65] like courts in other states, have recognized that the legislature may abrogate the common law in ways other than the inclusion of precise language of repeal:

> These appraisals of the strict-construction rule . . . show why it may have outlived its rationale, describe difficulties created by its continuing application, and indicate its limitations to reveal much, if anything, about legislative intent or a law's meaning . . . . True enough that legislation merely may restate and codify the common law for the purposes of clarity and uniformity. Generally, though, as was the case here, statutes

---

NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 61:2 (8th ed.) ("Thus, the essential inquiry turns on legislative intent. In this sense, interpretation of a statute in derogation of the common law is no different from the interpretation of any ambiguous statute. Courts routinely draw upon the full array of familiar interpretive tools and look to a law's plain text; employ maxims such as *ejusdem generis* and *expressio unius est exclusio alterius*; consider legislative history; invoke the rules disfavoring absurd, retroactive, and unconstitutional interpretations; seek to promote a law's policy and purpose; appeal to whole-statute and *in pari materia* principles; and rely on all the other traditional intrinsic and extrinsic maxims, rules, canons, and principles of construction.").

[62] *Cecil v. Am. Fed'n of State, Cnty. & Mun. Emps.*, 261 Md. App. 228, 264–66 (2024) ("Because abrogation (or not) depends on legislative intent, policy often provides further insight into a legislature's intended purpose in enacting a statute."); *see Matter of Batchelor*, 260 Md. App. 456, 464 (2024), *cert. granted sub nom. Matter of Isely*, 487 Md. 263 (2024) ("Conflict preemption occurs when 'the challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress[.]"'").

[63] *Lutz v. State*, 167 Md. 12, 15 (1934) (quoting 25 R.C.L. 1054).

[64] *Harrison*, 321 Md. at 341–42 (citing 3 NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION, § 61.06 (4th ed. 1986 rev.)); s*ee also Operation of the strict-construction rule*, 3 NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 61:2 (8th ed.) ("Instead, the rule really reflects a substantive policy presumption courts should make, if at all, only where legislative intent remains unknowable. Additionally, the rule may obscure the point that statutes generally do seek to remedy a defect in the common law, to make some change in the existing legal order. Thus the better question usually is not whether, but how much, a statute changes the common law. Including a presumption against change at any point during interpretation necessarily forestalls the proper inquiry and produces an answer to the wrong question. Finally, as Section 61:1 explains more fully, the circumstances that shaped and rationalized this substantive policy presumption are themselves now obsolete. Statutes have been the primary engine of American social and economic reform for close to a century and a half. To presume they derogate anything other than, perhaps, other statutes merely perpetuates hackneyed dogma, enervates the whole endeavor of statutory interpretation, and perverts the separation of powers premise of representative democracy.").

[65] *Harrison*, 321 Md. at 341–42.

seek to remedy a defect in the common law, to make some change in the existing legal order. The question for courts then becomes not whether, but how much, a statute changes the common law. And Minnesota's approach is sensible because it recognizes that the traditional presumption against change is not helpful to answer that question. Indeed, the presumption likely just complicates a court's interpretive obligation.[66]

By encouraging the Court to begin and end its statutory interpretation analysis by searching for the words "charitable immunity,"[67] the Debtor suggests that well-established canons of statutory interpretation do not and cannot apply to charitable immunity. The Debtor is wrong. While Maryland courts are unable to abrogate the doctrine of charitable immunity, the Maryland General Assembly has no such limitation.[68] This Court should decline the Debtor's invitation to elevate and prioritize the antiquated and unjust doctrine of charitable immunity above the language of the 2023 CVA and the intentions of the Maryland legislature.[69]

---

[66] *In general (strict construction)*, 3 NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 61:1 (8th ed.) (quoting *Teders v. Rothermel*, 205 Minn. 470 (1939)) (citations omitted); *see also Teders v. Rothermel*, 205 Minn. 470, 472 (1939) ("Too much judicial indulgence in 'strict construction' of statutes has heretofore disguised 'extraconstitutional obstacles to, or hindrances of, legislative purpose.' However radical the change, we do not permit ourselves, because it is an innovation, so to limit a statute by construction as to defeat or even hinder its purpose. Our effort is rather to give any statute 'a fair construction, with the purpose of its enactment in view, not narrowed or restricted because it is a substitute for the discarded common law.' It is with that rule, rather than any notion either of duty or right to construe strictly, as a guide, that we attempt interpretation of the Florida statute." (citations omitted)).

[67] Even when presented with express provisions of a statute, the Maryland Supreme Court has focused on legislative history to understand legislative intent. *See, e.g.*, *Roman Cath. Archbishop of Wash. v. Doe*, 489 Md. 514, 563–64 (2025) (discussing the 2017 Child Victims Act) ("In the same version of the bill in which the General Assembly adopted that compromise, it added Subsection (d) and the references to it as a 'statute of repose' in § 3 and the statement of purpose. Yet those changes are not referred to in the statements describing the compromise, in the records of committee hearings, or in seven of the eight sessions when the two chambers considered the legislation, with the only exception being a Senator's recitation of the purpose paragraph on the Senate Floor.").

[68] The suggestion by the Debtor that it has a right to common law charitable immunity under the Maryland constitution that cannot be affected by the legislature is without legal basis. MD. CONST. DECL. OF RTS. art. 5 (noting common law rights are subject "nevertheless, to the revision of, and amendment or repeal by, the Legislature of this State."); *see also Bd. of Educ. of Charles Cnty. v. Alcrymat Corp. of Am.*, 258 Md. 508, 515–16 (1970) (acknowledging, in the context of a litigant's ability to waive charitable immunity, "possible distinctions between the defense of governmental immunity, on the one hand, and the defense of charitable immunity, on the other").

[69] *WSC/2005 LLC v. Trio Ventures Assocs.*, 460 Md. 244, 258–59 (2018) ("Conflict preemption occurs when the new legislation has a clear incompatibility and disharmony with the common law, such that both the common law and the statutes cannot coexist." (citations omitted)).

PLAINTIFF'S TRIAL STATEMENT - 29

The Debtor also argues that, because the General Assembly expressly waived sovereign immunity for claims arising under the 2023 CVA, if the General Assembly intended to waive charitable immunity for CVA claims, it would have necessarily done so expressly as well. The Debtor will not present any evidence at trial for this contention, and the language of the statute and the important constitutional distinction between charitable and sovereign immunity undermines the Debtor's reliance on disfavored statutory canons.[70]

In addition to the policy goal of holding institutions liable and responsible for child sexual abuse, the legislature used liability caps to evidence its intent to abrogate immunity for both private and public defendants. To start, the General Assembly acted in the same way to abrogate sovereign immunity as it did for charitable immunity. "The [CVA] permitted greater awards of damages against governmental entities, up to $890,000 per claimant, than are available for most other types of claims."[71] As it did with private institutions, discussed above, the Maryland legislature used caps both to (i) hold public institutions accountable for child sexual abuse, and (ii) mitigate the financial catastrophe that could result from large awards.[72]

Absent specific language in the statute or legislative history to the contrary, the legislature's action against public institution should be viewed to have a parallel purpose to the legislature's intention against private institutions. Instead, the Debtor advocates without any evidence that the legislature affirmatively intended to provide private charities a free pass on child sexual abuse.

The Maryland General Assembly waived sovereign immunity expressly in the CVA because

---

[70] The Debtor relies on the interpretive canon of *expressio unius est exclusio alterius*, but the canon "should be applied with extreme caution, as [it] is not a rule of law, but merely an auxiliary rule of statutory construction applied to assist in determining the intention of the Legislature where such intention is not manifest from the language used." *Potomac Abatement, Inc. v. Sanches*, 424 Md. 701, 73 (2012) (internal citation omitted).

[71] *Roman Cath. Archbishop of Wash. v. Doe*, 489 Md. at 524.

[72] *See generally* 2025 CVA Amendments (adding the damages caps).

there is well-developed authority indicating that it must.[73] While the legislature is required to act expressly to abrogate sovereign immunity,[74] the Maryland General Assembly was not required to act in a specific way or use specific words of repeal when it comes to charitable immunity.[75] Viewing the CVA as a whole, the Court should view the legislature's imposition of damages caps for public institutions, which had the legal effect of waiving sovereign immunity,[76] and the corresponding imposition of damages caps for private entity-defendants, as likewise having the legal effect of waiving charitable immunity solely as to claims addressed by the 2023 CVA.

Because the legislature's intention is manifest from the record and shows clear intent to hold entities like the Debtor liable and responsible for child sexual abuse, the Court should enter judgment in favor of the Committee.[77]

---

[73] *Est. of Burris v. State*, 360 Md. 721, 736 (2000) ("The State has a common law sovereign immunity from such actions, however, except to the extent that the Legislature has waived that immunity by (1) authorizing a suit for damages, and (2) providing for the payment of any resulting judgment."); *see Bd. of Educ. of Balt. Cnty. v. Zimmer-Rubert*, 409 Md. 200, 212 (2009) ("When considering waivers of sovereign immunity, this Court and the Court of Special Appeals have strictly construed such waivers in favor of the sovereign." (citations omitted)).

[74] *Cf. Montrose Christian Sch. Corp.*, 363 Md. at 583 ("Moreover, even if a statutory employment discrimination action were characterized as a tort suit, charitable immunity cannot be used to shield liability where the common law has been modified by legislation permitting actions against charitable organizations.").

[75] *Antoine v. State*, 245 Md. App. 521, 558 n.15 (2020) ("If 'a statute and the common law are in conflict,' in those circumstances, even if 'the language . . . contain[s] no specific words of repeal or abrogation,' a statute will be 'construed as abrogating the common law as to that subject.'" (citing *Robinson v. State*, 353 Md. at 693)).

[76] Compare the 2022 version with the 2023 version of Md. Code, CJ&P §§ 5-303 and 5-518 and Md. Code, State Gov't § 12-104 (adding caps specific for CVA claims to pre-existing waivers of sovereign immunity).

[77] *See e.g.*, *Goldberg v. Miller*, 371 Md. 591, 602 (2002) (relying on legislative intent, history and statutory scheme in relation to other laws, rather than the statutory construction alone).

## V.    THE DEBTOR'S MISSION INCLUDES PAYING SURVIVORS AND SO CHARITABLE IMMUNITY DOES NOT APPLY IN THIS CASE.

Charitable immunity is meant to protect assets impressed with a trust for a charitable mission from being diverted to purposes contrary to the charity's mission.[78] The evidence at trial will show that paying Survivors is part of the Debtor's charitable mission. No judge-made doctrine can immunize the Roman Catholic Church from its own mission to pay Survivors and so charitable immunity is not a defense to paying Survivors' claims.

In this unique scenario, paying Survivors does not divert charitable assets from the Debtor's charitable mission; it instead fulfils that mission.[79] In addition to the Debtor's express acknowledgment that paying Survivors is part of its mission, the trial record will demonstrate several ways that paying Survivors fulfills the Debtor's mission. For example, the Committee will show that the Debtor has paid millions of dollars to Survivors prior to bankruptcy, and the Debtor has established entire departments meant to facilitate settlements and provide other services to Survivors. The Debtor has also represented to its donors, Catholic faithful, and broader community that paying and facilitating healing among Survivors is a core aspect of the Debtor's mission. Accordingly, charitable immunity cannot protect the Debtor's assets from being used for their intended purposes, which include paying Survivors. For these reasons, the Court should find that charitable immunity is not a defense to paying Survivors' claims.

---

[78] *See Montrose Christian Sch. Corp.*, 363 Md. at 582; *cf. Perry v. H. of Refuge*, 63 Md. 20, 27 (1885) ("To give damages out of a trust fund would not be to apply it to those objects whom the author of the fund had in view, but would be to divert it to a completely different purpose.").

[79] *See Inasmuch Gospel Mission v. Mercantile Tr. Co. of Balt.*, 184 Md. 231, 239 (1945) (explaining that even if a charitable donation is made with specific donor intent, the trust still vests in the main society to apply that donation in anyway it sees fit as long as it is within the charitable purposes of the institution).

## VI.    THE DEBTOR CANNOT PROVE IT HOLDS ITS ASSETS IN TRUST.

Only charitable trusts are entitled to charitable immunity, and the evidence at trial will show the Debtor does not hold its assets in a charitable trust(s).[80] A non-profit entity is not entitled to charitable immunity unless it first shows that "the assets of the charitable organization are held in trust . . . ."[81] Because a charitable trust is an express trust, the person seeking to establish the trust has the burden to prove, by clear and convincing evidence, that a charitable trust exists.[82] A charity can show its assets are held in a charitable trust in one of two ways.

*First*, courts look to the organizational documents of the nonprofit to determine whether the organization has limited the use of its assets to a specific, as opposed to discretionary, purpose(s).[83] Without a sweeping declaration in its articles of incorporation, "[i]t is imprecise to characterize any gifts to [a charity] as creating a charitable trust."[84] Notwithstanding a general statement in its articles that its assets are held for a charitable purpose, a charity might not hold assets in trust if it holds both legal and equitable title to the property,[85] including by holding the at-issue property for supporting its general corporate expenses as opposed to supporting specific charitable ones.[86]

---

[80] *James v. Prince George's Cty.*, 288 Md. 315, 336–37 (1980) ("[T]hat the fire company is a nonprofit corporation does not mean that it is entitled to charitable immunity.").

[81] *Id.*

[82] *Heart Church Ministries, Inc. v. African M.E. Zion Church*, 370 Md. 152, 183 (2002) (citing *Kelley v. Kelley*, 178 Md. 389, 399 (1940) ("[A]n express, resulting or constructive trust must be proven by clear and convincing evidence[.]"); *Masters v. Masters*, 200 Md. 318, 332 (1952)).

[83] *James v. Prince George's Cnty.*, 288 Md. at 337 ("Without examining the articles of incorporation of the fire company or taking evidence concerning the form of ownership of its assets, it is impossible to determine the validity of a claim of charitable immunity."); *see City of Annapolis v. W. Anna. Fire & Imp. Co.*, 264 Md. 729, 737 (1972) (holding that a volunteer fire company, although possibly a charitable corporation, is not necessarily a charitable trust).

[84] *City of Annapolis*, 264 Md. at 739.

[85] *Brandt, Inc. v. Y.W.C.A. of Balt. City*, 169 Md. 607, 182 A. 452, 454-45 (1936).

[86] *Inasmuch Gospel Mission*, 184 Md. at 239; *Baltzell v. Church Home*, 110 Md. 244, 73 A. 151, 155 (1909)*; see also City of Annapolis*, 264 Md. at 739 (citing *Gordon v. City of Baltimore*, 258 Md. 682, 702–03 (1970)); Charles M. Howard, *Charitable Trusts in Maryland*, 1 MD. L. REV. 105, 121 (1937)).

*Second*, a charity can show that it holds specific assets in charitable trust if those specific assets were transferred to the charity with sufficient trust intent. To create a charitable trust in this way, (1) a fiduciary relationship must exist between the parties, (2) the trust must identify a trustee(s)' duties, (3) a property must be held in trust, (4) a manifestation of intention to create a charitable trust must be present, and (5) the trust must have a charitable purpose.[87] A charitable trust is "[a] fiduciary relationship with respect to property arising as a result of a manifestation of an intention to create it . . . ."[88] The person who holds the property in trust must abide by "equitable duties to deal with the property for a charitable purpose."[89] Critically, however, the grantor of any trust asset must have intended for the charity to "deal with [the] property for the benefit of other persons[,]—a required element of a valid charitable trust."[90] So, where a conveyance does not expressly state that the property was intended for use for a charitable purpose, courts do not look to extrinsic evidence to impute a trust.[91]

Because only funds held in a charitable trust are protected by the doctrine of charitable immunity, Survivors may properly seek recovery from the Debtor's non-insurance assets to which the Debtor holds both legal and equitable title. It is then the Debtor's obligation to delineate what assets are trust assets eligible for charitable immunity. For these reasons, the Court should determine that the Debtor may not rely solely on its asserted religious mission as sufficient grounds for the application of charitable immunity and instead must produce clear and convincing evidence at trial

---

[87] RESTATEMENT (SECOND) OF TRUSTS § 348; *see Rosser v. Prem*, 52 Md. App. 367, 377 (1982).

[88] RESTATEMENT (SECOND) OF TRUSTS § 348 (1959) (emphasis added); *see Rosser*, 52 Md.App. at 374.

[89] RESTATEMENT (SECOND) OF TRUSTS § 348 (emphasis added).

[90] *Long Green Valley Ass'n*, 432 Md. at 319 (quoting *From the Heart Church Ministries*, 370 Md. at 181–82) (internal quotations omitted).

[91] *Id.* at 320 ("We need not resort to extrinsic evidence in parsing the plain meaning of the Respondents' intent because the language of the Bellevale Easement demonstrates clearly that the Respondents did not intend for the Easement to impose a charitable trust.")

that establishes all assets it intends to shield from Survivors are held in a charitable trust(s).

The evidence at trial will show that the Debtor cannot claim charitable immunity because its property is not held in trust. Because Maryland courts have established that the doctrine of charitable immunity is based on a trust fund theory, a party invoking the defense must establish that the contested property is held in a charitable trust. [92] To successfully assert charitable immunity then, the Debtor must prove by clear and convincing evidence either that (i) its articles of incorporation create such a trust or (ii) by showing specific funds were gifted with a intention to create a charitable trust.[93] The Debtor cannot produce clear and convincing evidence at trial to prove either, and so the Court should enter judgment in favor of the Committee.

> a.    **The Debtor Does Not Have Articles of Incorporation Impressing Its Assets with a Charitable Trust.**

Although an organization may prove that its assets are held in trust through explicit language in its articles of incorporation, the Debtor cannot do so here because it has not filed articles as required under Maryland law.

The Maryland Code on Corporations and Associations establishes provisions regarding Catholic organizations in Maryland.[94] There is no dispute that this part of the Code applies to the Debtor. Section 5-316 goes on to provide:

> (b) The corporators shall file the articles with the Department in the same manner and with the same effect as provided in Part I of this subtitle."[95]

---

[92] *James v. Prince George's Cty.*, 288 Md. at337 ("Thus, only when the assets of the charitable organization are held in trust, either expressly or by implication, and when the corporation has no liability insurance covering the complained of, does the charitable immunity doctrine apply[.]" (citations omitted)); s*ee Howard v. Bishop Byrne Council Home, Inc.*, 238 A.2d 863, 864 (1968) (explaining that Maryland's law on charitable immunity is based on the trust fund theory).

[93] *James v. Prince George's Cty.* 288 Md. at 337.

[94] *See* Md. Code Ann, Corps. & Ass'ns § 5-314 ("This part applies to every religious corporation formed in this State by a congregation of the denomination of Christians known as the Roman Catholic Church.").

[95] Md. Code Ann. Corps. & Ass'ns § 5-316 (Part I consists of Md. Code, Corps. & Ass'ns §5–301 to § 5–313); *see* Md. Code Ann., Corps. & Ass'ns § 5-304 ("(a) The trustees shall file articles of incorporation for

But, the Debtor has failed to file any articles of incorporation with the State of Maryland as required by Maryland Code, Corporations & Associations § 5-316. Without valid articles of incorporation, the Debtor cannot prove all of its assets are impressed with a charitable trust that limits use of those assets to a specific purpose.[96] Absent such a sweeping statement in its articles, the Debtor must instead show specific funds were gifted with an intention to create a charitable trust.[97]

**b.    The Debtor Cannot Show Its Property Is Held in Trust Through Specific Trust Intent Because It Holds Legal and Equitable Title And It Was Given the Property for Its General Purposes.**

The Debtor also cannot prove specific funds it holds were impressed with a charitable trust. Rather, evidence at trial will show that the Debtor holds substantial property for its own corporate purposes and not purposes directed by any trustor.

*City of Annapolis v. West Annapolis Fire & Improvement Company* is particularly applicable to the present matter.[98] In that case, Maryland's highest court held that, despite being a charity, a fire company did not hold its property in a charitable trust.[99] The court explained that "an express trust cannot exist where the same person has both legal title to and beneficial enjoyment of the property[.]"[100] It continued to say that "where property is given to a corporation for such uses as are

---

record with the Department. (b) The articles of incorporation shall contain: (1) The plan of the church . . . ."); Md. Code Ann., Corps. & Ass'ns § 5-302(c) ("The plan shall include: (1) The purposes for which the religious corporation is formed . . . .").

[96] *James v. Prince George's Cty.*, 288 Md. at 337 ("Without examining the articles of incorporation of the fire company or taking evidence concerning the form of ownership of its assets, it is impossible to determine the validity of a claim of charitable immunity.").

[97] *Id.*

[98] 264 Md. 729 (1972).

[99] *Id.* at 737. Although this case concerned a nonprofit corporation—a fire company—rather than a charitable organization, the court held that "the case law dealing with gifts to corporations organized for charitable, educational, or religious purposes is equally applicable to gifts to a non-profit corporation, formed to advance the public good[.]" *Id.* at 737.

[100] *Id.* (citing *Brandt, Inc. v. Y.W.C.A.*, 182 A. 452 (1936)).

within its corporate powers, no trust is created[.]" [101]

The Debtor's circumstances are similar to that of the fire company in *City of Annapolis*.[102] First, the evidence at trial will show how the Debtor holds both legal and equitable title to its property. Like the charity in *City of Annapolis*, the evidence trial will show how the Debtor enjoys the beneficial use of its property because it may use the funds for its discretionary purposes.[103]

Second, the Debtor cannot show that its assets were donated with a specific trust intent, but rather, the evidence will show the Debtor's assets were acquired to support the Debtor's generic corporate mission. Like the property of the fire company, the Debtor's assets "represent the accumulation of funds given to or raised by the [Debtor] in support of its corporate purpose[.]"[104] The Debtor's assets cannot have been given for a specific purpose sufficient to establish trust intent if they are simply an accumulation of funds given for the Debtor's general, "overall" corporate purposes or as funds donated to be used in the Archbishop's sole (and not the donor's) discretion. The overwhelming evidence will show that the Archbishop purports to retain discretion to use the Debtor's funds in his sole discretion and is generally not bound by the specific intentions of any donor or donors. Accordingly, the Debtor has not proven it holds any of its assets in trust and is not entitled to charitable immunity.

---

[101] *Id.* (citing *Baltzell v. Church Home*, 73 A. 151, 156 (1909)).

[102] The Debtor's contention that fire departments are simply different than churches, is simply wrong: "While we are unwilling to accept the idea that a charitable trust was created, there is no question in our minds that **the case law dealing with gifts to corporations organized for charitable, educational, or religious purposes is equally applicable to gifts to a non-profit corporation, formed to advance the public good, such as a volunteer fire company which performs services usually regarded as a function of government** . . . ." *City of Annapolis*, 264 Md. at 737 (emphasis added) (citing *Williams v. Rescue Fire Co.*, 254 F. Supp. 556 (D. Md.1966); *Fire Ins. Patrol v. Boyd*, 120 Pa. 624 (1888); 15 Am. Jur. 2d Charities § 146, at 155 (1964); Restatement (Second) of Trusts § 373(a), at 256 (1959)).

[103] *City of Annapolis*, 264 Md. at 737 (explaining that an express trust cannot exist where the organization holds legal title to a property and beneficial enjoyment of the property).

[104] *Id.*

    **c.**     **The Debtor Cannot Trace Assets Held in Commingled Accounts.**

Even if the Debtor can prove some of its assets are held in a charitable trust,[105] the Debtor must still trace the trust property.[106] "In bankruptcy cases involving commingled funds, the claimant bears the further burden of tracing the alleged trust property 'specifically and directly' back to the . . . transfers giving rise to the trust."[107] To sufficiently "trace" trust property, the party asserting the trust must prove that the purported trust assets went into the hands of the trustee and remained there until, as applicable here, the trustee's insolvency.[108] The Debtor must produce clear and convincing evidence to support its tracing.[109]

The trust proponent's burden to trace cash and cash accounts is particularly burdensome. To trace cash properly, for example, the Debtor must provide evidence of every check written with a trust purpose, then trace each dollar from the account in which the check was initially deposited to the accounts that now comprise the estate's property.

---

[105] *In re B.I. Fin. Servs. Grp., Inc.*, 854 F.2d 351, 354 (9th Cir. 1988) ("[I]f the claimant cannot first show that a trust has been created, there is no need to inquire further as to whether the property can be identified or traced." (citations omitted)).

[106] 5 COLLIER ON BANKRUPTCY ¶ 541.28 (16th ed. 2021); *see Callaway v. Memo Money Order Co.*, 381 B.R. 650, 655 (E.D.N.C. 2008) (collecting cases and noting that, where state trust law does not require tracing, Section 541 imposes a tracing requirement).

[107] 5 COLLIER ON BANKRUPTCY ¶ 541.28 (16th ed. 2021) (*quoting In re Advent Mgmt. Corp.*, 104 F.3d 293, 296 (9th Cir. 1997) (explaining that commingled funds are presumed to be recoverable property of debtor's estate when constructive trust claimant failed to satisfy the strict tracing standard)).

[108] *See Schuyler v. Littlefield*, 232 U.S. 707 (1914*); In re Dameron*, 155 F.3d 718, 724 (4th Cir. 1998) ("In cases where the trust property has been commingled, courts resolve the issue with reference to the so-called 'lowest intermediate balance' rule, which is grounded in the fiction that, when faced with the need to withdraw funds from a commingled account, the trustee withdraws non-trust funds first, thus maintaining as much of the trust's funds as possible. Hence, pursuant to the lowest intermediate balance rule, if the amount on deposit in the commingled fund has at all times equaled or exceeded the amount of the trust, the trust's funds will be returned in their full amount. Conversely, if the commingled fund has been depleted entirely, the trust is considered lost. Finally, if the commingled fund has been reduced 'below the level of the trust fund but not depleted, the claimant is entitled to the lowest intermediate balance in the account.' In no case is the trust permitted to be replenished by deposits made subsequent to the lowest intermediate balance.").

[109] *Holland v. Bank of Italy*, 1 P.2d 1031, 1037 (Cal. App. 4th Dist. 1931); *In re Valley Food Servs., LLC*, 389 B.R. 685, 693 (Bankr. W.D. Mo. 2008).

For cash accounts, simple tracing is not enough. The Fourth Circuit has adopted the Lowest Intermediate Balance Rule ("LIBR") as the framework for tracing trust funds.[110] The LIBR is a particularly useful tool when trust funds are mixed with funds not held for distinct purposes, as explained by the Bankruptcy Court for the District of Delaware:

> Cash is fungible. If you deposit $1 into your bank account and immediately withdraw $1 from your account there is simply no way to determine whether it is the same dollar that you just deposited (nor does it matter). Upon deposit, that $1 was commingled with the rest of the money in your account and became indistinguishable from its brethren. **Thus, in reality, there is simply no way to trace trust funds once they have been commingled with non-trust funds**.[111]

Under the LIBR, the Debtor must first identify the starting balance of the trust. So, if the Debtor contends a charitable trust formed when it received a particular donation, then the Debtor must explain how much money was first deposited into the bank account and show that money was deposited with a trust purpose.[112] Then, if the Debtor wishes to argue that the deposited funds continue to be funds held in trust, the Debtor must show that the alleged trust account balance never fell below the starting account balance. If the account balance fell below the starting balance, even once, then the charitable trust exists only as to the lowest balance that ever occurred in the account. The Debtor must trace under this LIBR standard with clear and convincing evidence.[113]

Based on the Committee's review of thousands of pages of financial records produced by the

---

[110] *In re Dameron*, 155 F.3d at 724; *see In re R & T Roofing Structures & Com. Framing, Inc.*, 887 F.2d 981, 987 (9th Cir. 1989); *see In re Skagit P. Corp.*, 316 B.R. 330, 338 (B.A.P. 9th Cir. 2004) ("The LIBR assumes that traced proceeds are the last funds withdrawn from a contested account. If the traced proceeds are withdrawn and spent, they are treated as lost and no longer available. If the balance in the account falls below the amount of funds subject to the secured creditor's interest deposited into the account, the secured creditor is allowed only the lowest intermediate balance between the time of commingling and the time the rights in the account are determined.").

[111] *In re Cath. Diocese of Wilmington, Inc.*, 432 B.R. 135, 151 (Bankr. D. Del. 2010).

[112] *Id.*

[113] RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 58, cmt. e.

Debtor,[114] as well as the Debtor's written discovery responses, the Debtor cannot meet its burden under LIBR to trace purported trust funds. Because the Debtor cannot trace trust funds and meet a necessary condition to prove a charitable trust, the Court must find that the legal and equitable title to the Debtor's property is held solely and exclusively by the Debtor and is not protected by charitable immunity.

## VII.    THE DEBTOR IS NOT ENTITLED TO DECLARATORY RELIEF.

The Debtor seeks its own affirmative declaratory relief seeking to confirm the validity of its charitable immunity affirmative defense. The counterclaim requests three distinct forms of relief, each defined and discussed more below: (i) the Availability Declaration (ii) the Insurance Declaration, and (iii) the Abrogation Declaration. The Debtor cannot establish its entitlement to any of its requested relief and so the Counterclaim should be dismissed.

Declaratory relief is appropriate where the judgment "will serve a useful purpose in clarifying the legal relations in issue" or alternatively that the judgment "will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding."[115] Declaratory relief is not appropriate where the consequences of the relief sought remain uncertain following the entry of the judgment.[116] "It serves neither the needs of the parties, nor the jurisprudence of the court, nor the interests of the public for the judiciary to employ the declaratory judgment procedure to announce legal rules imprecise in definition and uncertain in dimension."[117] While the Committee's request to extinguish charitable immunity is a proper request for consequential relief that provides certainty in

---

[114] Evidence such as internal accounting notes is insufficient to substitute for the rigorous showing required by LIBR. *Sony Corp. of Am. v. Bank One, W. Va., Huntington NA*, 85 F.3d 131, 139 (4th Cir. 1996), *as amended on denial of reh'g and reh'g en banc* (July 5, 1996) ("The words on the check and deposit slip merely provided useful notes for Stereo Factory's internal recordkeeping. Those notes, however, did not earmark the transferred funds and do not override the operation of the lowest intermediate balance rule.").

[115] *Mitchell v. Henderson*, 128 F. Supp. 2d 298, 305 (D. Md. 2001).

[116] *See United States v. State of Washington*, 759 F.2d 1353, 1357 (9th Cir. 1985).

[117] *Id.* at 1357.

the chapter 11 case, the Debtor's counterclaim, in contrast, fails to request appropriate declaratory relief. Because the Committee should prevail on its affirmative claims and the Court cannot grant the Debtor's requested form of relief, the Counterclaim should be dismissed.

Each component part of the declaratory relief sought in the Counterclaim would be inappropriate under the Declaratory Judgment Act. None of the three Counterclaim Declarations, if granted by this Court, would serve to resolve and clarify issues or otherwise contribute to the efficient use of judicial resources. The Cross-Motion does not meaningfully engage with the particulars of the prayers for relief in the Debtor's Counterclaim or establish the Debtor's entitlement to the declarations sought in the Counterclaim. This brief addresses each in turn.

First is the Availability Declaration. In the Availability Declaration, the Debtor seeks a declaration that "[t]he defense of charitable immunity is available to the Debtor in connection with any and all claims filed by Survivors in this case, because that defense was available to the Debtor under Maryland law at the time the Petition for Relief was filed."[118]

If granted as written, the Availability Declaration would leave multiple matters open for future litigation. One concerns the ambiguity inherent in a declaration concerning the "availability" of an affirmative defense. It is common for courts disposing of similar issues to describe a defense as "available," subject to the defendant's demonstration that it is entitled to the protections of the defense on the particular facts of the case.[119] Here, it would appear that a finding that the defense is "available" to the Debtor would not resolve the claim-by-claim or asset-by-asset fact issues that may emerge in a particular lawsuit by an individual Survivor, who may seek to recover particularly identifiable assets

---

[118] Counterclaim, Prayer for relief ¶ 1.

[119] *See, e.g.*, *Dunbar v. Biedlingmaier*, No. DKC 20-0738, 2022 WL 814293, at *8 (D. Md. Mar. 17, 2022) (describing public official immunity as "a legal defense available to certain limited classes of local government employees" and going on to identify elements required to prove the defense for such persons and exceptions to the defense).

PLAINTIFF'S TRIAL STATEMENT - 41

of the Debtor existing now or in the future which have not been made the subject of a charitable trust. The Availability Declaration would not serve to terminate or afford relief from the uncertainty and controversy giving rise to this adversary proceeding or any future litigation concerning Survivor claims and the Debtor.[120] The Debtor's Counterclaim should thus be denied.

Second is the Insurance Declaration. In the Insurance Declaration, the Debtor seeks a finding that "[t]he Debtor's use of the defense of charitable immunity does not extend to any Survivor claims to the extent they may be covered by insurance."[121] The Committee agrees that the Debtor's insurers cannot benefit from the Debtor's potential access to charitable immunity. But this is an unexceptional statement of well-established Maryland law. The Insurance Declaration does not resolve any justiciable disputes between the Committee and the Debtor, and so the Debtor is not entitled to declaratory relief on this basis.

Third is the Abrogation Declaration. In the Abrogation Declaration, the Debtor seeks a finding that "[t]he Maryland Child Victim's Act did not alter or abrogate the defense of charitable immunity which was established law at the time of the filing of the Petition for Relief."[122] Like the Availability Declaration, the declaration sought by the Debtor would entail statements of law—including the "established" nature of the defense of charitable immunity—that do not terminate or afford relief from the uncertainty or controversy at issue in this adversary proceeding or future litigation. Again, the Debtor is not entitled to declaratory relief on this basis.

Because the Counterclaims seek inappropriate declaratory relief, the Counterclaims should be dismissed and judgment should be entered in favor of the Committee.

---

[120] *See Mitchell*, 128 F. Supp. 2d at 305.

[121] Counterclaim at 11, ¶ 2.

[122] *Id.* at 11, ¶ 3.

## STATUS OF PLEADINGS

The Committee does not anticipate amending its Complaint or Answer or abandoning any issues from its Complaint or Answer.

## STIPULATIONS

The Committee anticipates filing with the Debtor stipulations of facts and providing for the admission of exhibits, except with regard to issues of relevance, weight, and hearsay.

## SUMMARY OF RELIEF SOUGHT

The Committee requests an order and judgment (i) declaring that the Debtor cannot rely on the affirmative defense of charitable immunity with regard to Survivor claims asserted against the Debtor in this bankruptcy case, including for claims that are uninsured or underinsured; and (ii) denying the Debtor's counterclaim in its entirety.

***

**EXHIBITS**[123]

| Exhibit No. | Description |
|---|---|
| P 01 | Maryland Attorney General Report, April 5, 2023 |
| P 02 | Maryland Attorney General Revised Interim Report, September 26, 2023 |
| P 03 | Transcript of Audio Hearing of the Maryland State Senate Judicial Proceedings Committee, February 23, 2023 |
| P 04 | Transcript of Audio Hearing of the Maryland State Senate Floor Actions, March 13, 2023 |
| P 05 | Transcript of Audio Hearing of the Maryland State Senate Floor Actions, March 14, 2023 |
| P 06 | Transcript of Audio Hearing of the Maryland State Senate Judiciary Committee, March 28, 2023 |
| P 07 | Website Showing Senate Bill 686 |
| P 08 | Website Showing House Bill 1 |
| P 09 | MCC Website "Who We Are" Section |
| P 10 | MCC Website Post on HB 1378, April 2, 2025 |
| P 11 | MCC Position Statement—House Bill 001, dated March 2, 2023 |
| P 12 | MCC Position Statement—House Bill 1378, March 26, 2025 |
| P 13 | MCC Emails to Senator Smith, February 18, 2025 |
| P 14 | Archbishop Lori Statement, "Apology, Healing & Action", April 3, 2023 |
| P 15 | Archbishop Lori Statement, "Healing and Ministry in the Archdiocese of Baltimore", September 3, 2023 |
| P 16 | Archbishop Lori: Bankruptcy Was the Only Way Forward for Baltimore Archdiocese, America the Jesuit Review, November 9, 2023 |
| P 17 | Archbishop Lori Statement, "A Message from Archbishop Lori on May 31 Chapter 11 Deadline", May 30, 2024 |

---

[123] The Committee reserves the right to supplement its Exhibit list through December 8, 2025 according to the Court's protocol for submitting exhibit lists. The Committee further reserves the right to offer additional exhibits for impeachment or rebuttal, and to introduce any or all of the Defendant's exhibits.

| Exhibit No. | Description |
|---|---|
| P 18 | Website: Chapter 11 Reorganization, www.archbalt.org/chapter-11-reorganization |
| P 19 | Website: Chapter 11 Reorganization Frequently Asked Questions, www.archbalt.org/chapter-11-faq |
| P 20 | Website: How the Church Responds to Sexual Abuse Allegations – Questions and Answers, www.archbalt.org/about-us/how-the-church-responds-to-sexual-abuse-allegations-questions-and-answers |
| P 21 | Debtor's Informational Brief, September 29, 2023 (Dkt. 5) |
| P 22 | Declaration of John Matera in support of First Day Motions, September 29, 2023 (Dkt. 6) |
| P 23 | Archbishop Lori Statement, "Archbishop Lori's Message on Chapter 11", September 29, 2023 |
| P 24 | Testimony at Creditors Meeting, November 15, 2023 |
| P 25 | Testimony at Creditors Meeting, December 19, 2023 |
| P 26 | Debtor's SOFA, Summary of Assets and Liabilities, October 31, 2023 (Dkt. 145-146) |
| P 27 | Committee's Adversary Complaint, April 1, 2025 (AP, Dkt. 1) |
| P 28 | Debtor's Answer and Counterclaims, May 2, 2025 (AP, Dkt. 15) |
| P 20 | Debtor's Responses/Objections to Committee's First Request for Admissions |
| P 30 | Debtor's Responses/Objections to Committee's First Requests for Production |
| P 31 | Debtor's Responses/Objections to Committee's Second Requests for Production |
| P 32 | Debtor's Responses/Objections to Committee's First Interrogatories |
| P 33 | Debtor's Supplemental Responses/Objections to Committee's First Interrogatories (August 18, 2025) |
| P 34 | Debtor's Supplemental Responses/Objections to Committee's First Interrogatories (revised and verified, November 5, 2025) |
| P 35 | Claims Register: https://dm.epiq11.com/case/rcabaltimore/info. |
| P 36 | Transcript from Hearing of October 3, 2023 (*see* Dkt. 42) |

| Exhibit No. | Description |
|---|---|
| P 37 | Transcript from Hearing of October 6, 2025 (Dkt. 1426) |
| P 38 | Transcript of Bishop Parker Deposition, November 6, 2025 |
| P 39 | Amended 30(b)(6) Notice of Bishop Parker |
| P 40 | Bishop Parker's Declaration in support of Cross-Motion for Summary Judgment, September 18, 2025 (AP, Dkt. 68-2) |
| P 41 | Transcript of John Matera Deposition, November 3, 2025 |
| P 42 | Amended 30(b)(6) Notice of John Matera |
| P 43 | St. Bartholomew's Catholic Church Ledger |
| P 44 | Debtor's Combined Financial Statements, June 2023 and 2022 |
| P 45 | Debtor's Request to Alienate Gibbons Property, March 14, 2012 |
| P 46 | Debtor's Request to Alienate Seton Keough Property, July 27, 2020 |
| P 47 | Sexual Misconduct Trust Fund Agreement |
| P 48 | Amended and Restated Archdiocesan Sexual Misconduct Self-Insurance Program Trust Fund Agreement, June 22, 2015 |
| P 49 | First Amendment to the Amended and Restated Archdiocesan Sexual Misconduct Self-Insurance Program Trust Fund Agreement, March 8, 2022 |
| P 50 | Debtor's List of Trusts and Foundations |
| P 51 | Debtor's Combined Financial Statements, June 2023 and 2022 |
| P 52 | Tenders of Proofs of Claim, August 8, 2024 |
| P 53 | Debtor's Request for *Nihil Obstat* to File for Bankruptcy Chapter 11 – Reorganization, September 13, 2023 |
| P 54 | Settlement Agreement with Release (Redacted/Confidential) |
| P 55 | Answer to Complaint in *Martin v. Father Francis Lefevre, et al.,* October 31, 1995 |
| P 56 | Code of Canon Law, Book II. The People of God, Part I. The Christian Faithful |
| P 57 | Minutes of the College of Consultors Special Meeting, July 21, 2020 |

| Exhibit No. | Description |
|---|---|
| P 58 | Debtor and Committee's Joint Request for Mediation, May 23, 2024, Dkt. 564 |
| P 59 | Hartford Insurers' Response to Joint Request for Mediation, June 6, 2024, Dkt. 586 |
| P 60 | Insurers' (Federal Insurance, Indemnity Insurance, Insurance Company of North America, Westchester Fire) Omnibus Objection to Joint Request for Mediation, June 6, 2024, Dkt. 587 |
| P 61 | Declaration re: of Adam P. Haberkorn in Support of Moving Insurers' Omnibus Objection to Joint Requests for Mediation, June 6, 2024, Dkt. 588 |
| P 62 | Reply in support of Joint Request for Mediation, July 1, 2024, Dkt. 626 |
| P 63 | Transcript of Hearing on Joint Request for Mediation, July 8, 2024 |
| P 64 | Hartford Insurers' Supplemental Response to Joint Request for Mediation, July 17, 2024, Dkt. 648 |
| P 65 | Insurers' (Federal Insurance, Indemnity Insurance, Insurance Company of North America, Westchester Fire Insurance) Supplemental Omnibus Objection to Joint Request for Mediation, July 17, 2024, Dkt. 649 |
| P 66 | Insurers' (Lexington Insurance, New Hampshire Insurance and National Union Fire Insurance) Joinder to Harford Insurers' Response to Joint Request for Mediation, July 18, 2024, Dkt. 657 |
| P 67 | Transcript of Continued Hearing on Joint Request for Mediation held on July 22, 2024, Dkt. 699 |
| P 68 | Transcript of Continued Status Hearing on Joint Request for Mediation, July 29, 2024 |
| P 69 | Order Directing Mediation, Appointing Mediators, and Ordering Mediation Discovery, July 29, 2024, Dkt. 705 |
| P 70 | Committee's Expedited Motion for Relief from the Automatic Stay, April 16, 2025, Dkt. 1043 |
| P 71 | Supplemental Certificate of Service in support of Motion for Relief from the Automatic Stay, April 16, 2025, Dkt. 1045 |
| P 72 | Joinder of Survivor Counsel to Motion for Relief from the Automatic Stay, April 28, 2025, Dkt. 1089 |
| P 73 | Joinder of Survivor Counsel to Motion for Relief from the Automatic Stay, April 29, 2025, Dkt. 1093 |

| Exhibit No. | Description |
|---|---|
| P 74 | Ad Hoc Committee of Parishes, Schools, and Affiliates Response to Motion for Relief from the Automatic Stay, April 30, 2025, Dkt. 1104 |
| P 75 | Hartford Insurers' Response to Motion for Relief from the Automatic Stay, April 30, 2025, Dkt. 1110 |
| P 76 | Debtor's Response to Motion for Relief from the Automatic Stay, April 30, 2025, Dkt. 1111 |
| P 77 | Wasau Insurer's Response to Motion for Relief from the Automatic Stay, April 30, 2025, Dkt. 1112 |
| P 78 | Federal Insurance's Opposition to Motion for Relief from the Automatic Stay, April 30, 2025, Dkt. 1113 |
| P 79 | American Casualty Insurer's Limited Objection to Motion for Relief from the Automatic Stay, April 30, 2025, Dkt. 1116 |
| P 80 | Travelers Indemnity, United States Fidelity, St. Paul Fire and Marine, and Northland Insurance's Joinder to American Casualty's Limited Objection (Dkt. 1116) to Motion for Relief from the Automatic Stay, April 30, 2025, Dkt. 1118 |
| P 81 | Federal Insurance, Indemnity Insurance, Insurance Company of North America, Westchester Fire Objection to Motion for Relief from the Automatic Stay, April 30, 2025, Dkt. 1119 |
| P 82 | Transcript from Hearing on Motion for Relief from the Automatic Stay, May 1, 2025, Dkt. 1128 |
| P 83 | Statement of Support Submitted by Survivor in support of Relief from the Automatic Stay. May 1, 2025, Dkt 1120 (sealed) |
| P 84 | Status Report With Respect to Expedited Motion for Relief From Stay, May 2, 2025, Dkt. 1122 |
| P 85 | Statement of Roman Catholic Archbishop of Baltimore and Ad Hoc Committee of Parishes, Schools, and Related Entities Regarding Covered Entities, May 2, 2025, Dkt. 1123 |
| P 86 | Federal Insurance, Indemnity Insurance, Insurance Company of North America, Westchester Fire's Response to Court's Inquiry Regarding Contours of Modified Stay if Granted, May 2, 2025, Dkt. 1124 |
| P 87 | Order Modifying Automatic Stay, May 2, 2025, Dkt. 1127 |
| P 88 | Motion to Extend Automatic Stay, September 29, 2023, Dkt. 12 |

| Exhibit No. | Description |
|---|---|
| P 89 | Declaration re: in Support of First-Day Motions, September 9, 2023, Dkt. 6 |
| P 90 | Exhibit/Witness List, October 2, 2023, Dkt. 37 |
| P 91 | Objection on behalf of Eva Dittrich, October 2, 2023, Dkt. 27 |
| P 92 | Interim Order, Pursuant to Sections 105(a) and 362 of the Bankruptcy Code, Clarifying the Extent of the Automatic Stay with Respect to Certain Related Entities and Insurance Coverage, October 4, 2023, Dkt. 52 |
| P 93 | Stipulation by Eva Dittrich, Debtor Extending Time to Respond to First-Day Motions, October 9, 2023, Dkt. 80 |
| P 94 | Objection on behalf of Eva Dittrich, October 30, 2023, Dkt. 129 |
| P 95 | Opposition on behalf of the Committee, November 2, 2023, Dkt. 162 |
| P 96 | Second Interim Order, Pursuant to Sections 105(a) and 362 of the Bankruptcy Code, Extending the Automatic Stay to Certain Related Entities, November 6, 2023, Dkt. 173 |
| P 97 | Transcript of Hearing held on 11/6/2023, November 27, 2023, Dkt. 212 |
| P 98 | Debtor's Motion for Order (I) Establishing Deadlines for Filing Proofs of Claim; (II) Approving Sexual Abuse Proof of Claim Form; (III) Approving Form and Manner of Notice; and (IV) Approving Confidentiality Procedures, October 30, 2023, Dkt. 139 |
| P 99 | Response on behalf of Hartford Accident and Indemnity Company, Twin City Fire Insurance Company, November 13, 2023, Dkt. 186 |
| P 100 | Line Amending Cover Page Only to Exhibit D - Winona POC attached to Hartford's Response at Docket No. 186, November 13, 2023, Dkt. 188 |
| P 101 | Motion response on behalf of interested party American Casualty, November 13, 2023, Dkt. 190 |
| P 102 | Objection on behalf of Federal Insurance Co., Pacific Employers Insurance Company, November 13, 2023 |
| P 103 | Joinder of American Casualty Company to Hartford Accident and Indemnity Company and Twin City Fire Insurance Company's Response in Support of Debtor's Motion for Order (I) Establishing Deadlines for Filing Proofs of Claim; (II) Approving Sexual Abuse Proof of Claim Form; (III) Approving Form and Manner of Notice; and (IV) Approving Confidentiality Procedures, November 14, 2023, Dkt. 194 |

| Exhibit No. | Description |
|---|---|
| P 104 | Committee's Response, November 29, 2023, Dkt. 221 |
| P 105 | Response on behalf of Hartford Accident and Indemnity Company, Twin City Fire Insurance Company, December 12, 2023, Dkt. 257 |
| P 106 | Debtor's Omnibus Response, December 13, 2023, Dkt. 264 |
| P 107 | Debtor's Exhibit/Witness List, December 13, 2023, Dkt. 265 |
| P 108 | Brief / Joinder By Pacific Employers Insurance Company And Federal Insurance Company To The Insurers' Reply To The Official Committee Of Unsecured Creditors' Response To Debtors' Motion For Order (I) Establishing Deadlines For Filing Proofs Of Claim; (II) Approving Sexual Abuse Proof Of Claim Form; (III) Approving Form And Manner Of Notice; And (Iv) Approving Confidentiality Procedures, December 17, 2023, Dkt. 279 |
| P 109 | Transcript of Hearing held on 12/18/2023, January 4, 2024, Dkt. 297 |
| P 110 | Federal Insurance Co., Pacific Employers Insurance Company's Objection, January 12, 2024, Dkt. 306 |
| P 111 | Debtor's Line Attaching Redlined Proposed Orders, January 12, 2024, Dkt. 311 |
| P 112 | Hartford's Line Attaching Redlined Proposed Orders, January 12, 2024, Dkt. 312 |
| P 113 | Federal Insurance Co., Pacific Employers Insurance Company's Line Attaching Redlined Proposed Orders, January 16, 2024, Dkt. 314 |
| P 114 | Pacific Employers Insurance Company's Request for Judicial Notice, January 16, 2024, Dkt. 315 |
| P 115 | Order (I) Establishing Deadlines for Filing Proofs of Claim; (II) Approving Sexual Abuse Claim Supplement; (III) Approving Form and Manner of Notice; and (IV) Approving Confidentiality Procedures (related document(s):[139] Motion for Order (I) Establishing Deadlines for Filing Proofs of Claim; (II) Approving Sexual Abuse Proof of Claim Form; (III) Approving Form and Manner of Notice; and (IV) Approving Confidentiality Procedures, January 16, 2024, Dkt. 316 |
| P 116 | Transcript from Hearing held 1/12/2024, January 25, 2024, Dkt. 338 |
| P 117 | Notice of Limited Mediation Dispute, April 1, 2025 Dkt. 1032 |

## EXPERTS

No party identified experts during discovery, and the Committee does not intend to offer the testimony of any experts at trial.

## PRETRIAL RULINGS AND EVIDENTIARY ISSUES

Several critical legal and evidentiary issues were resolved prior to trial.

First, the Court held that evidence in this case may be considered on "purely secular terms without relying 'on religious precepts in determining whether the document indicates that the parties have intended to create a trust.'" Memorandum Opinion, Dkt. 111, at 12 (quoting *From the Heart Church Ministries, Inc. v. African Methodist Episcopal Zion Church*, 370 Md. 152, 180 (Md. 2002)); *see also id*. ("The Court pauses here to acknowledge the Debtor's First Amendment argument concerning what the Court can and cannot resolve. The Court has no intention to delve into canon law or the Debtor's religious tenets. The Court will, as it must, focus solely on "neutral principles of law . . . that are 'applicable not only to religious bodies, but to public and private lay organizations and to civil governments as well.'").

Second, the Court approved the Stipulation Regarding Trial Witnesses and Testimony and Order Approving Same, Dkt. 42, which limits the Debtor from calling any witness other than Bishop Parker and John Matera at trial.

Third, the Court took judicial notice of documents submitted by the Committee, including publicly available legislative records, the Maryland Attorney General's Report on Child Sexual Abuse in the Archdiocese of Baltimore, certain filings submitted by the Debtor in the Bankruptcy Case, and the Claims Register from the Bankruptcy Case. (Order Granting Motion for Judicial Notice, Dkt. 110; *see also* Committee's Motion for Judicial Notice, Dkt. 44.)

The Committee expects to submit motions in limine for the Court's consideration on matters potentially including the admissibility of exhibits (or categories thereof) identified on Debtor's exhibit

list; lack of relevance of legal theories and facts the Committee expects the Debtor to seek to introduce

at trial; and Fed. R. Civ. P. 37(d).

## **CONCLUSION**

For the foregoing reasons, and others to be presented at trial, the Committee respectfully asks

the Court to enter judgment in its favor.

Date: December 3, 2025                                    Respectfully submitted,


<u>/s/ Richard L. Costella</u>
Alan M. Grochal, Fed. Bar No.: 01447 Richard
L. Costella, Fed. Bar No. 14095
**Tydings & Rosenberg LLP**
1 East Pratt Street, Suite 901
Baltimore, Maryland 21202
Tel: (410) 752-9772
Fax: (410) 727-5460
Email: rcostella@tydings.com
            agrochal@tydings.com

*Local Counsel to the Official Committee of
Unsecured Creditors*

-and-

Edwin H. Caldie (MN # 388930)
Andrew Glasnovich (MN # 0398366)
Christopher Sevedge (MO # 68383)
Nicole Khalouian (NY #5755681)
**Stinson LLP**
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Main: 612-335-1500
Facsimile: 612-335-1657
Email: ed.caldie@stinson.com
            drew.glasnovich@stinson.com
            chris.sevedge@stinson.com
            nicole.khalouian@stinson.com

*Counsel to the Official Committee of
Unsecured Creditors*

6485811.1

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on December 3, 2025, a copy of the foregoing **_PRETRIAL STATEMENT_** was served via the Court's ECF filing system, and where indicated by electronic mail, on the following:

Blake D.  Roth, Esquire; blake.roth@hklaw.com
Catherine K. Hopkin, Esquire,  chopkin@yvslaw.com
Philip Tucker Evans, Esquire; philip.evans@hklaw.com
Christopher Scott Kunde, Jr., Esquire; scott.kunde@hklaw.com
Hugh Bernstein, Esquire; hugh.m.bernstein@usdoj.gov (by email)
Irving E. Walker, Esquire; iwalker@coleschotz.com
Ford Elsaesser, Esquire; felsaesser@eaidaho.com


/s/ Richard L. Costella
Richard L. Costella

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF MARYLAND

3   Case No. 23-16969-MMH

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   ROMAN CATHOLIC ARCHBISHOP OF BALTIMORE,

8

9           Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  United States Bankruptcy Court

13                  101 W. Lombard Street

14                  Baltimore, Maryland

15

16                  October 3, 2023

17                  10:04 AM

18

19

20

21  B E F O R E :

22  HON MICHELLE M. HARNER

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  DOMINIQUE FOSTER

1    That's absolutely right.  And each of these cases,

2  and we expect in this case, a compensation trust for

3  survivors that's run by survivors.  So importantly, it's not

4  run by the church.  You do not have the church making

5  judgment calls on claims, what they're worth, whether true

6  or untrue.  We stay out of that process.

7    THE COURT:  And that kind of trust is funded at

8  least in large part by the kinds of insurance policies we

9  were speaking about earlier that would be subject to this

10  outside litigation.

11    MR. ROTH:  It will be funded primarily -- it will

12  be funded from the Debtor, from insurance policies,. and

13  from parishes and schools.  That will be part of their

14  contribution.  And historically, the insurance, if you

15  average it, which I know average is about 55 percent of the

16  compensation, ultimately comes from carriers.

17    THE COURT:  Okay.  I appreciate that kind of pie

18  chart of what the trust may look like.  And again, Mr. Roth,

19  I am not holding you to any of those statements regarding

20  the future path of this case and I hope parties take it as

21  just guidance as to what the Debtor hopes could happen here

22  because I think it's good to know the road ahead.  It helps

23  people, I think, get more comfortable in the process.  So I

24  appreciate those.

25    I interrupted your presentation.  Please continue.

Page 120

1                    C E R T I F I C A T I O N

2

3       I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6

7

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  October 16, 2023



Planet Depos®
We Make It *Happen*™

**CONFIDENTIAL**

# Transcript of Bishop Adam John Parker, Designated Representative

**Date:** November 6, 2025
**Case:** Roman Catholic Archbishop of Baltimore, In Re:

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

CONFIDENTIAL

Transcript of Bishop Adam John Parker, Designated Representative   1 (1 to 4)
Conducted on November 6, 2025

**1**

```
1        IN THE UNITED STATES BANKRUPTCY COURT
2           FOR THE DISTRICT OF MARYLAND
3              (Baltimore Division)
4   In Re:              Case No.
5   ROMAN CATHOLIC ARCHBISHOP OF    23-16969-MMH
6   BALTIMORE,          (Chapter 11)
7              Debtor
    ------------------------------------------------
8   THE OFFICIAL COMMITTEE OF
9   UNSECURED CREDITORS,
10     v.                Adv. Proc. No.
11  ROMAN CATHOLIC ARCHBISHOP   25-00084-MMH
12  OF BALTIMORE,
13             Defendant.
    ------------------------------------------------
14              CONFIDENTIAL
15
16    Rule 30(b)(6) Deposition of the ROMAN CATHOLIC
17    ARCHBISHOP OF BALTIMORE, By and through its
18         Designated Representative
19          BISHOP ADAM JOHN PARKER
20            Baltimore, Maryland
21          Thursday, November 6, 2025
22          9:03 a.m. Eastern Time Zone
```

**2**

```
1   Job No.:  605919
2   Pages:  1 - 136
3
4        Rule 30(b)(6) Deposition of the Roman
5   Catholic Archbishop of Baltimore, by and through
6   its designated representative Bishop Adam John
7   Parker, held at the law offices of:
8
9           TYDINGS & ROSENBERG LLP
10          One East Pratt Street, Suite 901
11          Baltimore, Maryland 21202
12          (410) 752-9700
13
14
15
16
17
18
19
20       Pursuant to Notice, before Dawn M. Hart,
21  RPR/RMR/CRR and Notary Public in and for the State
22  of Maryland.
```

**3**

```
1           A P P E A R A N C E S
2   ON BEHALF OF THE OFFICIAL COMMITTEE OF
3   UNSECURED CREDITORS:
4       CHRISTOPHER B. SEVEDGE, ESQUIRE
5       ANDREW GLASNOVICH, ESQUIRE (MN)
6       SHELBY E. KOSTOLNI, ESQUIRE (WDC)
7       KATIE PARNOW, ESQUIRE (WDC)
8       NICOLE KHALOUIAN, ESQUIRE (NY)
9       STINSON LLP
10      1201 Walnut Street, Suite 2900
11      Kansas City, Missouri 64106
12      (816) 842-8600
13  ON BEHALF OF THE DEBTOR:
14      PHILIP T. EVANS, ESQUIRE
15      BLAKE DANIEL ROTH, ESQUIRE (TN)
16      NICK DELLEFAVE, ESQUIRE (WDC)
17      HOLLAND & KNIGHT LLP
18      800 17th Street, Northwest, Suite 1100
19      Washington, DC 20006
20      (202) 457-7043
21
22  -and-
```

**4**

```
1        A P P E A R A N C E S (Continued)
2
3       ALAN M. GROCHAL, ESQUIRE
4       RICHARD L. COSTELLA, ESQUIRE
5       TYDINGS & ROSENBERG LLP
6       One East Pratt Street, Suite 901
7       Baltimore, Maryland 21202
8       (410) 707-6432
9
10
11
12
13
14
15
16
17
18
19   ALSO PRESENT:  Maddie Reif, AV Technician
20
21
22
```

105

1       MR. EVANS:  Objection to the extent the
2   answer may require divulging information provided
3   by counsel.  But other than that, if you
4   understand and can answer, you may answer.
5       **A   Not knowing the actual amounts of**
6   **judgments that would be rendered in court, I**
7   **cannot answer.**
8       Q   Okay.  Bishop Parker, is it the Debtor's
9   intention to pay survivors fairly and equitably as
10  part of the bankruptcy process?
11      **A   Yes, it is.**
12      Q   What is the concept of fair and what
13  does the concept of fair and equitable mean to
14  you?
15      **A   It means that all of the survivors would**
16  **have — with legitimate claims would have the**
17  **opportunity to receive compensation.  Not that**
18  **everybody would necessarily receive the same**
19  **amount, but all would have the opportunity to**
20  **receive compensation.**
21      Q   What would be a fair amount of
22  compensation for survivors?

106

1       **A   Are you referring to a dollar figure?**
2       Q   Yes.
3       **A   I'm not able to answer that question**
4   **because it would be different depending on the**
5   **perspective of the individual.**
6       Q   Okay.
7       **A   So by "fair," we want a fair opportunity**
8   **for all survivors to have the opportunity to**
9   **participate.  I would distinguish that from the**
10  **word that some have used as in reasonable, what is**
11  **a reasonable amount.  So when we say "fair"**
12  **compensation, we mean a fair opportunity for**
13  **people to participate.**
14      **It would be fair that they would have**
15  **the access to the Survivors' Compensation Trust as**
16  **opposed to a path of litigation where perhaps only**
17  **a few people would have access to compensation.**
18      Q   So if everyone -- if all survivors got a
19  dollar from the bankruptcy case, as long as
20  everyone's all participating, that would be a fair
21  and equitable proposal?
22      MR. EVANS:  Objection.

107

1       You may answer.
2       **A   It would be fair if one dollar were the**
3   **amount of the finan -- resources of the Debtor,**
4   **yes.**
5       Q   Okay.  So exploring that a little bit
6   more, would you agree that the Debtor's ability to
7   pay is also a factor in what is fair and
8   equitable?
9       **A   Yes.**
10      Q   Can you help me understand that a little
11  bit more in terms of what the Debtor considers its
12  ability -- what finite resources does the Debtor
13  have to pay survivors?
14      **A   To describe it generally, it would be**
15  **the funds that are not designated for a specific**
16  **purpose that the archdiocese has in what we often**
17  **refer to our stable patrimony.  Those would be**
18  **dollars that we have, in many cases, invested over**
19  **the years that have grown through market gains and**
20  **are not designated for mission-specific purposes.**
21      **They would also exclude dollars that**
22  **even if not designated for mission-specific**

108

1   **purposes, that we would in fact need for**
2   **undertaking our mission.**
3       Q   Understood.
4       MR. GLASNOVICH:  Rich, can you pull up
5   Exhibit 10.  I know we're going out of order,
6   we'll mark it properly, but I sent it to you as
7   Exhibit 10.
8       MR. COSTELLA:  Rich, the request from
9   Archbishop Lori.
10      MR. GLASNOVICH:  Yep.  We'll mark it
11  Exhibit 9.
12      (Exhibit 9 was marked for identification
13  and is attached to the transcript.)
14  BY MR. GLASNOVICH:
15      Q   And this is a rather long document, and
16  what I will represent to you is we're not going to
17  be talking much about anything kind of beyond the
18  first 20 pages or so.  So through page 21 I think
19  is probably where my questions are going to be.
20  If we go beyond that, I'll give you some
21  opportunity to review the rest of it.
22      **A   (Reviewing.)**

CONFIDENTIAL
Transcript of Bishop Adam John Parker, Designated Representative    34 (133 to 136)
Conducted on November 6, 2025

133

1  near being done with my outline, I think.  I want
2  to take just a little bit of time to kind of
3  review my notes.  If we could come back after
4  lunch, I'm very hopeful that we can wrap up, but I
5  do need a little bit of time.  Would we be okay
6  with a half-hour?  Did that work on Monday, Pete?
7        MR. EVANS:  I think we have to go for 45
8  minutes, just because service was slow.
9        MR. GLASNOVICH:  Okay, let's do 45
10 minutes, then.  That will be enough time for me
11 to -- so we'll meet back at, can we say, 12:40
12 or -- yeah, it would be 12:40.
13       MR. EVANS:  12:40 Eastern.
14       (A recess was taken at 11:54 a.m.)
15       (Back on the record at 12:40 p.m.)
16       MR. GLASNOVICH:  It's 11:40.  So I'm not
17 going to have additional questions.  I would like
18 to open it up to Pete or Blake.  If you all have
19 questions for the witness, I'm happy to make time
20 for you guys.
21       MR. EVANS:  We have no questions.  Thank
22 you.

134

1        MR. GLASNOVICH:  Great.  I'm going to go
2  ahead and close the deposition.  The only caveat
3  that I have is that I know yesterday we submitted
4  some -- or the Debtor submitted documents under
5  seal to the Court.  Some of those would pertain to
6  some of the deposition topics.
7        If for some reason the Court does
8  require production of those, we'll reserve the
9  right to ask for a recall of Bishop Parker to go
10 over those things.  But we can deal with those
11 issues if and when they arise.
12       MR. EVANS:  Understood.
13       MR. COSTELLA:  Hey, Drew, one of the
14 things we didn't do on Tuesday was whether or not
15 they wanted to read and sign.
16       MR. GLASNOVICH:  Oh, yeah, I thought
17 Pete --
18       MR. EVANS:  Yeah, I did say that on
19 Monday.
20       MR. COSTELLA:  Monday, that's what I
21 meant.
22       MR. EVANS:  Yes, no.  On Monday I said

135

1  that running out the door, and I will say the same
2  thing here.
3        (Off the record at 12:43 p.m.)
4
5
6        ACKNOWLEDGMENT OF DEPONENT
7        I, Adam John Parker, do hereby acknowledge
8  that I have read and examined the foregoing
9  testimony, and the same is a true, correct and
10 complete transcription of the testimony given by
11 me, and any corrections appear on the attached
12 Errata sheet signed by me.
13
14
15 _____   _____
16    (DATE)              (SIGNATURE)
17
18
19
20
21
22

136

1        CERTIFICATE OF SHORTHAND REPORTER
2        I, Dawn M. Hart, the officer before whom the
3  foregoing deposition was taken, do hereby certify
4  that the foregoing transcript is a true and
5  correct record of the testimony given; that said
6  testimony was taken by me stenographically and
7  thereafter reduced to typewriting under my
8  direction; that reading and signing was not
9  waived; and that I am neither counsel for, related
10 to, nor employed by any of the parties to this
11 case and have no interest, financial or otherwise,
12 in its outcome.
13       IN WITNESS WHEREOF, I have hereunto set my
14 hand and affixed my notarial seal this 11th day
15 of November, 2025.
16 My commission expires:
17 January 2, 2029
18
19 _____
20 NOTARY IN AND FOR THE
21 STATE OF MARYLAND
22

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF MARYLAND

3    23-16969-MMH

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    Roman Catholic Archbishop of Baltimore

8            Debtor.

9    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10   Adversary: 25-00084-MMH

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12   Official Committee of Unsecured Creditors

13           Debtor,

14       v.

15   Roman Catholic Archbishop of Baltimore et al.

16           Plaintiff.

17   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

18

19

20

21

22

23

24

25

Page 2

1    United States Bankruptcy Court
2    6500 Cherrywood Lane
3    Greenbelt, MD  20770
4
5    October 6, 2025
6    10:07 AM
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21    B E F O R E :
22    HON. MICHELLE M. HARNER
23    U.S. BANKRUPTCY JUDGE
24
25    ECRO:  ANNA MARIE KOMISAREK

Page 3

1    CASE 23-16969
2    HEARING re [1313] Amended Notice of Debtor's Disposition of
3    Real Property Filed by Roman Catholic Archbishop of
4    Baltimore
5
6    [1320] Motion to Dismiss Case for other reasons Filed by The
7    Official Committee of Unsecured Creditors
8
9    [1325] Declaration re: and Disclosure Statement of Richard
10   W. Anderson Jr., on Behalf of CQI Associates, LLC re: Order
11   Authorizing The Debtor To Employ Professionals Used In The
12   Ordinary Course Of Business Effective As Of The Petition
13   Date Filed by Catherine Keller Hopkin
14
15   [1358] Amended Objection on behalf of The Official Committee
16   of Unsecured Creditors Filed by Alan M. Grochal
17
18   [1360] Objection on behalf of The Official Committee Of
19   Unsecured Creditors Filed by Alan M. Grochal
20
21   [1399] Objection on behalf of Roman Catholic Archbishop of
22   Baltimore Filed by Blake Daniel Roth
23
24   [1400] Memorandum in Opposition by Ad Hoc Committee of
25   Parishes, Schools, and Affiliates to Official Committee of

Page 4

1    Unsecured Creditors' Contingent Motion to Dismiss the
2    Bankruptcy Case. Filed by Irving Edward Walker
3
4    [1403] Exhibit/Witness List Filed by Alan M. Grochal
5
6    Case 25-00084
7    HEARING re [43] Motion For Summary Judgment Filed by
8    Official Committee Of Unsecured Creditors.
9
10   [44] Motion for Judicial Notice Filed by Official Committee
11   Of Unsecured Creditors
12
13   [45] Line Substituting Exhibit L to Declaration of Drew
14   Glasnovich in Support of Motion For Summary Judgment Filed
15   by Richard L. Costella
16
17   [46] Support Document Filed by Richard L. Costella
18
19   [68] Opposition and Cross-Motion for Summary Judgment Filed
20   by Roman Catholic Archbishop of Baltimore
21
22   [80] Memorandum of Law (Reply in Support of Motion for
23   Summary Judgment) Filed by Alan M. Grochal
24
25   [81] Motion to Intervene (Ad Hoc Committee of Parishes,

Page 5

1    Schools, and Affiliates' Motion to Intervene). Filed by Ad
2    Hoc Committee of Parishes, Schools, and Affiliates
3
4    [88] Exhibit/Witness List Filed by Alan M. Grochal
5
6    [89] Exhibit/Witness List Filed by Philip Tucker Evans
7
8    [90] Opposition on behalf of Official Committee Of Unsecured
9    Creditors Filed by Richard L. Costella
10
11   [92] Objection on behalf of Roman Catholic Archbishop of
12   Baltimore Filed by Philip Tucker Evans
13
14   [93] Opposition on behalf of Official Committee Of Unsecured
15   Creditors Filed by Richard L. Costella
16
17   [98] Line in Response to the Debtor's Exhibit/Witness List
18   Filed by Richard L. Costella
19
20
21
22
23
24
25   Transcribed by:  Lindsay Peacock

2 (Pages 2 - 5)

Page 54

1  how it would, those policies would get exhausted, and some
2  would lose and some would win.
3       There are also Survivors in this case that have
4  filed proofs of claim in years where the Debtor doesn't have
5  insurance, and through this process, they can be
6  compensated.  Certainly, the Debtor could settle with them
7  outside of bankruptcy.  But if there's 100 of them, it's 100
8  separate settlements, and it's, again, a situation where
9  it's very costly to the Debtor, it's very expensive to the
10  Debtor, it's expensive and costly for those Survivors.  And
11  again, if we settle with 40 or 50, that's not to say that
12  the next 40 or 50, there would be funds available to settle
13  with them.
14       And so when we say fair and equitable, we believe
15  that there is substantial insurance out there to pay what
16  has been paid in other cases, and what other Survivors have
17  consented to, and so in our view, that is fair compensation.
18  And then on the other hand, it's equitable in the sense that
19  every Survivor that has a claim against the Debtor, or one
20  of the Debtor's parishes and schools, is going to be
21  compensated.  It isn't the first ones that get there.  It
22  isn't the ones that were fortunate enough to have insurance
23  coverage in the years that their claims arose under Maryland
24  law.  And so it does pool all these assets together, and it
25  does make sure that everyone gets compensation, not just the

Page 55

1  first, not just the ones in specific years.
2       THE COURT:  So I understand your definition of
3  equitable.  I want to focus a little bit more on fair, and
4  maybe pull it into the context of 1129(b).  And I'm not sure
5  how 1129(b) works with a sole corporation, as we have in
6  this case.  But if we're in cram-down, wouldn't the Survivor
7  class have to be paid its claims in full before anything
8  continued down?  Now of course, usually that's continued
9  down to the equity of the entity.  I'm not sure how that
10  works under canon law and Maryland State law with the
11  corporation sole.  We'd have to think about that.  But I
12  need more information on what you mean by fair, as I'm
13  thinking about whether or not there is a plan that could be
14  confirmed here without Committee support.
15       MR. ROTH:  So with respect to the absolute
16  priority rule, in a non-profit, there are no equity holders.
17  So most courts that have grappled with this say that that
18  portion of the confirmation requirements doesn't apply in a
19  non-profit because there's nothing going down to the equity.
20  That aside, our view here is that charitable immunity, plus
21  or minus, if we win, and we present to this Court a
22  liquidation analysis of what would be distributable to
23  Survivors, it would be the liquidation value of the
24  insurance.  And so if the Debtor is putting insurance plus,
25  then we've satisfied, by Bankruptcy Code standards, the

Page 56

1  fairness standard.  And I don't know if that directly
2  answers your question, but --
3       THE COURT:  I think it does.  Although for some
4  reason this feels different to me than a pure nonprofit.  So
5  again I would want to think about that, although I recognize
6  the mission of the Church.
7       But let me ask you this.  Let's say there's not a
8  ruling in the Debtor's favor, or not one that's 100% on the
9  charitable immunity defense, and you can't get the Committee
10  on board.  What does the liquidation analysis look like then
11  for charitable immunity?  How does the Debtor go about
12  thinking of the liquidation value of its assets, knowing
13  that some may be exposed, some not?
14       MR. ROTH:  So at that point, the Debtor -- excuse
15  me, the Debtor would have to do a more traditional
16  liquidation analysis that would have Secured Creditors in
17  that stack.  Because we do have Secured Creditors.  We have
18  the school bonds, we have the P&C claims that are ahead of
19  other Creditors in this case.  And while very lofty numbers
20  get thrown around as to what are the assets of the Debtor,
21  the Debtor's view is that scope of the limit of what is
22  assets of the Debtor is much more limited than what other
23  people have pointed to.  There are also going to be assets
24  that are subject to Debtor-imposed restrictions, there are
25  going to be assets that are in express trusts.  And so it's

Page 57

1  going to look different, but it's not going to look $500
2  million different.
3       THE COURT:  Okay.  And then I guess one more
4  question on the plan, and the position of the Debtor, that
5  even if the motion for summary judgment is denied and the
6  cross-motion is granted, there is purpose to this case, is
7  it fair to all of the parties involved in this case to keep
8  it here when at that point State law really is equipped to
9  do what I would be doing, which is to simply liquidate the
10  claims and pay them, knowing the charitable immunity defense
11  is asserted?
12       MR. ROTH:  I don't think the State Courts can do
13  what this Court can do, in the time that this Court can do
14  it.  I think if -- And again, I have to make assumptions
15  because I don't have the facts of how the cases would play
16  out.  But assuming that litigation were to go forward, and
17  complaints were filed, and assuming Baltimore City lifts the
18  stay on the cases in State Court in the near future, the
19  average for a Baltimore City, I believe it was Circuit Court
20  case, is almost two years per case for a civil trial.  And
21  assuming that that is including simple cases and complex
22  cases, let's use that as the -- we'll call it a year-and-a-
23  half.  Assume there are no appeals, assume there are no
24  coverage disputes, how many trials are reasonable in a year?
25  And if all 900 proofs of claim in this case are valid, which

15 (Pages 54 - 57)

Page 254

1 pleadings, which I welcome. Some of them contain sensitive
2 information, and so we have been, under the confidentiality
3 protocols, been putting them on the docket, but putting them
4 under seal. So everything I get, whether it's to my
5 Chambers, which I hope people don't do, but I've gotten a
6 couple, but whether it's to Chambers or to the Clerk's
7 Office, we put on the docket. But I am trying to be mindful
8 that this is a sensitive issue case. So if you could
9 communicate with the Survivor community that they are
10 welcome to file papers in this case, but it would be helpful
11 to us and to the Clerk to let us know if they want it filed
12 as is, or if they want it somehow redacted, or if they want
13 --
14     I just would like to respect people's wishes. And
15 because the Clerk and the Court both have an obligation to
16 put things on the public docket, it would be helpful to know
17 beforehand, just so --
18     MR. CALDIE: Understood, Your Honor. And it
19 sounds, too, like there's an element of we want them to make
20 an informed decision about what they're doing, too.
21     THE COURT: Yes.
22     MR. CALDIE: Let them know, hey, this is public,
23 unless you (indiscernible)
24     THE COURT: Right. Because I fear sometimes
25 people think if they send me a letter, it stays in Chambers.

Page 255

1 And under the Judicial Code, I can't do that. I need to put
2 it on the public docket, so there's no ex parte
3 communications. And so I don't want someone to
4 inadvertently send me something, thinking it's for my eyes
5 only, and then wake up and it's on Epiq. Right? So if we
6 could somehow inform the Survivor community that
7 they're welcome, they're welcome to file papers in this
8 case, but just to let us know how to docket that
9 information. And then I will leave to you and the Debtor to
10 share -- I mean, I think you and the Debtor should see it,
11 right, even if it goes on the docket and it's confidential.
12 But we have confidentiality procedures for you to share with
13 the Debtor and the Insurers. But if you could think about a
14 protocol maybe, or something that would guide everyone, that
15 would be helpful.
16     MR. CALDIE: You know, if there is a protocol,
17 Your Honor, we may actually file a motion on it, just to
18 make sure that we're not -- I haven't thought it through.
19 Maybe that's unnecessary.
20     THE COURT: That's fine. But if we're going to do
21 that, let's try to get it set for the next omnibus. And
22 that way, people can know what's expected, and there's no
23 surprises. I don't like surprises.
24     MR. CALDIE: Heard, and understood. Neither do
25 we. Thank you, Your Honor.

Page 256

1     THE COURT: Okay. Okay. Anything else for the
2 good of the order today?
3     MR. CALDIE: No, Your Honor.
4     THE COURT: Okay. Most importantly, stay safe and
5 stay well. And with that, we stand adjourned.
6     THE COURT DEPUTY: All rise. Court now stands
7 adjourned.
8
9     (Whereupon these proceedings were concluded at 5:15 PM.)

Page 257

1           C E R T I F I C A T I O N
2
3     I, Lindsay Peacock, certify that the foregoing
4 transcript is a true and accurate record of the proceedings.
5
6
7
8
9 Lindsay Peacock
10
20 Veritext Legal Solutions
21 330 Old Country Road
22 Suite 300
23 Mineola, NY 11501
24
25 Date: October 10, 2025

65 (Pages 254 - 257)